No. 15-16909

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DOE I, DOE II, Ivy HE, DOE III, DOE IV, DOE V, DOE VI,
ROE VII, Charles LEE, ROE VIII, DOE IX, LIU Guifu, WANG Weiyu,
individually and on behalf of proposed class members,
*Plaintiffs-Appellants*,

v.

CISCO SYSTEMS, INC.,
John CHAMBERS, Fredy CHEUNG, and Does 1-100,
*Defendants-Appellees.*

Appeal from United States District Court
for the Northern District of California
No. 5:11-cv-02449-EJD
The Honorable Edward J. Davila, United States District Judge

## *AMICI CURIAE* BRIEF OF HUMAN RIGHTS ORGANIZATIONS (EARTHRIGHTS INTERNATIONAL AND THE CENTER FOR CONSTITUTIONAL RIGHTS) IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Marco B. Simons
Richard L. Herz
Maryum Jordan
Marissa Vahlsing
Michelle Harrison
**EarthRights International**
1612 K Street, N.W. Suite 401
Washington, DC 20006
202-466-5188 · marco@earthrights.org
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT........................................................iii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENTS PURSUANT TO RULE 29......................................... 1

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* .............. 1

STATEMENT OF THE ISSUE ADDRESSED BY *AMICI CURIAE* ................... 3

SUMMARY OF ARGUMENT ................................................ 4

ARGUMENT ........................................................................ 7

    I.    The Supreme Court's decision in *Kiobel* is narrow, and the district court's standard is wrong. ........................................7

        A.    *Kiobel* is limited to its facts and expressly contemplates that some extraterritorial cases may proceed. ...............7

        B.    The district court's test, which looked exclusively at U.S.-based conduct, is inconsistent with *Kiobel* and this Court's precedent............................................................................9

        C.    In light of *Kiobel*'s unique history and facts — and especially after *Daimler AG v. Bauman* — *Kiobel* holds little relevance for cases against U.S. defendants.....................................10

            i.    Due to *Kiobel*'s unique history, the courts never addressed personal jurisdiction in a case where, after *Daimler*, it was likely lacking. ......................................11

            ii.    After *Daimler*, it appears likely that the *Kiobel* case would not have been found to have sufficient connections to establish general personal jurisdiction.....................................12

i

iii.     Because *Kiobel* was examining contacts with the U.S. in the context of a case against a foreign company where personal jurisdiction was likely lacking, it holds little relevance for cases against U.S. nationals....................................13

II.     The *Kiobel* presumption is largely displaced where the defendant is a U.S. citizen or national, especially where there is also some U.S. conduct........................................................................15

A.     The history and purpose of the ATS shows that it applies to claims against U.S. nationals no matter where they violate international law. ...............................................16

B.     Because international law requires the U.S. to provide a remedy for those harmed by U.S. nationals' violations of international law, failure to provide that remedy would interfere with U.S. foreign relations. .....................................19

C.     The concerns animating *Kiobel* do not apply where, as here, the defendant is a U.S. national..........................................21

CONCLUSION....................................................................................... 26

CERTIFICATE OF COMPLIANCE PURSUANT TO CIRCUIT RULE 32(a)(7) ............................................................................................ 28

CERTIFICATE OF SERVICE ............................................................. 29

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* EarthRights International (ERI) and the Center for Constitutional Rights (CCR) are nonprofit corporations, which have no parent corporation nor stock held by any publicly held corporation.

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. CASES

*Ahmed v. Magan,*
   No. 2:10-cv-00342, 2013 U.S. Dist. LEXIS 117963 (S.D. Ohio Aug.
   20, 2013) ..................................................................................................... 8 n.2

*Al Shimari v. CACI Premier Tech., Inc.,*
   758 F.3d 516 (4th Cir. 2014) ......................................................................*passim*

*The Appollon,*
   22 U.S. 362 (1824) .............................................................................................. 23

*Blackmer v. United States,*
   284 U.S. 421 (1932) ............................................................................................ 23

*Chowdury v. Worldtel Bangladesh Holding Ltd.,*
   746 F.3d 42 (2d Cir. 2014) ............................................................................ 7 n.1

*Daimler AG v. Bauman,*
   134 S. Ct. 746 (2014) ............................................................................... 10, 12-13

*Doe v. Drummond Co.,*
   782 F.3d 576 (11th Cir. 2015) .....................................................................*passim*

*Doe v. Exxon Mobil Corp.,*
   No. 01-1357, 2015 U.S. Dist. LEXIS 91107
   (D.D.C. July 6, 2015) ................................................................................... 8 n.2

*Doe v. Nestle USA,*
   766 F.3d 1013 (9th Cir. 2014) ....................................................................*passim*

*Filártiga v. Pena-Irala,*
   630 F.2d 876 (2d Cir. 1980) ............................................................................... 20

*Flomo v. Firestone Natural Rubber Co., LLC,*
   643 F.3d 1013 (7th Cir. 2011) ........................................................................... 12

*Goodyear Dunlop Tires Operations, S.A., v. Brown,*
   131 S. Ct. 2846 (2011) ....................................................................................... 13

*Helicopteros Nacionales de Colombia, S.A., v. Hall,*
   466 U.S. 408 (1984) .................................................................. 11

*Kiobel v. Royal Dutch Petroleum Co.,*
   456 F. Supp. 2d 457 (S.D.N.Y. 2006) .................................... 11-12

*Kiobel v. Royal Dutch Petroleum Co.,*
   621 F.3d 111 (2d Cir. 2010) .................................................. 12

*Kiobel v. Royal Dutch Petroleum Co.,*
   132 S. Ct. 1738, 182 L. Ed. 2d (2012) ................................... 12

*Kiobel v. Royal Dutch Petroleum,*
   133 S. Ct. 1659 (2013) ....................................................... *passim*

*Mujica v. Airscan Inc.,*
   771 F.3d 580 (9th Cir. 2014) .............................................. *passim*

*Sexual Minorities Uganda v. Lively,*
   960 F. Supp. 2d 304 (D. Mass. 2013) ........................... 8 n.2, 25 n.8

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ................................................. 16, 17, 18 n.5

*Royal Dutch Petroleum Co. v. Wiwa,*
   532 U.S. 941, 121 S. Ct. 1402, 149 L. Ed. 2 d 345 (2001) ........ 11

*Tel-Oren v. Libyan Arab Republic,*
   726 F.2d 774 (D.C. Cir. 1984) ............................................. 17

*United States v. Bowman,*
   260 U.S. 94 (1922) ............................................................. 23

*U.S. Steel Corp. v. Multistate Tax Comm'n,*
   434 U.S. 452 (1978) ........................................................... 17

*Wiwa v. Royal Dutch Petroleum Co.,*
   No. 96-cv-8386, 1998 U.S. Dist. LEXIS 23064 (S.D.N.Y. Sept. 25,
   1998) .................................................................................. 11

*Wiwa v. Royal Dutch Petroleum Co.,*
   226 F.3d 88 (2d Cir. 2000) .................................................. 11

# FOREIGN CASES

Case C-412/98, *Group Josi v. UGIC*, 2000 E.C.R I-05925 .........................................25 n.7

Case C-281/02, *Andrew Owusu v. N.B. Jackson,* 2005 E.C.R I-01383............................. 25

# STATUTES AND RULES

28 U.S.C. §1350.................................................................................................*passim*

# TREATISES

William Blackstone, Commentaries on the Laws of England, bk. 4 (1791)................ 17

Emmerich de Vattel, Law of Nations, bk.2, ch. 6, §§75-77 (1797) ............................... 17

# INTERNATIONAL SOURCES AND FOREIGN LAWS

Bribery Act, 2010, c. 23 (U.K.) ...........................................................................24 n.6

Justice for Victims of Terrorism Act, 2012, c. 1 (Can.)...........................................24 n.6

Prevention and Combating of Corrupt Activities Act, 2004 (Act No. 12 of 2004) (S. Afr.) ........................................................................................24 n.6

Criminal Code Act 1995 (Cth), Division 268 - Genocide, crimes against humanity, war crimes and crimes against the administration of the justice of the International Criminal Court (Austl.) ............................................24 n.6

# OTHER AUTHORITIES

*Breach of Neutrality*, 1 Op. Att'y. Gen. 57 (1795) .........................................16, 18

Br. of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of Neither Party, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), 2012 WL 2165345 ........................................................................................................ 23

Br. of the Federal Republic of Germany as *Amicus Curiae* in Support of Respondents, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (Feb. 2, 2012) ................................................................................ 22-23, 26

Br. of the Governments of The Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as *Amici Curiae* in Support of Neither Party, *Kiobel v. Royal Dutch Petroleum, Co.*, 133 S. Ct. 1659 (2013) (No 10-1491), 2012 WL 2312825 .................................... 22, 23

Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute*, 106 AM. J. INT'L L. 509 (2012) .................................. 17, 18

European Council Regulation (EC) No. 44/2001 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters 2001 O.J. (L 12) ....................................................................... 25

Restatement (Third) of the Foreign Relations Law of the United States (1987) .............................................................................................. 23-24

Ross J. Corbett, Kiobel, Bauman, *and the Presumption Against the Extraterritorial Application of the Alien Tort Statute*, 13 NW. U. J. INT'L HUM. RTS. 50 (2015) ........................................................................ 15

Suppl. Br. for the U.S. as Amicus Curiae in Partial Supp. of Affirmance, Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013) (No. 10-1491), 2012 WL 2161290 ............................................................... 19, 20

William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists"*, 19 HASTINGS INT'L & COMP. L. REV. 221 (1996) ...................... 17

## STATEMENTS PURSUANT TO RULE 29

Plaintiffs-Appellants have consented to the filing of this brief. Defendants-Appellees declined to take any position. Accordingly, *amici* have also filed a Motion for Leave to File an *Amici* Brief. No counsel for a party authored this brief in whole or in part. No person contributed money to *amici* for the purpose of funding the preparation or submission of this brief.

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

**EarthRights International (ERI)** is a non-profit organization based in Washington, D.C., that advocates on behalf of victims of human rights abuses. ERI's mission includes the objective of ensuring accountability and effective remedies for victims of human rights and environmental abuses worldwide.

ERI has represented plaintiffs in lawsuits against corporations under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, alleging liability for aiding and abetting security forces in carrying out torture and extrajudicial killings in foreign countries, including the following: *Doe v. Unocal Corp.*, No. 00-56603 (9th Cir.); *Bowoto v. Chevron Corp.*, No. 09-15641 (9th Cir.); *Wiwa v. Royal Dutch Petroleum Corp.*, No. 96-cv-8386 (S.D.N.Y. Feb. 28, 2002); *Doe v. Chiquita Brands Int'l, Inc.*, No. 08-CIV-80421 (S.D. Fla.). All these cases involve human rights abuses in foreign countries; three involved claims against U.S. corporations. ERI routinely submits *amicus* briefs to appellate courts on the ATS, including two *amicus* briefs to the Supreme Court in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

The **Center for Constitutional Rights** (CCR), is a nonprofit legal and educational organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. CCR has litigated many international human rights cases under the ATS, against natural persons, including *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980), and against both U.S. and foreign corporations, including (*inter alia*) *Wiwa*, 226 F.3d 88, *Unocal*, 395 F.3d 932, and *In re Xe Servcs. Alien Tort Litig.*, 665 F. Supp. 2d 569 (E.D. Va. 2009). CCR is currently representing plaintiffs in two ATS cases against U.S. nationals, *Al Shimari v. CACI Premier Tech., Inc.,* 758 F.3d 516 (4th Cir. 2014) and *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013). CCR has also served as *amicus* in numerous ATS cases, including *Kiobel*, 133 S. Ct. 1659.

Thus, ERI and CCR are currently litigating cases against U.S. nationals involving injuries occurring outside of the U.S., have recently litigated several such cases, and may litigate more such cases in the near future. Moreover, the outcome of this case directly affects both ERI and CCR's missions of ensuring accountability and effective remedies for victims of human rights violations, including survivors of torture. *Amici* therefore have an interest in the proper interpretation of the reasoning and holding of the Supreme Court's decision in *Kiobel*, as well as the general question of the availability of the ATS as a remedy for human rights violations, particularly those committed or abetted by U.S. nationals.

## STATEMENT OF THE ISSUE ADDRESSED BY *AMICI CURIAE*

This case involves allegations that a U.S. corporation knowingly and purposefully created a customized surveillance system central to the Chinese Communist Party's violent repression of a religious minority. The U.S. Defendants designed and implemented that system from U.S. soil. Through Defendants' surveillance system, believers were identified, located, detained and tortured.

The district court dismissed Plaintiffs-Appellants' ATS claims in part because it found them barred by *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). According to the district court, to establish that the claims "touch and concern" the United States as *Kiobel* requires, the Plaintiffs must, but did not show that Defendants "planned, directed or committed [the abuses] in the United States." ER24.

*Amici* agree with Plaintiffs-Appellants that the district court's novel requirement that the abuses at issue be "planned, directed or committed in the United States" is wrong and that Defendants engaged in sufficient relevant conduct in the United States to satisfy any recognized version of the *Kiobel* test. *See* Appellant's Opening Brief (AOB) at 40, 45-46.

*Amici* focus on a related error: the district court afforded no weight to the fact that the Defendants are United States citizens. ER23-24; *see* AOB at 42-44. This Court has indicated "that a defendant's U.S. citizenship or corporate status is one factor that, in conjunction with other factors, can establish a sufficient connection between an ATS claim and the territory of the United States to satisfy *Kiobel*." *Mujica v. Airscan Inc.*,

3

771 F.3d 580, 594 (9th Cir. 2014). This Court has not explained how *much* weight U.S. citizenship is afforded under *Kiobel*. *Amici* demonstrate that U.S. citizenship is critically important in light of the history and purposes of the ATS; where a Defendant is a U.S. citizen, little else is required to show that the claims touch and concern the United States.

## SUMMARY OF ARGUMENT

Claims under the ATS, asserted against U.S. national defendants engaged in relevant U.S. conduct, unquestionably have a sufficient nexus to the United States to be cognizable in U.S. courts. *Kiobel* held that the principles underlying the presumption against the extraterritorial application of federal statutes similarly limit the circumstances in which courts should enforce the ATS. *Kiobel*, 133 S. Ct. at 1669. Claims arising abroad that "touch and concern the territory of the United States . . . with sufficient force" are actionable. *Id.*

The district court misapplied *Kiobel* and its Ninth Circuit progeny. It created a new, unduly circumscribed requirement that the abuses at issue be "planned, directed or committed in the United States." ER24. That standard is mistaken, not least because the district court failed to give any weight to the fact that defendants are U.S. nationals, contrary to this Court's teaching in *Mujica*.

*Kiobel* is quite narrow. The Supreme Court held only that where the acts occurred entirely outside the United States, a *foreign* multinational defendant's "mere corporate presence" in the United States was insufficient. The Court did not address

4

the situation here, where there is a U.S. defendant and U.S. conduct; *Kiobel* was explicitly limited to its facts. Indeed, the *Kiobel* defendants' connections to the United States were so tenuous that serious questions can be raised about whether there was personal jurisdiction. In such circumstances, it is unsurprising that the claims in *Kiobel* were dismissed, and such dismissal does not remotely call into question the viability of claims against U.S. defendants who acted at least in part in the United States.

The fact that, unlike in *Kiobel*, the defendant here is a U.S. national is critically important in displacing the *Kiobel* presumption for at least three reasons.

*First*, the original purpose of the ATS confirms that the ATS permits claims against U.S. nationals who participate in international law violations, at home or abroad, and would be subverted if it did not. The focus of the ATS was to uphold the laws of nations and to ensure that the United States met its international obligation to provide a forum for violations. That obligation took on particular force and consequence when the violation involved a U.S. national. Thus, the ATS was not enacted with purely domestic conduct in mind. And while state courts had and still have jurisdiction to hear transitory torts, the purpose was to ensure a federal, and thus a uniform, adequate and fair forum.

*Second*, while, as in *Kiobel*, the acts of a foreigner outside of the United States generally have little or no bearing on or in the United States, the acts of an American, whether at home or abroad, are of overriding concern to our nation. The concern that motivated the First Congress to pass the ATS remains vitally important today. Now,

as then, the U.S. bears responsibility for its nationals' acts abroad, and if the U.S. does not provide redress, it must answer to the international community for its failure to do so. Forcing victims harmed by U.S. nationals to go to state courts — or worse, foreign courts that may not be adequate or even available — may leave the United States in violation of its international obligations to provide a remedy. That is why the United States Government urged the Supreme Court in *Kiobel* not to bar such suits. And *Kiobel*, which was carefully limited to the facts before it, is perfectly consistent with the United States' position.

*Third*, while *Kiobel* was based on the foreign policy and comity concerns that might arise from adjudicating so-called "foreign-cubed" cases, there are no such concerns when a U.S. court hears a claim against a U.S. national, especially where there is also relevant conduct in the United States. Every nation has the well-established and undisputable right to regulate and adjudicate its own nationals' actions. Indeed, where human rights violations are at issue, every nation has the obligation to do so. Other States will not complain, but rather will welcome, when the United States acts to fulfill its international obligations by holding its own nationals accountable for internationally-recognized human rights violations. In fact, the very foreign nations that argued in *Kiobel* that the claims in that case exceeded the proper jurisdictional reach of U.S. courts under international law also expressly confirmed that there was no such problem where the defendant is a U.S. national.

Because neither the express holding nor the reasoning of *Kiobel* applies in these

circumstances, *Kiobel* does not preclude Plaintiffs' claims. ATS claims touch and

concern the United States with sufficient force where the defendant alleged to have

committed relevant conduct in the United States — indeed, in this case, to have aided

and abetted violations of universally recognized human rights norms from the United

States — is a U.S. citizen.

## ARGUMENT

**I.     The Supreme Court's decision in *Kiobel* is narrow, and the district court's standard is wrong.**

**A.     *Kiobel* is limited to its facts and expressly contemplates that some extraterritorial cases may proceed.**

The Supreme Court's holding in *Kiobel* was narrow. *Kiobel* concluded that the

"principles underlying" the presumption-against-extraterritoriality canon of statutory

construction constrain courts considering ATS federal-common-law claims, 133 S. Ct.

at 1664, but it expressly contemplated that some extraterritorial claims may proceed.

*Id.* at 1669.[1] In particular, ATS claims that "touch and concern" the territory of the

United States with "sufficient force" may "displace" the presumption even when the

---

[1] *See also Doe v. Nestle USA*, 766 F.3d 1013, 1027 (9th Cir. 2014); *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 56 (2d Cir. 2014) (Pooler, J., concurring) ("[A]s to the question of 'whether' the ATS allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States, the answer was an unequivocal 'Yes.'"); *Doe v. Drummond Co.*, 782 F.3d 576, 585 (11th Cir. 2015); *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528 (4th Cir. 2014).

claims involve extraterritorial conduct. *Id.*[2]

The Court did not purport to determine the circumstances in which ATS claims for violations occurring abroad are actionable. *Kiobel* was self-consciously limited to its facts: namely, *Kiobel* was a "foreign-cubed" case; the plaintiffs and defendants were foreigners and all of the conduct and events at issue occurred outside the United States. 133 S. Ct. at 1669. The Court held only that the "mere corporate presence" of foreign corporate defendants — who were headquartered outside the United States and had operations in many places — was the *only* connection to the United States and that "[o]n these facts," the presumption had not been displaced. *Id.* at 1669.

This Court has explicitly recognized *Kiobel*'s narrowness. In *Doe v. Nestle USA*, the Court noted that *Kiobel* held *only* that the touch and concern test "is not met when an ATS plaintiff asserts a cause of action *against a foreign corporation based solely on foreign conduct*" and "leaves important questions about extraterritorial ATS claims unresolved." *Nestle*, 766 F.3d at 1027-28 (emphasis added). Indeed, as Plaintiffs and

---

[2] *See Al Shimari*, 758 F.3d at 530 ("plaintiffs' ATS claims 'touch and concern' the territory of the United States with sufficient force to displace the presumption against extraterritorial application" regarding torture and war crimes in Abu Ghraib in Iraq); *Doe v. Exxon Mobil Corp.*, No. 01-1357, 2015 U.S. Dist. LEXIS 91107, at *46 (D.D.C. July 6, 2015) (approving claims for abuses committed in Indonesia); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 at 324 (D. Mass. 2013) (approving claims for abuses committed in Uganda) (quotation marks omitted); *Abukar Hassan Ahmed v. Abdi Aden Magan*, No. 2:10-cv-00342, 2013 U.S. Dist. LEXIS 117963, at *4 (S.D. Ohio Aug. 20, 2013) (approving claims for abuses committed in abuses in Somalia).

the Eleventh Circuit have noted, AOB at 38, *Doe v. Drummond Co.*, 782 F.3d 576, 585 (11th Cir. 2015), all three *Kiobel* concurrences — seven Justices — averred that the Court intentionally left key questions unanswered as to what claims would displace the presumption. *See Kiobel*, 133 S. Ct. at 1669 (Kennedy, J., concurring); *id.* (Alito, J, concurring); *id.* at 1673 (Breyer, J., concurring).

### B. The district court's test, which looked exclusively at U.S.-based conduct, is inconsistent with *Kiobel* and this Court's precedent.

The district court failed to weigh the Defendants' U.S. citizenship. That was an error of law. In *Mujica*, this Court recognized that "a defendant's U.S. citizenship or corporate status is one factor that, in conjunction with other factors, can establish a sufficient connection between an ATS claim and the territory of the United States to satisfy *Kiobel*." 771 F.3d at 594.[3] Because the district court gave *no* weight to Defendants' U.S. citizenship, the decision below conflicts with *Mujica*.

Rather than following *Mujica*, the district court purported to apply Justice Alito's concurrence. The Court did so even though that concurrence garnered only two votes and Justice Alito himself recognized that he had suggested a "broader standard" that would exclude more claims than that adopted by the majority, 133 S. Ct. at 1669-70 (Alito, J., concurring), and even though this Court has specifically held

---

[3] *Accord Al Shimari*, 758 F.3d at 530-31 (defendant's U.S. corporate citizenship and other connections to U.S. territory satisfied the "touch and concern" test); *Drummond Co.*, 782 F.3d at 594-95 (holding that U.S. citizenship or corporate status is relevant under *Kiobel*).

that *Kiobel* "did not incorporate" the "focus" test that Justice Alito favored. *Nestle*, 766 F.3d at 1028; AOB at 39. That was error.

C.  **In light of *Kiobel*'s unique history and facts — and especially after *Daimler AG v. Bauman* — *Kiobel* holds little relevance for cases against U.S. defendants.**

*Kiobel* did not consider a case such as this one where the defendant is a U.S. national. The narrowness of the *Kiobel* ruling — and its limited relevance for cases against U.S. nationals — can only be properly understood in the context of *Kiobel*'s unusual history, in which personal jurisdiction was never challenged, and, in all likelihood, would have been found to be lacking given the Court's recent decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). There, the Supreme Court rejected personal jurisdiction over a foreign corporation based on "sizable" sales in the forum, where the corporation was neither incorporated in the forum nor had its principal place of business there. *Id.* at 761. It therefore seems inescapable that where the only connection to the United States is the "mere corporate presence" of a foreign corporation, as was the situation in *Kiobel*, 133 S. Ct. at 1669, general personal jurisdiction would be absent. It was due only to quirks in the procedural history that the issue was never addressed in *Kiobel*, and the Supreme Court faced an ATS case with fewer connections to the United States than is generally understood to be sufficient for general personal jurisdiction.

10

i.    **Due to *Kiobel*'s unique history, the courts never addressed personal jurisdiction in a case where, after *Daimler*, it was likely lacking.**

A brief examination of *Kiobel*'s procedural history is necessary to place the Supreme Court's decision in context.

That history begins not with *Kiobel*, but with a related case, *Wiwa v. Royal Dutch Petroleum Co.*, No. 96-cv-8386 (S.D.N.Y.). *Wiwa* was filed in 1996, six years before *Kiobel*. Royal Dutch/Shell sought to dismiss *Wiwa*, arguing, among other things, lack of personal jurisdiction. *See Wiwa v. Royal Dutch Petroleum Co.*, No. 96- cv-8386, 1998 U.S. Dist. LEXIS 23064 (S.D.N.Y. Sept. 25, 1998).

Relying on the rule that general personal jurisdiction is present whenever the defendant maintains "continuous and systematic business contacts," *Helicopteros Nacionales de Colombia, S.A., v. Hall*, 466 U.S. 408, 416 (1984), the Second Circuit found that Royal Dutch/Shell's maintenance of an Investor Relations Office in New York was sufficient to confer general personal jurisdiction. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98-99 (2d Cir. 2000). The Supreme Court denied certiorari. *Royal Dutch Petroleum Co. v. Wiwa*, 532 U.S. 941, 121 S. Ct. 1402, 149 L. Ed. 2d 345 (2001).

The *Kiobel* case was subsequently filed as a companion to *Wiwa*, and related to the same court. Presumably because the personal jurisdiction issue had already been litigated in *Wiwa*, Royal Dutch/Shell apparently did not contest personal jurisdiction in *Kiobel*. The case proceeded in tandem with *Wiwa* for four years, until the district court dismissed key claims *Kiobel* — most notably, ATS claims for extrajudicial killing.

11

*Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 465 (S.D.N.Y. 2006). The *Kiobel* plaintiffs challenged this ruling through an interlocutory appeal. The Second Circuit declined to address the issues decided by the district court, and issued its widely-criticized ruling that corporations cannot be held liable for violations of international law. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010); *cf. Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1017 (7th Cir. 2011) (criticizing the "outlier" *Kiobel I* decision); *Nestle*, 766 F.3d at 1021-22 (rejecting the *Kiobel I* analysis and confirming that corporations can be sued).

The Supreme Court granted certiorari on the corporate liability issue, and then, after oral argument, ordered supplemental briefing and reargument on the question of extraterritoriality. Order Restoring Case for Reargument, *Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 1738, 182 L. Ed. 2d 270 (2012). In answering that question, the Court considered a case in which the issue of personal jurisdiction over a foreign multinational had not been raised, to determine whether that case had sufficient connections to the United States to proceed under the ATS.

       **ii.**     **After *Daimler*, it appears likely that the *Kiobel* case would not have been found to have sufficient connections to establish general personal jurisdiction.**

In *Wiwa*, the Second Circuit assessed Royal Dutch/Shell's contacts for the purposes of personal jurisdiction on the basis of the "continuous and systematic" business test. More recently, however, in *Daimler*, the Supreme Court clarified that for *general* jurisdiction, the question was whether the "corporation's 'affiliations with the

State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler*, 134 S. Ct. at 761 (quoting *Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S., at ___, 131 S. Ct. 2846, 2851, 180 L. Ed. 796 (2011)).

In *Kiobel*, the Supreme Court characterized Royal Dutch/Shell's connections to the United States as "mere corporate presence." 133 S. Ct. at 1669. While that presence may have been sufficiently continuous and systematic to render the corporation subject to jurisdiction under the prior test, it seems unlikely that mere corporate presence would meet the *Daimler/Goodyear* "essentially at home" standard. Indeed, Justice Breyer's concurrence in *Kiobel* openly questioned whether personal jurisdiction would have been present:

> [Royal Dutch/Shell's] only presence in the United States consists of an office in New York City (actually owned by a separate but affiliated company) that helps to explain their business to potential investors. . . .
>
> Under these circumstances, even if the New York office were a sufficient basis for asserting general jurisdiction, *but see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011), it would be farfetched to believe, based solely upon the defendants' minimal and indirect American presence, that this legal action helps to vindicate a distinct American interest . . . .

133 S. Ct. at 1677-78 (Breyer, J., concurring). Justice Breyer's use of the "*but see*" signal clearly indicates that he thought such jurisdiction was lacking.

### iii. Because *Kiobel* was examining contacts with the U.S. in the context of a case against a foreign company where personal jurisdiction was likely lacking, it holds little relevance for cases against U.S. nationals.

As noted above, *Kiobel* is a narrow decision. But its narrowness can only

properly be understood in the context of this unusual history, in which personal jurisdiction was never raised, due to a prior decision in a related case under a standard that was later superseded. It is therefore not surprising that the Supreme Court found the case lacking in sufficient connections to the United States; it most likely lacked even sufficient connections to establish personal jurisdiction.

This contrasts markedly with a case in which not only is a corporation more than merely present in the United States — it is a U.S. national, with its headquarters and principle place of business in the United States. The Supreme Court in *Kiobel* had no occasion to examine such a situation. Its entire discussion of foreign policy implications and comity concerns occurred in the context of a case against a non-U.S. corporation that most likely would not even be considered "at home" in the United States. As one commentator has pointed out, these foreign policy concerns are generally absent when the defendant is a U.S. corporation:

> It is unproblematic to see *Kiobel* as satisfied whenever personal jurisdiction is obtained by reason of the defendant's domicile. In those cases, there is certainly some nexus with the territory of the United States. They might be foreign-conduct cases, but they are not foreign-cubed. The plaintiff may be an alien, the conduct may have occurred for the most part overseas, but the defendant will either be a U.S. national or a resident alien. Were state courts to provide foreign plaintiffs with inadequate satisfaction, either because of the law applied or the fairness of their proceedings, the national honor might certainly be implicated in ways that drove the ATS in the first place. A similar logic applies to corporate defendants that have their principal place of business in the United States. Such suits could in many cases be heard under the federal courts' diversity jurisdiction, but the ATS both provides a uniform cause of action subject to federal control and fills in the gaps of diversity jurisdiction. . . .

> This is not to argue that [*Daimler AG v.*] *Bauman* can completely eclipse *Kiobel*, but only that *Kiobel* should be read narrowly, its policy objectives having been satisfied by *Bauman*.

Ross J. Corbett, Kiobel, Bauman*, and the Presumption Against the Extraterritorial Application of the Alien Tort Statute*, 13 Nw. U. J. Int'l Hum. Rts. 50, 80-81 (2015). In other words, the concerns expressed by the *Kiobel* majority are addressed if the defendant is a U.S. corporation or otherwise "at home" in the U.S. under the *Daimler/Goodyear* standard.

## II. The *Kiobel* presumption is largely displaced where the defendant is a U.S. citizen or national, especially where there is also some U.S. conduct.

Under *Mujica*, Defendants' U.S. citizenship must be afforded weight, 771 F.3d at 594; the district court erred in discounting it entirely. Section I.B. *supra*. This Court has not declared precisely how much weight to give this factor. *Mujica* held that the defendant's U.S. citizenship *alone* did not satisfy the "touch and concern" test. 771 F.3d at 594-95. The Court noted that in cases against U.S. defendants "at least some of the conduct relevant to [Plaintiffs'] claims" must have "occurred in the United States." *Id.* at 595. Because the exercise of jurisdiction over a U.S. defendant involved in serious human rights abuses is so important to the United States and so central to the original purposes of the ATS, this Court should confirm that a showing that "some of the [relevant] conduct" occurred here is sufficient in cases against a U.S. defendant.

Violations involving U.S. defendants give rise to U.S. responsibility under

international law regardless of whether there is U.S. conduct, and failure to remedy them would be inconsistent with the United States' duties under international law. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 717 (2004). A central purpose for which Congress enacted the ATS was to uphold the law of nations. *Kiobel* did not change this. Today, the ATS remains a vehicle through which the United States upholds its obligations under international law, as the U.S. Government itself recognized in *Kiobel*. Moreover, the foreign policy concerns underlying *Kiobel* do not apply where the ATS defendant is a U.S. national.[4]

## A.    The history and purpose of the ATS shows that it applies to claims against U.S. nationals no matter where they violate international law.

The First Congress enacted the ATS because it was concerned about "the inadequate vindication of the law of nations." *Sosa*, 542 U.S. at 717. Failure to provide a remedy when a United States citizen violated international law was then, as today, a breach by the United States of its own international duties.

---

[4] *Amici* respectfully submit that, for the reasons detailed herein, a defendant's U.S. citizenship is so central to the *Kiobel* analysis that, contrary to *Mujica*, it alone ought to be sufficient. *See Mujica*, 771 F.3d at 619 (Zilly, J., dissenting) ("[T]he ATS confers jurisdiction when an ATS claim is brought against a domestic corporation or other U.S. national, without any allegation of underlying conduct within the United States."). *Amici*'s argument, however, does not in any way turn on this observation. Given the critical U.S. conduct at issue here — including aiding and abetting abuses from U.S. soil — Plaintiffs here meet any justifiable U.S. conduct requirement. AOB at 45-46. The district court's holding that the Defendant must have "planned, directed or committed [the abuses] in the United States," ER24, is mistaken, AOB at 36-40, and is particularly unwarranted when applied to a U.S. defendant.

As Blackstone explained, if a sovereign failed to provide redress for its citizen's acts, it would itself be considered an abettor. William Blackstone, *Commentaries on the Laws of England*, bk. 4, 67-68 (1791). The Supreme Court has noted that "[t]he international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel," *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978), and Vattel confirms that nations "ought not to suffer their citizens to do an injury to the subjects of another state." Vattel, *The Law of Nations* 162 (1797). Even modern commentators critical of the ATS agree that when the ATS was enacted, the United States had a duty to ensure that torts in violation of international law committed by its citizens were redressed. Curtis Bradley, *Agora: Kiobel, Attorney General Bradford's Opinion and the Alien Tort Statute*, 106 AM. J. INT'L L. 509, 526 & n.112 (2012) (collecting authorities).

State courts already had (and still have) jurisdiction over such suits. *Sosa*, 542 U.S. at 722; *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 790 (D.C. Cir. 1984) (Edwards, J., concurring). But the First Congress preferred claims involving international law to be heard in federal rather than state court, because the federal government was primarily responsible for fulfilling international obligations. Concerned about the potential for inconsistent or biased outcomes in state courts, Congress provided a federal forum. *See, e.g.*, William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 HASTINGS INT'L & COMP. L. REV. 221, 235-36 (1996).

Consistent with its purpose, the ATS was understood from its inception to apply where American nationals violated international law abroad. Attorney General Bradford's "Breach of Neutrality" opinion, 1 Op. Atty. Gen. 57 (1795), confirms as much. The Bradford Opinion addressed an attack on a British colony abetted by U.S. nationals, and a formal protest by the British government. The underlying events occurred in large part in Sierra Leone, then under British rule, and far outside the territory of the United States. The Attorney General concluded that "there can be no doubt" that the victims would have an ATS claim against the Americans who participated in the attack. *Id.* at 59. *Kiobel* distinguished the Bradford Opinion from the facts at issue in that foreign-cubed case by pointing out that the attack on Sierra Leone involved a possible treaty violation and U.S. citizens. 133 S. Ct. at 1668.[5] The Bradford Opinion "provides support for the extraterritorial application of the ATS to the conduct of U.S. citizens." Bradley, *supra*, 106 Am. J. Int'l L. at 510. And while *Mujica* held that the Bradford Opinion did not establish that U.S. citizenship alone is sufficient, 771 F.3d at 596, its recognition that the ATS applied absent any U.S. conduct certainly further supports the conclusion that where the defendant is a U.S. citizen, any U.S. conduct requirement should not be onerous.

Thus, barring ATS suits against U.S. nationals who have participated in human

---

[5] *See also Sosa*, 542 U.S. at 721 (noting that "[a]lthough it is conceivable that Bradford . . . assumed that there had been a violation of a treaty, 1 Op. Atty. Gen., at 58, that is certainly not obvious").

rights abuses abroad, where at least some relevant conduct occurred here, would conflict with the statute's original purposes. The United States' international obligations continue to require that it provide a means of redress where U.S. nationals violate universally recognized human rights principles, as discussed below. In light of the First Congress' aims, a claimant subject to a violation of internationally-recognized norms abroad by a U.S. national acting in part on U.S. soil must have an ATS claim in federal court.

**B.     Because international law requires the U.S. to provide a remedy for those harmed by U.S. nationals' violations of international law, failure to provide that remedy would interfere with U.S. foreign relations.**

When it comes to the conduct of a U.S. national in violation of international law, the United States is not merely permitted to ensure compliance with international law obligations related to a right to a remedy, it is required to do so. *See, e.g.,* United Nations Convention Against Torture, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1464 U.N.T.S 85, Art. 14. Although concerns about international law and foreign policy counseled against the claim in *Kiobel*, these same concerns favor adjudication of a case like this one.

That is the distinction the United States drew in its supplemental brief in *Kiobel*. The U.S. Government argued that *Kiobel* should be dismissed for lack of any U.S. connection, but it urged the Supreme Court not to adopt a categorical rule against the extraterritorial application of the ATS. Suppl. Br. for the U.S. as *Amicus Curiae* in

Partial Supp. of Affirmance ("U.S. *Kiobel* Br."), at 4-5, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), 2012 WL 2161290. The United States stressed that it was in our national interests to maintain ATS jurisdiction over extraterritorial human rights violations where individual perpetrators would otherwise have "safe haven" on U.S. territory. U.S. *Kiobel* Br. at 19-20.

As an example of an appropriate case, the Government cited *Filártiga v. Peña-Irala*, which "involved a suit by Paraguayan plaintiffs against a Paraguayan defendant based on alleged torture committed in Paraguay." U.S. *Kiobel* Br. at 4. The Government emphasized that the defendant "was found residing in the U.S."; this "could give rise to the prospect that [the U.S.] would be perceived as harboring the perpetrator" and thus U.S. responsibility under international law was engaged. *Id.* at 4. The United States distinguished *Filártiga* from *Kiobel*, because in the latter, with British and Dutch defendants who were present elsewhere, "the United States cannot be thought responsible in the eyes of the international community for affording a remedy for the company's actions, *while the nations directly concerned could.*" *Id.* at 5 (emphasis added). Here, the United States is the nation directly concerned.

Thus, the United States concluded that "allowing suits based on conduct occurring in a foreign country in the circumstances presented in *Filártiga* is consistent with the foreign relations interests of the United States, including the promotion of respect for human rights." *Id.* at 4-5. The United States' foreign relations interests are even stronger here than in *Filártiga*, since the defendants are not merely U.S. *residents*,

but are actually U.S. nationals.

In *Kiobel*, no one argued that the United States had a responsibility under international law to hold foreign defendants accountable based on the actions of their Nigerian subsidiary. The defendant was likely not even "at home" in the jurisdiction under recent U.S. personal jurisdiction principles. And the *Kiobel* plaintiffs conceded that they could have brought their claims in the defendants' home jurisdictions. Dismissal of claims against U.S. nationals, such as this one, however, raises the specter of impunity for U.S. nationals that engage in egregious violations of U.S. and international law — an outcome that *Kiobel* nowhere countenances and that is itself inconsistent with the very international norms the ATS was passed to uphold.

**C.    The concerns animating *Kiobel* do not apply where, as here, the defendant is a U.S. national.**

*Kiobel* was a "foreign-cubed" case, where the Supreme Court was concerned about the legal and foreign policy implications of haling a foreign citizen into a U.S. court without any relationship between the case and the United States. None of those concerns apply where, as here, the defendant is a U.S. national.

First, *Kiobel* noted that courts should be "wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs." 133 S. Ct. at 1664 (internal citation omitted). But the Legislature enacted the ATS to fulfill U.S. responsibilities under international law, and the Executive has already determined that permitting cases against those who reside in the U.S. *furthers* U.S. foreign policy.

Second, the Court expressed concern about the possibility "that other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world." *Kiobel,* 133 S. Ct. at 1669. That the Court raised this issue confirms that it was specifically worried about the "serious foreign policy consequences," *id.*, of hearing cases against *foreign* nationals — *not* U.S. nationals. A suit against a U.S. national in *U.S. courts* in no way suggests that U.S. nationals could be sued anywhere in the world.

Third, *Kiobel* reaffirmed that the primary basis for the presumption against extraterritoriality is to avoid "unintended clashes between our laws and those of other nations which could result in international discord." *Id.* at 1664 (internal citation omitted). Indeed, in *Kiobel,* the home governments of the defendant corporations claimed that the assertion of ATS jurisdiction in a foreign-cubed case would violate international law limits on the exercise of jurisdiction. Br. of the Governments of The Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as *Amici Curiae* in Support of Neither Party ("Netherlands/UK *Kiobel* Br."), at 6, 24-26, *Kiobel v. Royal Dutch Petroleum, Co.*, 133 S. Ct. 1659 (2013) (No 10-1491), 2012 WL 2312825. The German government argued that the case would interfere with comity by intruding upon a foreign nation's "inherent interest in applying its laws and using its courts" in cases where its own citizens are accused of violating international customary law. Br. of the Federal Republic of Germany as *Amicus Curiae* in Support of Respondents ("Germany *Kiobel* Br."), at 10, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.

Ct. 1659 (2013) (No. 10-1491), 2012 WL 379578.

But those same governments recognized that no such concerns arise when the defendant is a U.S. citizen. "[T]he extraterritorial application of the ATS to acts committed by American individuals, corporations, and other U.S. entities in foreign sovereign territory, would be consistent with international law." Netherlands/UK *Kiobel* Br. at 15; *accord* Br. of the European Commission on Behalf of the European Union as *Amicus Curiae* in Support of Neither Party, at 4, 11-12, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) (No. 10-1491), 2012 WL 2165345.

There is no doubt about the authority of U.S. courts, or other branches of the U.S. government, to assert jurisdiction over the extraterritorial acts of U.S. citizens. *See The Appollon*, 22 U.S. 362, 370 (1824) (national laws can extend extraterritorially to govern the conduct of a nation's own citizens). Indeed, even criminal prosecutions of U.S. nationals for conduct abroad are uncontroversial. *See, e.g., Blackmer v. United States*, 284 U.S. 421, 436 (1932) ("By virtue of the obligations of citizenship, the United States retained its authority over [the defendant], and he was bound by its laws made applicable to him in a foreign country."); *United States v. Bowman*, 260 U.S. 94, 98 (1922) ("Some . . . offenses . . . are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to . . . leave open a large immunity for frauds as easily committed on the high seas and in foreign countries as at home . . . .").

Under international law, the "nationality principle" — a "principal bas[i]s of the jurisdiction to prescribe" — allows countries to regulate "the activities, interests,

status or relations of its nationals *outside as well as within its territory*." Restatement (Third) of the Foreign Relations Law of the United States, Part 4, Introductory Note and § 402(2) (1987) (emphasis added). Likewise, a state may "exercise jurisdiction through its courts to adjudicate with respect to a person or thing if the relationship of the state to the person or thing is such as to make the exercise of jurisdiction reasonable." *Id.* § 421. Thus, other nations accept that it is within the prescriptive powers of the U.S. to regulate the actions of its citizens, and it is within the power of its courts to adjudicate when violations take place. Where the perpetrators are U.S. nationals, there is a sufficient nexus between the United States and the violations for the U.S. to properly assert jurisdiction under the ATS — and more so where there is also U.S. conduct.

Indeed, there are statutory and common law examples of extraterritorial jurisdiction from numerous states — such as Canada, Australia, the United Kingdom, and South Africa — comparable to or even broader than the ATS.[6] In fact, the European Union's Brussels I Regulation, adopted in 2001, mandates that an EU member state court *must* adjudicate claims against corporations domiciled in that state,

---

[6] Bribery Act, 2010, c. 23, §§ (3)(6)(a), 12(5) (U.K.) (allowing application of act even if act of bribery occurred outside U.K territory); Justice for Victims of Terrorism Act, 2012, c. 1, s. 2 (Can.); Prevention and Combating of Corrupt Activities Act, 2004 (Act No. 12 of 2004)(South Africa); Criminal Code Act 1995 (Cth), Division 268 - Genocide, crimes against humanity, war crimes and crimes against the administration of the justice of the International Criminal Court (Austl.).

even when the conduct occurred outside the EU and involves non-EU victims. European Council Regulation (EC) No. 44/2001 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters 2001 O.J. (L 12).[7] This EU rule goes far beyond the ATS, covering nearly all claims (not only serious violations of international law). *See id.* The EU does not even permit cases against EU corporations to be dismissed on the basis of *forum non conveniens* — jurisdiction is mandatory based on domicile unless exclusive jurisdiction lies elsewhere. Case C-281/02 *Andrew Owusu v. N.B. Jackson* [ECJ 2005] 1445, 1462.

In short, adjudication of ATS cases against U.S. nationals, even where the international law violations occurred outside U.S territory, is on such firm jurisdictional ground that extraterritorial application of the ATS in such cases does not conflict with "*Sosa*'s basic caution to avoid international friction." *Kiobel*, 133 S. Ct. at 1673-74 (Breyer, J., concurring) (internal punctuation omitted).[8]

---

[7] Case C-412/98, *Group Josi v. UGIC*, 2000 E.C.R I-05925. Although *Group Josi* interprets the Brussels Convention rather than the Regulation, the Brussels Regulation itself acknowledges its role in codifying the Convention. Recital 19 to the Brussels Regulation.

[8] *See Al Shimari*, 758 F.3d at 530 ("this case does not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens"); *Drummond Co.*, 782 F.3d at 595 (noting that "[i]f the defendants are U.S. citizens, some of the foreign policy concerns that the presumption against extraterritorial application is intended to reduce may be assuaged or inapplicable, since we would not be haling foreign nationals into U.S. courts to defend themselves"); *Lively*, 960 F. Supp. 2d at 322-24 (holding *Kiobel* did not bar ATS claims against an

Just as Germany argued that it had an "inherent interest" in adjudicating international law claims against its own nationals, Germany *Kiobel* Br. at 10, so too does the United States. As the U.S. Government made clear, in cases involving abuses committed by Americans, *failure* to allow ATS claims would create the perception that the U.S. is a safe haven and open the United States to international censure, precisely what *Kiobel* sought to avoid.

## CONCLUSION

United States nationals who commit relevant conduct supporting international law violations from the United States are not immune from ATS suits in their home forum. A contrary conclusion would create the risk that the United States would contravene its own international obligations to provide a means of redress. Such a result would conflict with the ATS's purpose, and would undermine current U.S. foreign policy. Accordingly, the Court should conclude that the ATS provides a federal forum for such claims against a U.S. national.

---

American citizen, in part because "[t]his is not a case where a foreign national is being hailed [sic] into an unfamiliar court to defend himself.").

For the above reasons, the decision below should be reversed.

Dated: January 11, 2016   Respectfully Submitted,

/s/ Marco B. Simons

Marco B. Simons

Richard L. Herz[*]

Maryum Jordan

Marissa Vahlsing

Michelle Harrison

EARTHRIGHTS INTERNATIONAL

1612 K Street, N.W. Suite 401

Washington, DC 20006

Counsel for *Amici Curiae*

---

[*] Based in CT; admitted to practice only in NY.

## CERTIFICATE OF COMPLIANCE PURSUANT TO CIRCUIT RULE 32(A)(7)(C)

Pursuant to Ninth Circuit Rule 32(a) (7) (c), I certify that Brief of *Amici Curiae* Human Rights Organizations in Support of Plaintiffs-Appellants and Reversal complies with the typeface and type style requirements of Fed. R. App. P. 32(a) because it is proportionately spaced and has a typeface of 14 points in Garamond font. The brief complies with the type-volume limitation of Fed. R. App. P. 32(d) because it contains 6,978 words, as calculated by Microsoft Word, the word-processing program used to prepare the brief.

Dated: January 11, 2016        Respectfully submitted,

/s/ Marco Simons
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January, 2016, a true and correct copy of the foregoing document was served on all interested parties via the Court's CM/ECF system.

Dated: January 11, 2016

Respectfully submitted,

/s/ Marco Simons
Counsel for *Amici Curiae*