# No. 15-16909

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

▶▶◀◀

DOE I, DOE II, IVY HE, DOE III, DOE IV, DOE V, DOE VI, CHARLES LEE, ROE VII, ROE VIII, LIU GUIFU, DOE IX, WEIYU WANG, and those individuals similarly situated,

*Plaintiffs-Appellants,*

v.

CISCO SYSTEMS, INC., JOHN CHAMBERS, and FREDY CHEUNG,

*Defendants-Appellees.*

_____

*On Appeal from the United States District Court*
*for the Northern District of California*
*Case No. 5:11-cv-02449 (Hon. Edward J. Davila)*

## DEFENDANTS-APPELLEES' PETITION FOR REHEARING AND REHEARING *EN BANC*

Date of Decision: July 7, 2023
Judges: Tashima, Berzon and Christen

Isaac Nesser
Todd Anten
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Kathleen M. Sullivan
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Christopher G. Michel
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW
Washington, DC 20005
(202) 538-8000

*Counsel for Defendants-Appellees*

August 11, 2023

# TABLE OF CONTENTS

INTRODUCTION AND RULE 35(b) STATEMENT.................................................1

BACKGROUND ............................................................................................3

ARGUMENT ................................................................................................6

I.    PANEL REHEARING OR REHEARING *EN BANC* IS WARRANTED TO INVITE THE VIEWS OF THE UNITED STATES..................................6

II.   THE PANEL MAJORITY'S ERRONEOUS AND SIGNIFICANT ATS RULINGS WARRANT REHEARING *EN BANC*..........................................8

    A.   The Panel Majority's *Sosa* Step Two Analysis Conflicts With *Sosa* And *Jesner* ...................................................................................8

    B.   The Panel Majority's Aiding-and-Abetting Ruling Conflicts With *Central Bank*..................................................................................11

    C.   The Panel Majority's *Mens Rea* Standard Conflicts With Decisions Of Other Circuits .........................................................................13

    D.   The Panel Majority's Extraterritoriality Ruling Conflicts With *Nestlé* And *Kiobel*...........................................................................14

III.  THE PANEL'S ERRONEOUS AND SIGNIFICANT TVPA RULING WARRANTS REHEARING *EN BANC*.......................................................16

CONCLUSION...........................................................................................18

CERTIFICATE OF COMPLIANCE ..................................................................20

CERTIFICATE OF SERVICE ........................................................................21

ADDENDUM ............................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ....................................................................3, 14

*Bafford v. Northrop Grumman Corp.*,
  994 F.3d 1020 (9th Cir. 2021) ...................................................................18

*Balintulo v. Ford Motor Co.*,
  796 F.3d 160 (2d Cir. 2015) ......................................................................14

*Bowoto v. Chevron Corp.*,
  621 F.3d 1116 (9th Cir. 2010) ........................................................ 3, 4, 5, 16, 17

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ..................................................................3, 11, 12, 13, 17, 18

*Doe v. Nestlé, S.A.*,
  929 F.3d 623 (9th Cir. 2018) .....................................................................16

*Doe v. Nestlé USA, Inc.*,
  788 F.3d 946 (9th Cir. 2015) .....................................................................14

*Doe v. Qi*,
  349 F. Supp. 2d 1258 (N.D. Cal. 2004) .....................................................7

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011) .....................................................................18

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022) ...............................................................................12

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ..................................................... 2, 6, 8, 9, 10, 11, 12, 13

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ............................................................................. 3, 4, 9, 14

*Mastafa v. Chevron Corp.*,
    770 F.3d (2d Cir. 2014) ........................................................................13

*Nestlé USA, Inc. v. Doe*,
    141 S. Ct. 1931 (2021) ....................................................... 3, 9, 14, 15

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ..............................................................3, 13

*Reynolds v. Higginbottom*,
    2022 WL 864537 (N.D. Ill. Mar. 23, 2022) ........................................17

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ...........................................2, 4, 5, 8, 9, 10, 11, 12

## Statutes and Laws

15 C.F.R. § 742.7 ....................................................................................10

28 U.S.C. § 1350 .......................................................................................3

28 U.S.C. § 1350 (note) .......................................................................3, 17

Pub. L. No. 101-246, 104 Stat. 15 (1990) ("Tiananmen Act") ...............10

## Other Authorities

Br. of United States as Amicus Curiae in Support of Petitioners,
    *American Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919 (U.S. Feb. 11, 2008),
    *available at* 2008 WL 408389 ...........................................................12

Br. of United States as Amicus Curiae Supporting Petitioners,
    *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (Sept. 8, 2020),
    *available at* 2020 WL 5498509 .............................................. 8, 12, 13

## INTRODUCTION AND RULE 35(b) STATEMENT

In this divided decision authored by Judge Berzon and joined by Judge Tashima over the partial dissent of Judge Christen, the panel majority reversed Judge Davila's 2014 dismissal of claims filed in 2011 under the Alien Tort Statute ("ATS") against Cisco Systems, Inc. ("Cisco"). The reinstated 13-year-old ATS claims, asserted by or on behalf of Chinese nationals, allege that Cisco's sale of networking equipment to the Chinese government some two decades ago aided and abetted Chinese officials' mistreatment of Falun Gong practitioners in China in violation of international law. The panel also reinstated claims filed by one plaintiff under the Torture Victim Protection Act ("TVPA") against former Cisco CEO John Chambers and another former Cisco executive. The panel announced as a "matter of first impression" that executives of a U.S. corporation that does business abroad may now be held personally liable under the TVPA for aiding and abetting torture by a foreign government.

Both rulings urgently call for rehearing or rehearing *en banc*. Moreover, the panel issued both rulings without asking for the views of the United States—even though both rulings have serious foreign-policy consequences. Specifically, the panel would have a U.S. court determine whether the Chinese government violated international law by mistreating its own citizens. That is an issue that should be decided by the political branches and not by a jury sitting in San Jose.

There are consequently three independently sufficient reasons to grant rehearing or rehearing *en banc*:

*First*, as the dissent emphasized, the panel should have solicited the views of the United States before issuing this decision. Whether the Chinese government violated international law through its treatment of Chinese-national Falun Gong practitioners in China is a highly sensitive matter of foreign policy on which Congress and the Executive Branch have comparative responsibility and expertise. The panel majority inferred from the fact that the Government had not filed an *uninvited* amicus brief that the Government must have no objection to this lawsuit proceeding. But by inferring consent from the Government's silence, the panel majority upends the settled practice that, when the Court would benefit from the Government's views, it invites them. The Government in any event has already expressed the view that U.S. courts should *not* adjudicate ATS and TVPA suits challenging the legality of Chinese government officials' treatment of Falun Gong practitioners in China. The panel majority erred in ignoring that view.

*Second*, the panel majority's ATS rulings create several conflicts with precedent warranting *en banc* review. To begin with, as the dissent correctly explains, the panel majority's disregard of foreign policy and separation of powers considerations favoring dismissal here conflicts with the U.S. Supreme Court's decisions in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), and *Jesner v. Arab*

*Bank, PLC*, 138 S. Ct. 1386 (2018). The panel majority's recognition of an ATS aiding-and-abetting cause of action under federal common law further conflicts with *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). The panel majority decision also conflicts with the decisions of sister circuits in adopting an ATS *mens rea* standard of knowledge rather than purpose. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009); *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011). And the panel's extraterritoriality ruling conflicts with *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), and *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013).

***Third***, the panel's conclusion that the TVPA encompasses aiding-and-abetting claims warrants *en banc* review because it conflicts with the Court's prior decision in *Bowoto v. Chevron Corp.*, 621 F.3d 1116 (9th Cir. 2010), as well as with *Central Bank*, misconstrues the statute, and invites a troubling new cascade of litigation against U.S. corporate executives who do business abroad.

## BACKGROUND

This case arises from a final order of the District Court for the Northern District of California (Davila, J.) dismissing a complaint invoking the ATS, 28 U.S.C. § 1350, and the TVPA, 28 U.S.C. § 1350 (note), against Cisco and former Cisco executives John Chambers and Fredy Cheung. The operative complaint (ER29-115) alleges that, by selling networking equipment to Chinese law

enforcement authorities, Cisco supposedly aided and abetted Chinese police and prison officials in committing international law violations in China against Chinese nationals who practiced Falun Gong.

The district court dismissed all plaintiffs' claims with prejudice.  *See* ER15-28; *see also* ER5-14 (denying motion for reconsideration).  The court ruled that the ATS allegations were impermissibly extraterritorial under *Kiobel* (ER21-25) and, alternatively (ER26-27), that the complaint failed to adequately allege the *mens rea* or *actus reus* required for ATS aiding-and-abetting liability, even if the *mens rea* standard is merely "knowledge."  Relying on this Court's prior decision in *Bowoto*, the court also dismissed the TVPA claims against the individual defendants on the ground that the TVPA does not provide for aiding-and-abetting claims.  ER25.

Plaintiffs appealed, and the prolonged appeal involved supplemental briefing on intervening Supreme Court decisions and two oral arguments, one before Judges Reinhardt, Tashima and Berzon and the second before Judges Tashima, Berzon and Christen after Judge Reinhardt's passing.  The panel decision ("Op.") (attached as Addendum) reversed the dismissal of the ATS claims against Cisco, affirmed the dismissal of the ATS claims against Chambers and Cheung, and reversed the dismissal of the TVPA claims against Chambers and Cheung.  Op. 84.

In reinstating the ATS claims against Cisco, the panel majority concludes that, despite the judicial "caution" called for by *Sosa* in ATS cases, 542 U.S. at

728, "no general or case-specific foreign policy considerations caution against" allowing plaintiffs' claims (Op. 39, *see* Op. 28-35), nor do any separation of powers concerns so caution (Op. 36-39); that the ATS allows judicial implication of a private right of action for aiding and abetting (Op. 35-36); that the applicable *mens rea* standard for ATS aiding-and-abetting claims is "knowing assistance" rather than "purpose" (Op. 49-59); and that plaintiffs' allegations adequately overcome the presumption against extraterritorial application of the ATS (Op. 63-70). In addition, the panel unanimously holds that one plaintiff's TVPA aiding-and-abetting claims against the individual defendants are cognizable notwithstanding this Court's prior decision in *Bowoto*. Op. 74-83.

Judge Christen concurred in part but dissented from the reinstatement of the ATS claims against Cisco. Op. 84-93. Judge Christen would have solicited the views of the United States. Op. 91-92; *see* Op. 88 (expressing "deep[] concern[] about the practical consequences of allowing Plaintiffs' claims to go forward without input from the political branches"). Judge Christen also would have affirmed the dismissal of the ATS claims against Cisco under *Sosa*, which "demands that we exercise judicial discretion to avoid creating foreign policy controversies." Op. 88. Refuting the panel majority's suggestion (Op. 33) that the case presents no foreign policy concerns because Cisco is a nongovernmental actor, the dissent explains (Op. 89) that "a finding of liability in this case would

5

necessarily require a showing that the Chinese Communist Party and Ministry of Public Security violated international law with respect to the Chinese-national Plaintiffs. Such a finding could have serious ramifications for Sino-American relations, fraught as they already are."

## ARGUMENT

## I. PANEL REHEARING OR REHEARING *EN BANC* IS WARRANTED TO INVITE THE VIEWS OF THE UNITED STATES

This decision never should have issued without the panel's inviting the views of the United States. The Executive Branch has a strong interest in addressing whether a federal district court should adjudicate the issue of the Chinese government's alleged violation of international law through its treatment of Chinese-national Falun Gong adherents in China. And this Court has a strong interest in respecting the Executive Branch's comparative "responsibility and institutional capacity to weigh foreign-policy concerns," *Jesner*, 138 S. Ct. at 1403. Therefore, as the dissent properly concludes, when the panel "had an opportunity to solicit the State Department's position," it "should have done so." Op. 91.

The panel or the full court should grant rehearing not only to restore the standard practice of inviting the Government's views in a case involving serious foreign policy and separation of powers concerns, but also to dispel any improper inference from the absence of an ***uninvited*** Government brief. The panel majority concludes that, because no "Executive Branch agency has submitted an amicus

6

brief, declaration, or letter objecting to this lawsuit," it may "infer a lack of concern from the government's silence." Op. 32, 34. But presuming a lack of foreign policy concern whenever the Department of State does not submit its views proactively in a pending federal case would create serious institutional havoc. As the dissent rightly observes, "[t]here is no evidence that the Department maintains a practice of affirmatively filing statements of interest in ATS cases," and it is not "realistic to expect the Department ... to monitor all 94 federal district courts for any ATS litigation raising foreign policy concerns." Op. 92-93.

Moreover, the panel majority improperly disregards (Op. 33) that the Department of State has already expressed the view that U.S. courts should ***not*** adjudicate ATS or TVPA claims brought by Chinese nationals to challenge Chinese officials' treatment of Falun Gong practitioners in China. *See Doe v. Qi*, 349 F. Supp. 2d 1258, 1296-97 (N.D. Cal. 2004) (quoting letter expressing the view of the State Department that adjudicating such challenges "is not the best way for the United States to advance the cause of human rights in China" and urging that the court "find[] the suits non-justiciable" because of the "potentially serious adverse foreign policy consequences that such litigation can generate").[1]

---

[1] The full text of the State Department letter filed in *Qi* is available at https://www.asser.nl/upload/documents/DomCLIC/Docs/NLP/US/LiuQi_StateDept_25-9-2002.pdf.

More generally, the United States has made clear in numerous amicus briefs in other ATS cases that it holds views highly relevant to the panel majority's decision here. For example, the Government's recent amicus brief before the Supreme Court in *Nestlé* argued that there should be no judicial implication of aiding-and-abetting liability under federal common law at *Sosa*'s second step and that the claims there were foreclosed by the presumption against extraterritoriality. *See* Br. of United States as Amicus Curiae Supporting Petitioners at 9-34, *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (Sept. 8, 2020), *available at* 2020 WL 5498509 ("U.S. *Nestlé* Br."). Such Government briefs confirm that the panel majority should not have presumed acquiescence here based on the Government's silence.

Rehearing or rehearing *en banc* should be granted so that the Court may invite the views of the United States.

## II. THE PANEL MAJORITY'S ERRONEOUS AND SIGNIFICANT ATS RULINGS WARRANT REHEARING *EN BANC*

### A. The Panel Majority's *Sosa* Step Two Analysis Conflicts With *Sosa* And *Jesner*

Regardless of whether the Court invites the Government's views at this juncture, rehearing *en banc* is warranted to resolve the conflict between the panel majority's ATS ruling and the "step two" analysis required by *Sosa*. That analysis asks whether recognizing a cause of action under the ATS in the absence of express authority from the political branches is a "proper exercise of judicial

8

discretion." *Jesner*, 138 S. Ct. at 1399 (plurality) (citing *Sosa*, 542 U.S. at 732-33). *Sosa* requires courts to exercise "great caution" before recognizing new forms of liability under the ATS, 542 U.S. at 728, and at least three justices of the U.S. Supreme Court have signaled their view that U.S. courts should not recognize ***any*** new causes of action under the ATS beyond the three historic international law torts identified in *Sosa*, *see Nestlé*, 141 S. Ct. at 1939-40 (plurality opinion of Thomas, J., joined by Gorsuch and Kavanaugh, JJ.).

*Sosa* step two especially requires judicial caution in recognizing causes of action that will "trigger[] serious foreign policy consequences," *Jesner*, 138 S. Ct. at 1407 (quoting *Kiobel*, 569 U.S. at 124), and "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs," *Sosa*, 542 U.S. at 727. As the dissent correctly observes (Op. 88), allowing plaintiffs' ATS claims to proceed against Cisco would do just that, for any finding of aiding-and-abetting liability here would first require a finding that Chinese government officials violated international law in their treatment of Chinese-national Falun Gong practitioners in China. As the dissent correctly explains, that fact provides an even stronger reason to decline to recognize an ATS cause of action here than in *Jesner*. *See* Op. 89 ("The concerns the Court expressed in *Jesner* about holding a foreign corporation liable apply tenfold to a case that hinges on whether a foreign government's treatment of its own nationals violated international law."); *Jesner*,

138 S. Ct. at 1407; *id*. at 1409-10 (Alito, J., concurring in part and concurring in the judgment) ("[A] court should decline to create a cause of action as a matter of federal common law where the result would be to further, not avoid, diplomatic strife.").

Relatedly, this case implicates important separation of powers concerns that also counsel against recognizing an ATS cause of action here at *Sosa* step two. At the time Cisco sold generic networking products to Chinese law enforcement authorities some two decades ago, Congress and the Commerce Department had carefully balanced the importance of ongoing trade with China with human rights concerns that arose after the events at Tiananmen Square by enacting the Foreign Relations Authorization Act for Fiscal Years 1990 and 1991, Pub. L. No. 101-246, 104 Stat. 15 (1990) (the "Tiananmen Act") and promulgating detailed export regulations under the Act. The regulations controlling certain exports to China for crime control reasons conspicuously did ***not*** control exports of computer networking hardware and software. *See* 15 C.F.R. § 742.7. The panel majority decision wrongly disregards (Op. 38-39) that considered judgment by the political branches to allow U.S. companies to export networking products to China.

Rehearing *en banc* is therefore needed to resolve the conflict between the panel majority opinion and both *Sosa* and *Jesner*.

## B. The Panel Majority's Aiding-and-Abetting Ruling Conflicts With *Central Bank*

The panel majority's analysis under *Sosa*'s second step further conflicts (Op. 35-36) with *Central Bank*, which presumes against judicially inferring private rights of action for aiding and abetting. *See* 511 U.S. at 182 ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). *Central Bank's* limitation on the judiciary applies with even greater force in ATS cases than in cases that arise under statutory causes of action like the securities laws at issue in *Central Bank*. That is because the ATS is merely "a jurisdictional statute creating no new causes of action" at all, *Sosa*, 542 U.S. at 724, much less any cause of action for aiding and abetting. Accordingly, any ATS cause of action is purely a matter of judge-made federal common law, making it even more important that federal courts "exercise 'great caution' before recognizing new forms of [ATS] liability," *Jesner*, 138 S. Ct. at 1403 (quoting *Sosa*, 542 U.S. at 728).

The panel majority dismissed *Central Bank* as "not apposite," asserting that it "does not govern" the inquiry "[b]ecause ATS liability is generally determined under international law." Op. 35-36. But that is incorrect. The panel majority blinks past *Sosa* step two, which ***independently*** requires that courts look to U.S. law considerations and "practical consequences," 542 U.S. at 732, before deciding

whether an otherwise possible international law claim should be recognized under the ATS as a matter of federal common law. *See Jesner*, 138 S. Ct. at 1399 (plurality) (even assuming the existence of a universally recognized norm under international law, "it must be determined further whether allowing this case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed"); *cf. Egbert v. Boule,* 142 S. Ct. 1793, 1800 (2022) (declining to recognize a judicially implied First or Fourth Amendment *Bivens* cause of action for monetary damages because, "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts").

Notably, the United States has long argued as amicus in ATS cases that, under *Central Bank* and *Sosa*'s second step, "aiding and abetting is not cognizable under the ATS," U.S. *Nestlé* Br. at 8, 22-27, and that recognizing "aiding and abetting liability constitutes an improper expansion of judicial authority to fashion federal common law" under the ATS, Br. of United States as Amicus Curiae in Support of Petitioners at 8, *American Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919 (U.S. Feb. 11, 2008), *available at* 2008 WL 408389. The United States has also expressly disagreed with the view of the panel majority (Op. 35-36) that aiding-and-abetting liability under the ATS is determined solely by international law, deeming that view "untenable after *Jesner*" and stating that, "under *Jesner*'s

application of *Sosa*'s second step, permitting aiding-and-abetting claims 'to proceed' would not represent 'a proper exercise of judicial discretion'" because "there are numerous 'sound reasons to think Congress might doubt the efficacy or necessity'" of allowing such claims.  U.S. *Nestlé* Br. at 23 (quoting *Jesner*, 138 S. Ct. at 1399, 1402).

*En banc* rehearing is thus warranted to resolve the conflict between the panel majority's aiding-and-abetting ruling and *Central Bank*.

### C.   The Panel Majority's *Mens Rea* Standard Conflicts With Decisions Of Other Circuits

Even if aiding-and-abetting claims are deemed cognizable under the ATS, the panel majority's decision warrants *en banc* review because it conflicts with the law of other circuits on the *mens rea* standard for such claims.  The panel majority holds (Op. 49-59) that the required *mens rea* is mere knowledge rather than purpose.  But the Second Circuit "hold[s] that the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone." *Talisman*, 582 F.3d at 259; *see Mastafa v. Chevron Corp.*, 770 F.3d 170, 191-92 & n.18 (2d Cir. 2014) (citing cases).  And the Fourth Circuit agrees, also imposing "a purpose standard."  *Aziz*, 658 F.3d at 401 (defendant must have "the purpose of facilitating the alleged violation").

This stark split between the panel majority and the Court's sister circuits on the proper *mens rea* standard warrants *en banc* review; indeed, eight judges of this

Court have already opined that adoption of a knowledge rather a purpose standard places this Court on the "wrong side" of that split. *Doe v. Nestlé USA, Inc.*, 788 F.3d 946, 951 (9th Cir. 2015) (Bea, J., joined by O'Scannlain, Gould, Tallman, Bybee, Callahan, M. Smith and N.R. Smith, JJ., dissenting from denial of rehearing *en banc*).[2]

### D. The Panel Majority's Extraterritoriality Ruling Conflicts With *Nestlé* And *Kiobel*

Finally, the panel majority's ATS ruling warrants *en banc* review because its extraterritoriality analysis (Op. 63-70) conflicts with the Supreme Court's prior decisions. *Kiobel* held that, "even where the [ATS] claims touch and concern the territory of the United States, they must do so with sufficient force," 569 U.S. at 124-25, and *Nestlé* held that ATS claims can overcome the presumption against extraterritorial application of U.S. law only if they allege domestic conduct that amounts to more than generic corporate activity like high-level supervision and management. 141 S. Ct. at 1937. *En banc* review is warranted to ensure that the Supreme Court decision in *Nestlé* is not rendered a nullity.

---

[2] The panel majority's suggestion in dicta (Op. 62 n.22) that it "likely would reach the same conclusion" under the purpose standard independently conflicts with the law of the Second Circuit. *See Balintulo v. Ford Motor Co.*, 796 F.3d 160, 170 (2d Cir. 2015) (plaintiffs did not "plausibly allege that by developing hardware and software to collect innocuous population data, IBM's purpose was to denationalize black South Africans and further the aims of a brutal regime").

While the panel majority tries to overcome *Nestlé* by crediting allegations that Cisco handled "all aspects of the high-level design phases" from San Jose, "assign[ed] … resources" to "large-scale overseas projects" from San Jose, "orchestrated" phases of its general technology from San Jose, or generally "manufactured" components such as "chips" in San Jose (Op. 67-68), such allegations are indistinguishable from high-level corporate activity deemed inadequate to sustain ATS claims in *Nestlé*. And as to the handful of paragraphs of the complaint that purport to connect Cisco's actions in San Jose to the Chinese government's alleged abuses toward Falun Gong practitioners in China, the panel majority fails to show how the complaint alleges that Cisco's activity in San Jose knowingly facilitated ***torture and persecution*** of Falun Gong members as opposed to merely their lawful apprehension and detention under Chinese law. The record is undisputed that the practice of Falun Gong is unlawful in China (SER4-6 (¶¶12-21)) and that Chinese law prohibits torture or brutality toward detainees or prisoners (SER2-3, 10-11 (¶¶7, 36-39)). Thus, as the district court correctly ruled (ER24), the allegations in the complaint do not "establish Defendants' planning, direction, or participation in the ***human rights abuses*** committed against Plaintiffs" through activities that took place in the United States (emphasis added). Here as in *Nestlé*, the panel majority's "reconstruction and/or rewriting of the allegations in the complaint … essentially eliminates the presumption against

extraterritoriality." *Doe v. Nestlé, S.A.*, 929 F.3d 623, 637 (9th Cir. 2018) (Bennett, J., joined by Bybee, Callahan, Bea, M. Smith, Ikuta, R. Nelson and Bade, JJ., dissenting from denial of rehearing *en banc*).

*En banc* review is this warranted to reconcile the panel majority's ATS extraterritoriality ruling with *Nestlé* and *Kiobel*.

## III. THE PANEL'S ERRONEOUS AND SIGNIFICANT TVPA RULING WARRANTS REHEARING *EN BANC*

*En banc* review is also warranted on the panel's reinstatement of the TVPA claims against Chambers and Cheung. In holding as "a matter of first impression" (Op. 75) that the TVPA permits aiding-and-abetting claims against individual corporate executives despite this Court's earlier decision in *Bowoto* (Op. 74-83), the panel creates an untenable conflict within this Court's precedent, misconstrues the statute, and invites a cascade of new TVPA litigation against executives of U.S. companies that do business abroad.

When this Court previously considered whether "corporations can be found vicariously liable" under the TVPA, the Court concluded that the statute "does not contemplate such liability" because it limits liability "to '[a]n individual' who subjects another to torture." *Bowoto*, 621 F.3d at 1128 As the district court correctly ruled, *Bowoto* thus directs that "claims for vicarious liability, including aiding and abetting, cannot be brought under the TVPA." ER25.

The panel purports (Op. 75-76) to distinguish *Bowoto* as limited to foreclosing corporate and not individual TVPA accomplice liability. But the statute by its plain terms provides for liability by an individual who "***subjects*** an individual to torture," 28 U.S.C. § 1350 note § 2(a) (emphasis added), not one who facilitates another's acts of torture. The panel suggests (Op. 76) that, if Congress had aimed to foreclose aiding and abetting liability, "it could have used the term 'tortures' or 'inflicts torture'" rather than the term "subjects … to torture." But the panel fails to explain how the word "subjects" can suggest aiding-and-abetting liability where "inflicts" does not.[3]

In any event, independent of *Bowoto*, the panel's decision warrants *en banc* review because it conflicts with the Supreme Court's holding in *Central Bank* that U.S. statutes are presumed to ***not*** confer aiding and abetting liability unless Congress expressly provides for such liability. *See Central Bank*, 511 U.S. at 182; *supra* Part II.B. Because "the text of the TVPA does not provide for aiding and abetting liability, and the Supreme Court has made crystal clear that there can be no civil aiding-and-abetting liability unless Congress expressly provides for it," the absence of text in the TVPA expressly providing for aiding and abetting liability

---

[3]   The panel also misplaces reliance (Op. 77) on decisions that found secondary TVPA liability available based on "command responsibility doctrine," a military concept that "typically involve[s] a traditional military relationship, or something close to a general-subordinate relationship." *Reynolds v. Higginbottom*, 2022 WL 864537, at *13 (N.D. Ill. Mar. 23, 2022). That concept does not apply to a corporate executive's lawful sale of products to a foreign government.

means it is not available. *Doe. v. Exxon Mobil Corp.*, 654 F.3d 11, 87 (D.C. Cir. 2011) (Kavanaugh, J., dissenting in part).

Accordingly, the Court should grant *en banc* review to reconcile the panel's ruling that the TVPA allows aiding-and-abetting claims with *Bowoto* and *Central Bank*. Alternatively, the panel should grant rehearing and remand the TVPA claims to allow the district court to apply the Court's newly announced rule to the facts alleged in the first instance. *See Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1032 (9th Cir. 2021).

## CONCLUSION

For the foregoing reasons, this Court should grant the petition.

August 11, 2023

Respectfully submitted,

s/ *Kathleen M. Sullivan*
Kathleen M. Sullivan
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
kathleensullivan@quinnemanuel.com

Isaac Nesser
Todd Anten
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
isaacnesser@quinnemanuel.com
toddanten@quinnemanuel.com

Christopher G. Michel
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300  I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
christophermichel@quinnemanuel.com

*Attorneys for Defendants-Appellees Cisco
Systems, Inc., John Chambers and Fredy
Cheung*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 15-16909

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,111 | .

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Kathleen M. Sullivan | **Date** | August 11, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/2021*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 11, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: August 11, 2023

By: */s/ Kathleen M. Sullivan*
Kathleen M. Sullivan

*Counsel for Defendants-Appellees*

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DOE I; DOE II; IVY HE; DOE III; DOE IV; DOE V; DOE VI; CHARLES LEE; ROE VII; ROE VIII; LIU GUIFU; DOE IX; WEIYU WANG, and those individuals similarly situated, | No. 15-16909 |
| | D.C. No. 5:11-cv-02449-EJD |
| *Plaintiffs-Appellants,* | |
| v. | OPINION |
| CISCO SYSTEMS, INC.; JOHN CHAMBERS; FREDY CHEUNG, AKA Zhang Sihua; DOES, 1-100, | |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted October 20, 2021
Pasadena, California

Filed July 7, 2023

Before:  A. Wallace Tashima, Marsha S. Berzon, and
Morgan Christen, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Christen

---

## SUMMARY[*]

---

### Alien Tort Statute / Torture Victim Protection Act

In an action brought by practitioners of Falun Gong who alleged that they or family members were victims of human rights abuses committed by the Chinese Communist Party and Chinese government officials and that these abuses were enabled by technological assistance of U.S. corporation Cisco Systems, Inc., and two Cisco executives, the panel affirmed the district court's dismissal of plaintiffs' claims under the Alien Tort Statute against the Cisco executives; reversed the dismissal of plaintiffs' Alien Tort Statute claims against corporate defendant Cisco; reversed the dismissal of one plaintiff's claims under the Torture Victim Protection Act against the Cisco executives; and remanded for further proceedings.

The district court dismissed plaintiffs' claims under the Alien Tort Statute ("ATS") on the ground that plaintiffs did not allege conduct sufficient to meet the standard for aiding and abetting liability under international customary law or to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

DOE I v. CISCO SYSTEMS, INC.                    3

overcome the presumption against the extraterritorial application of the ATS. The district court also dismissed plaintiff Charles Lee's Torture Victim Protection Act ("TVPA") claim against the Cisco executives on the ground that the statute does not provide for accomplice liability.

The panel held that under *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021), corporations may be held liable under the ATS. Agreeing with other circuits, the panel further held that, under the test set forth in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS. In addition, because aiding and abetting liability did not raise separation-of-powers or foreign policy concerns, such liability is cognizable for the purposes of the ATS.

The panel held that plaintiffs' allegations against Cisco were sufficient to meet the applicable aiding and abetting standard. Joining other circuits, the panel held that the *actus reus* of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation. Joining the Eleventh Circuit, the panel held that the *mens rea* for aiding and abetting liability under customary international law is knowing assistance. Applying this standard, the panel concluded that plaintiffs plausibly alleged that corporate defendant Cisco provided assistance to the Party and to Chinese Public Security that had substantial effects on those entities' violations of international law. Plaintiffs also plausibly alleged that Cisco knowingly provided such assistance.

Recognizing that the ATS does not apply extraterritorially, the panel held that this case involved a permissible domestic application of the ATS against Cisco

4   DOE I v. CISCO SYSTEMS, INC.

because much of the corporation's alleged conduct constituting aiding and abetting occurred in the United States. By contrast, plaintiffs did not sufficiently connect the alleged actions taken by the Cisco executives to the United States.

Reversing the district court's dismissal of the claim under the TVPA against the Cisco executives, the panel held, as a matter of first impression in the Ninth Circuit, that based on the text and the Convention Against Torture background of the TVPA, the TVPA provides a private right of action against those who aid and abet torture or extrajudicial killing. The panel held that the allegations against the executives were sufficient to meet the aiding and abetting standard, as determined under international law.

Concurring in part and dissenting in part, Judge Christen wrote that she joined Part II of the majority's opinion, addressing the TVPA claim. Judge Christen wrote that the majority's careful and cogent analysis of aiding and abetting liability under the ATS in Part I of its opinion was consistent with the views of other circuits, and in an appropriate case, Judge Christen would join it. She, however, did not do so here because she concluded that recognizing liability for aiding and abetting alleged human rights violations, committed in China and against Chinese nationals by the Chinese Communist Part and the Chinese government's Ministry of Public Security, was inconsistent with the purpose of the ATS. Judge Christen wrote that she would affirm the dismissal of plaintiffs' ATS claims on this basis, and go no further.

DOE I v. CISCO SYSTEMS, INC.                    5

## COUNSEL

Paul L. Hoffman (argued), Catherine Sweetser, and John C. Washington, Schonbrun Seplow Harris & Hoffman LLP, Hermosa Beach, California; Terri E. Marsh, Human Rights Law Foundation, Washington, D.C.; for Plaintiffs-Appellants.

Kathleen M. Sullivan (argued), Isaac Nesser, and Todd S. Anten, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York, for Defendants-Appellees.

William J. Aceves, California Western School of Law, San Diego, California; David J. Scheffer, Northwestern University School of Law Bluhm Legal Clinic, Chicago, Illinois; for Amicus Curiae David J. Scheffer, former United States Ambassador-at-Large for War Crimes Issues.

Sophia S. Cope and Cindy Cohn, Electronic Frontier Foundation, San Francisco, California, for Amici Curiae Electronic Frontier Foundation, Article 19, and Privacy International.

Marco B. Simons, Richard L. Herz, Maryum Jordan, Marissa Vahlsing, and Michelle Harrison, EarthRights International, Washington, D.C., for Amici Curiae Human Rights Organizations EarthRights International and the Center for Constitutional Rights.

6          Doe I v. Cisco Systems, Inc.

# OPINION

BERZON, Circuit Judge:

INTRODUCTION ...............................................................7

BACKGROUND ................................................................9

    I.    Factual Background ..............................................9

        A.    Crackdown Against Falun Gong .....................9

        B.    Cisco's Contributions to the Golden Shield ....11

        C.    Consequences for Falun Gong Adherents .......14

    II.   Procedural History .............................................16

DISCUSSION ..................................................................17

    I.    The Alien Tort Statute ........................................18

        A.    Background ...................................................18

        B.    Application ...................................................22

            1.    Aiding and Abetting Liability under the ATS ...............................................................23

               a.   *Sosa*'s First Step ....................................25

               b.   *Sosa's* Second Step ...............................28

            2.    Aiding and Abetting Standard and Pleadings ...............................................................39

               a.   *Actus reus* ...............................................40

                  (i)   Standard ............................................40

                  (ii)   Application to Corporate Defendant Cisco .......................................................45

               b.   *Mens rea* ...............................................49

                  (i)   Standard ............................................49

(ii)    Application to Corporate Defendant
Cisco .........................................................59

3.    Extraterritoriality ........................................63

a.    Background .............................................64

b.    Application..............................................66

(i)    Corporate Defendant Cisco...............66

(ii)    Defendants Chambers and Cheung...70

4.    State Action ...............................................71

II.    The Torture Victim Protection Act of 1991.........74

A.    Aiding and Abetting Liability ........................74

B.    Application....................................................80

1.    *Actus Reus*...................................................81

2.    *Mens Rea* ....................................................82

CONCLUSION.................................................................83

## INTRODUCTION

Plaintiff-Appellants are practitioners of Falun Gong, a religion originating in China in the 1990s. They allege that they or family members are victims of human rights abuses committed by the Chinese Communist Party and Chinese government officials. The alleged abuses, Plaintiffs contend, were enabled by the technological assistance of Defendants, U.S. corporation Cisco Systems, Inc., and two Cisco executives, John Chambers and Fredy Cheung (collectively, "Cisco," except where otherwise noted).

Plaintiffs initiated this lawsuit more than a decade ago, alleging that Cisco aided and abetted or conspired with Chinese officials in violation of the Alien Tort Statute

8          DOE I v. CISCO SYSTEMS, INC.

("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection
Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, and other
federal and state laws. Specifically, Plaintiffs contend that
Cisco, operating largely from its corporate headquarters in
California, "designed, implemented and helped to maintain
a surveillance and internal security network" for Chinese
officials, greatly enhancing their capacity to identify Falun
Gong practitioners and ensnare them in a system of physical
and mental torture, forced labor, and prolonged and arbitrary
detention.

The district court dismissed Plaintiffs' claims under the
ATS, ruling that Plaintiffs did not allege conduct sufficient
to satisfy the standard for aiding and abetting liability under
international customary law or to overcome the presumption
against the extraterritorial application of the ATS. The
district court also dismissed Plaintiff Charles Lee's TVPA
claim against Chambers and Cheung on the ground the
statute does not provide for accomplice liability.

We once again recognize aiding and abetting liability
under the ATS, *see, e.g.*, *Doe I v. Nestle USA, Inc.* ("*Nestle
I*"), 766 F.3d 1013, 1023 (9th Cir. 2014), and hold Plaintiffs'
allegations against corporate defendant Cisco sufficient to
meet the applicable aiding and abetting standard. We also
conclude that this case involves a permissible domestic
application of the ATS against corporate defendant Cisco,
because much of the corporation's alleged conduct
constituting aiding and abetting occurred in the United
States. Finally, we reverse the district court's dismissal of
the claim under the TVPA against Chambers and Cheung, as
the TVPA does provide a private right of action against those
who aid and abet torture, and the allegations against
Chambers and Cheung are sufficient to meet the aiding and
abetting standard.

Doe I v. Cisco Systems, Inc.                    9

# BACKGROUND

## I.  Factual Background

For the purposes of this appeal from the granting of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept as true the allegations of Plaintiffs' Second Amended Complaint. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 734 (2011).

As alleged in the complaint:

## A.  Crackdown Against Falun Gong

The Chinese Communist Party ("the Party") was founded in 1921, well before the People's Republic of China was established in 1949 at the end of the Chinese Civil War. Within a decade of its founding, the Party began periodically to launch violent political crackdowns, known as *douzheng* campaigns, against groups designated by the Party as enemies.[1] Groups that have been targeted by *douzheng* campaigns include Tibetan Buddhist Dalai Lama supporters, pro-democracy advocates, and reformist intellectuals. During *douzheng* campaigns, targets are subjected to numerous human rights abuses, including forced ideological conversion, beatings, and other forms of torture, detention in non-state facilities, and assignment to "re-education through labor" camps. Although the Chinese government does not officially sanction these campaigns and the Party is distinct organizationally and operationally from the Chinese state, state officials are involved in the *douzheng* campaigns.

In the early 1990s, the Falun Gong religious movement began in China. The religion is based on the tenets of

---

[1] Plaintiffs translate *douzheng* as "violent struggle."

truthfulness, compassion, and tolerance, and espouses absolute nonviolence. The Falun Gong movement grew quickly in popularity. By 1999, an estimated 70 to 100 million people in all regions of China practiced Falun Gong.

As the number of Falun Gong practitioners grew, the Party became concerned about their activities. Party Chairman and Chinese President Jiang Zemin ordered Chinese state law enforcement—called "Public Security"—to investigate and find grounds for a ban against the practice of Falun Gong.[2] In 1999, the Party officially called for a *douzheng* campaign against Falun Gong, with the goal of convincing adherents to renounce their beliefs or otherwise suppressing the practice. To facilitate the *douzheng*, the Party created Office 610, a subdivision specifically devoted to persecuting Falun Gong practitioners. The Chinese state designated Falun Gong organizations as illegal in 1999.

To monitor Falun Gong internet activity and identify individual practitioners based on that activity, the Party and Public Security envisioned an online tool that became known as the "Golden Shield." The Golden Shield was to comprise a "vast and multi-tiered surveillance system of a scale and capacity that could surveil the entire country's Internet use

---

[2] The complaint does not define "Public Security." We understand the term to refer to law enforcement officers managed by the Chinese Ministry of Public Security, "an organization under the State Council in charge of the country's public security." The State Council, The People's Republic of China, *Ministry of Public Security*, http://english.www.gov.cn/state_council/2014/09/09/content_28147498 6284154.htm (last visited Nov. 28, 2022); *see also* Suzanne E. Scoggins, *Policing Modern China*, 3 China L. & Soc'y Rev. 79, 82 (2018) (describing "China's Public Security Bureau" as "the institution that encompasses the heterogeneous forces and missions of the Chinese police").

DOE I v. CISCO SYSTEMS, INC. 11

for all Falun Gong believers." To develop such a system, capable of obtaining and organizing all the information about Falun Gong activities and adherents Chinese authorities desired—for example, the "home and work addresses, purchases, financial information, contact with other Falun Gong members, past Falun Gong activities, IP addresses, and family information" of Falun Gong adherents—the Party and Public Security required technology not available in China at the time. As a result, the Party and Chinese security officials together "sought the assistance of Western technology companies, including Cisco."

**B. Cisco's Contributions to the Golden Shield**

Cisco is a multinational corporation based in San Jose, California, with branch offices throughout the world, including in the Asia-Pacific region. Cisco conducted an extensive "marketing campaign," "directed from Cisco's headquarters in San Jose, California, in communication with Cisco subsidiaries in China," with the goal of obtaining contracts for the design and development of the Golden Shield. Defendant John Chambers, Cisco chief executive officer at all times relevant to the allegations, met with President and Party Chair Jiang Zemin and other Party officials repeatedly, beginning as early as 1998, to discuss the "objectives of the Golden Shield apparatus" and to explain "how Cisco could help Jiang control the Internet through advanced information security networks and technology." Cisco also participated in trade shows in Beijing in the early 2000s, at which it offered brochures marketing its services as useful to the "*douzheng*" of Falun Gong.

12        DOE I v. CISCO SYSTEMS, INC.

In 2001, Public Security selected Cisco to "submit the high-level design" for a national public security network. Cisco ultimately won several contracts "to design and implement many Golden Shield components," several of which were "first-of-their-kind features . . . developed specifically to aid Chinese security officers in the detection, apprehension and interrogation of Falun Gong" practitioners. Cisco's technological assistance had several facets, including "high-level [network] design"; customized "software product[s]"; the provision of "integrated hardware and software systems, i.e., 'solutions,' designed for specific purposes"; and ongoing maintenance, testing, and training. Cisco "manufactured key components of the Golden Shield in the United States, such as Integrated circuit chips that function in the same manner as the Central Processing Unit of a computer."

More specifically, "Cisco's design and implementation of the Golden Shield, under the direction and control of Defendants in San Jose, occurred in at least two phases." In the first phase, "Cisco provided high-level design for and implementation of the Golden Shield database-driven surveillance system that could be accessed digitally by national, provincial and major municipal security across China." This system included a "library of 'signatures,' i.e., carefully analyzed patterns of Falun Gong Internet activity to enable the intelligent identification of individual Falun Gong Internet users," "real time monitoring" of "Falun Gong Internet traffic patterns and behaviors," and widespread integration of Falun Gong databases "with Cisco security software systems not only to enable the identification and tracking of Falun Gong, but also and specifically to give Chinese security [officers] access to the sensitive

DOE I v. CISCO SYSTEMS, INC.                     13

information to facilitate the *zhuanhua* (forced conversion through torture) of Falun Gong believers."

In phase two, "Cisco engineers in San Jose" "carefully analyzed" the Golden Shield system with the goal of making it "more efficient" and increasing its "scope." One upgrade was the addition of "Ironport," which included a tool "marketed by Cisco as able to identify Falun Gong online email communication . . . to facilitate the identification and apprehension of Falun Gong believers who typically sent and forwarded pictorial Falun Gong images to others in China." Cisco "actively help[ed] Chinese security forces build a nationwide, networked video surveillance system." This system "has been a primary means" of identifying Falun Gong practitioners through non-internet activities, such as protests or religious practice.

The resulting surveillance system contains nationally accessible databases of information on the families, locations, contacts, and other sensitive personal data of suspected and known Falun Gong practitioners. The system includes "constantly updated 'lifetime' information profile[s]" of practitioners, combining data from their "initial identification" and subsequent "interrogation[s]" and "treatment[s]," all logged into centralized and accessible databases. Cisco employees in San Jose "approved," "enacted," and "orchestrated" the "construction, testing, verification, optimization, and servicing" of Cisco's "design solutions and security features" for the Golden Shield.

In addition to the provision of technology, Cisco engineers, "operational specialists," and "high-level executives" in San Jose provided "long-term customer support," including "network maintenance," testing, and training. For example, "Cisco intentionally incorporated the

14        DOE I v. CISCO SYSTEMS, INC.

Falun Gong-specific signatures into security software upgrades at regular intervals to ensure Falun Gong activities and individuals were identified, blocked, tracked and suppressed." Cisco also "provided 'skill training' and 'technical training' to Public Security officers" and "Office 610 security agents" "to enable them to use the customized technologies to suppress Falun Gong."[3]

## C. Consequences for Falun Gong Adherents

Plaintiffs allege that the *douzheng* of Falun Gong, which has largely depended on Golden Shield technology and Cisco's specific contributions to it, has devastated Falun Gong throughout China. Since the 1990s, the torture routinely used against such practitioners in forced conversion sessions and interrogations has been well documented by the United States Government, international human rights organizations, media outlets in the United States, and the UN Special Rapporteur. The U.S. Department of State estimates that hundreds of thousands of Falun Gong adherents have been persecuted, including through torture and detention in psychiatric facilities and labor camps. The Department has estimated that a significant percentage, and

---

[3] Some of the marketing and implementation of Cisco's technical assistance to the Party and Chinese security was carried out by Cisco China. Cisco created Cisco China in 1998 in part to comply with the requirements of the Party and Chinese Government for international corporations operating within China. Plaintiffs allege that Cisco China is an alter ego or a "mere proxy" of the parent corporation with no "clear corporate demarcation." During the marketing, design, and implementation of Cisco's projects with the Party and Chinese security, Plaintiffs allege, Cisco in San Jose oversaw all operations of Cisco China, and the two entities shared a management structure and chain of command, which required Cisco China to report to executives in San Jose and left major decisions to be made by those executives.

Doe I v. Cisco Systems, Inc. 15

in many cases the majority, of those confined to labor camps are Falun Gong practitioners. The *New York Times* estimated in 2009 that at least two thousand Falun Gong practitioners had been tortured to death.

Plaintiffs are thirteen Chinese nationals and a U.S. citizen, all identified through Golden Shield technology as participants in Falun Gong-related online activities and all apprehended, detained, and subjected in China to forced conversion, among other abuses. Two plaintiffs represent family members, Doe VII and Doe VIII, after Doe VII's disappearance and suspected death following the forced administration of medicine and Doe VIII's confirmed death by beating while detained. Some of the plaintiffs allege that they were detained several times, for years or months at a time, and were subjected to surveillance between detentions. The physical torture the plaintiffs endured in detention and while imprisoned in forced labor camps included beatings with steel rods and shocking with electric batons, sleep deprivation, being forced to sit or stand for prolonged periods of time in painful positions, and violent force-feeding. Plaintiffs report lasting emotional and physical injury caused by this abusive treatment.

Many plaintiffs allege that information collected and stored by Golden Shield technology was used during the forced conversion sessions to which they were subjected. One plaintiff, for example, alleges that during his detention and torture, Chinese authorities used information about his family and wife to attempt to coerce him to renounce his beliefs. Another alleges authorities used private emails and text messages, information about and threats against his brother, and threats to his brother's employment, all based on information obtained through Golden Shield surveillance, in torture sessions. Plaintiff Wang Weiyu, detained on

16     Doe I v. Cisco Systems, Inc.

several occasions and subjected to prolonged isolation and physical torture, alleges that information about his wife and threats against her safety were used against him by Chinese authorities during forced conversion sessions, and that the information used was obtained through Golden Shield surveillance.

## II. Procedural History

Plaintiffs filed this putative class action in 2011. The Second Amended Complaint names as defendants Cisco; two individual defendants, John Chambers and Fredy Cheung; and 100 unnamed Does whose capacity and identity were unknown at the time of filing. Chambers was Cisco's chief executive officer and Cheung was the vice president of Cisco China when the alleged violations occurred.

Chinese national plaintiffs brought suit under the ATS against Cisco for aiding and abetting or, alternatively, entering into a conspiracy with Party officials and the Chinese government to commit violations of seven aspects of international law. The alleged violations include torture; cruel, inhuman, or degrading treatment; forced labor; prolonged and arbitrary detention; crimes against humanity; extrajudicial killing; and forced disappearance. Additionally, U.S. citizen plaintiff Charles Lee alleged torture in violation of the TVPA against Chambers and Cheung.

The district court stayed the action while *Kiobel v. Dutch Petroleum Co.*, 569 U.S. 108 (2013), was pending before the Supreme Court. *Kiobel* held that the ATS does not apply extraterritorially. *Id.* at 124. After *Kiobel* was decided, Cisco moved to dismiss the complaint. In 2014, the district court granted the motion to dismiss. The court held that Plaintiffs failed to plead a sufficient connection between the alleged

DOE I v. CISCO SYSTEMS, INC.                    17

violations and the territory of the United States to permit the domestic application of the ATS. The court also held that the complaint did not adequately allege a claim for aiding and abetting liability under international law. Specifically, the complaint, according to the district court, did not show a "substantial effect on the perpetration of alleged violations against Plaintiffs" or demonstrate that Cisco knew its actions would contribute to violations of international law.

After we concluded in *Nestle I*, 766 F.3d 1013, that the allegations in that case—which concerned U.S. corporations' involvement in violations of international law that occurred abroad—were sufficient to satisfy the *mens rea* of an aiding and abetting claim under the ATS, *id.* at 1026, Plaintiffs in this case filed a motion for reconsideration, which the district court denied. This appeal followed. We stayed this case pending the Supreme Court's decisions in *Jesner v. Arab Bank, PLC*, 138 S. Ct 1386 (2018), and *Nestle USA, Inc. v. Doe* ("*Nestle II*"), 141 S. Ct. 1931 (2021), cases whose relevance we explain later in this opinion.

## DISCUSSION

Plaintiffs appeal the district court's dismissal of seven claims under the ATS and its dismissal of Plaintiff Charles Lee's TVPA claim against Chambers and Cheung. This court reviews *de novo* a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004). To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.  The Alien Tort Statute

### A.  Background

The ATS provides in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Before the ratification of the Constitution and the passage of the Judiciary Act of 1789 to implement its provisions, several international scandals had resulted from the "inability to provide judicial relief to foreign officials injured in the United States." *Kiobel*, 569 U.S. at 123; *see also Jesner*, 138 S. Ct. at 1396–97 (majority op.).**[4]** Noting the problems caused by the lack of a forum in which aggrieved foreigners—in particular, ambassadors—could find an appropriate remedy, the Supreme Court in *Jesner* concluded that the First Congress of the United States enacted the ATS as part of the Judiciary Act of 1789 to "promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." 138 S. Ct. at 1396–97, 1406 (majority op.); *see also Kiobel*, 569 U.S. at 123.

The precise contours of the ATS remained largely undefined for nearly two hundred years. *See Kiobel*, 569

---

[4] Some sections of the main opinion in *Jesner* represent the opinion of the Court, and others are signed only by three justices. 138 S. Ct. at 1393. We refer to the opinion of the Court as the "majority opinion" and to the other sections as the "plurality opinion."

DOE I v. CISCO SYSTEMS, INC.                    19

U.S. at 114. Beginning with the seminal case of *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the ATS gained new relevance and, more recently, definition. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). Two developments in the fleshing out of the ATS are of particular relevance to this case.

*First,* in *Sosa*, the Supreme Court delineated a "high bar" for recognition of new causes of action under the ATS. *Id.* at 728; *see also Jesner*, 138 S. Ct. at 1398, 1402 (majority op.). Noting that the ATS is "only jurisdictional" and does not itself provide a cause of action, the Court held that the ATS "enable[s] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Sosa*, 542 U.S. at 712. At the time the ATS was enacted, the common law recognized only three such causes of action: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 715 (citing 4 William Blackstone, Commentaries *68). *Sosa* concluded that under the ATS only claims that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to" those causes of action may be recognized today. *Id.* at 725. *Sosa* additionally instructed that courts are to consider foreign policy consequences and separation-of-power concerns before recognizing a cause of action or allowing a particular case to proceed. *Id.* at 728, 732–33; *see also Jesner*, 138 S. Ct. at 1399 (plurality op.). These requirements have been interpreted as prescribing a two-part test for determining

20      DOE I v. CISCO SYSTEMS, INC.

whether a new cause of action may be recognized under the ATS. *See Jesner*, 138 S. Ct. at 1399 (plurality op.).[5]

We note that the Supreme Court has divided several times as to whether *any* new international law causes of action should be recognized under the ATS, beyond the three that existed in 1789. Most recently, in *Nestle II*, three Justices opined that federal courts should not recognize new causes of action "beyond the three historical torts identified in *Sosa*." 141 S. Ct. at 1939 (plurality op.);[6] *see also Jesner*, 138 S. Ct. at 1408 (Alito, J., concurring in part and concurring in the judgment), 1408 (Thomas, J., concurring), 1412–14 (Gorsuch, J., concurring in part and concurring in the judgment); *Sosa*, 542 U.S. at 739 (Scalia, J., with Rehnquist and Thomas, JJ., concurring in part and concurring in the judgment). But the view that no new causes of action may be judicially recognized has never gained the support of a majority of the Court. As a result, the standard for recognizing new ATS causes of action remains the two-part test recognized in *Sosa*, which is strict but not insuperable.

---

[5] *Jesner*'s distillation of the *Sosa* two-part test appears in a section of the *Jesner* plurality opinion, but six justices have since cited that plurality opinion as describing the *Sosa* test. *See Nestle II*, 141 S. Ct. at 1938 (opinion of Thomas, J., with Gorsuch and Kavanaugh, JJ.); *id.* at 1945 (Sotomayor, J., with Breyer and Kagan, JJ., concurring in part and concurring in the judgment). We therefore rely on the *Jesner* plurality's description of the *Sosa* requirements.

[6] Two parts of the main opinion in *Nestle II* represent the opinion of the Court, and a third part is signed only by three justices. 141 S. Ct. at 1934. We refer to the opinion of the Court as the "majority opinion" and to the other part as the "plurality opinion."

DOE I v. CISCO SYSTEMS, INC. 21

*Second, Kiobel* applied the general presumption against the extraterritorial application of U.S. statutes to the ATS and concluded that nothing in the ATS rebutted the presumption. 569 U.S. at 124. Accordingly, the ATS "applies only domestically," and plaintiffs bringing an ATS claim "must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Nestle II*, 141 S. Ct. at 1936 (majority op.) (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)).

After *Sosa*, *Jesner*, and *Kiobel*, then, a foreign plaintiff may bring suit in federal court under the ATS for a tort committed in violation of the law of nations only if (1) the tort passes *Sosa*'s two-part test regarding the definition and specificity of the action and the practical and foreign policy implications of its recognition and (2) the conduct relevant to the statute's focus occurred in the United States.

Here, the ATS Plaintiffs are Chinese nationals suing for international human rights violations including torture; forced labor; prolonged arbitrary detention; extrajudicial killing; disappearance; cruel, inhuman, or degrading treatment; and crimes against humanity. Plaintiffs do not contend that Cisco directly committed any of the alleged violations, but rather that it aided and abetted or entered into a conspiracy or joint criminal enterprise with the Chinese Communist Party and Public Security officers to perpetrate the torts. Thus, the suit may proceed under the ATS only so long as the international law violations Plaintiffs allege, including aiding and abetting, meet *Sosa*'s two-part test, and conduct with regard to the violations that meet that test occurred in the United States.

22          DOE I v. CISCO SYSTEMS, INC.

**B. Application**

With that background, we turn to the particular arguments Cisco makes as to why it has no ATS liability. Corporate defendant Cisco initially argued for a generic limitation on ATS liability—that corporations may not be held liable under the ATS. Any such broad limitation, however, was laid to rest by the Supreme Court in *Nestle II*. Although there was no majority opinion so holding, five Justices in *Nestle II* concluded that domestic corporations are appropriate defendants under the statute. 141 S. Ct. at 1941–42 (Gorsuch, J., concurring, joined by Alito, J.), 1947 n.4 (Sotomayor, J., concurring in part and concurring in the judgment, joined by Breyer & Kagan, JJ.). Given that majority holding, we conclude that U.S. corporations may be sued for claims brought under the ATS.

Cisco's additional arguments as to why the ATS is inapplicable here require more extensive discussion.

*First,* Cisco maintains that the ATS does not recognize aiding and abetting, conspiracy, or joint criminal enterprise liability at all, and that even if such liability exists, Plaintiffs have not alleged conduct meeting the aiding and abetting *actus reus* or *mens rea*. *Second,* Cisco argues that the acts alleged here do not sufficiently touch and concern the United States, as required by *Kiobel* and *Nestle II*, to permit domestic application of the ATS. *Third,* Cisco posits that Plaintiffs have failed to allege state action as required under customary international law. We will consider each argument in turn.

One note before proceeding: The district court dismissed the case because, it concluded, Plaintiffs did not meet the aiding and abetting liability standard and Cisco's alleged actions did not sufficiently touch and concern the United

DOE I v. CISCO SYSTEMS, INC.                    23

States. The district court did not consider whether the ATS provides an underlying cause of action for the violations of international law that Cisco is alleged to have aided and abetted, namely, (1) torture, (2) prolonged arbitrary detention, (3) disappearance, (4) extrajudicial killing, (5) forced labor, (6) cruel, indecent, or degrading treatment, and (7) crimes against humanity. Cisco has not in this court contested the availability of a cause of action as to the first four violations, if committed directly.[7] Given that at least the accomplice liability for the uncontested causes of action survives the motion to dismiss if the other challenges raised on appeal fail, we proceed as if the additional causes of action also may lie and leave it to the district court on remand to consider in the first instance the viability of the substantive claims under the ATS to the degree that viability is contested.

### 1. Aiding and Abetting Liability under the ATS

Our Circuit has acknowledged several times the availability of aiding and abetting liability under the ATS.[8]

---

[7] We have previously recognized that the prohibition against state torture has attained *jus cogens* status—the highest and most universal norm of international law. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 715–17 (9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993); *U.S. v. Matta-Ballesteros*, 71 F.3d 754, 764 n.5 (9th Cir. 1995). Before *Sosa*, we recognized the availability of state torture claims under the ATS. *See Hilao v. Est. of Marcos*, 103 F.3d 767, 771 (9th Cir. 1996); *In re Est. of Ferdinand E. Marcos Hum. Rts. Litig.*, 978 F.2d 493, 499 (9th Cir. 1992).

[8] A Ninth Circuit panel first held aiding and abetting claims actionable under the ATS in *Doe v. Unocal Corp.* 395 F.3d 932, 947–51 (9th Cir. 2002). The Ninth Circuit ordered the case to be reheard by the en banc court, *see* 395 F.3d 978 (9th Cir. 2003), but later granted the parties'

24          DOE I v. CISCO SYSTEMS, INC.

*See Nestle I*, 766 F.3d at 1023;[9] *Sarei v. Rio Tinto*, 671 F.3d 736, 749, 765 (9th Cir. 2011) (en banc), *vacated*, *Rio Tinto PLC v. Sarei*, 569 U.S. 945 (2013).[10] We now revisit the question and conclude again, in agreement with every circuit to have considered the issue, that aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS. Because recognizing aiding and abetting liability does not raise separation-of-powers or foreign policy concerns under *Sosa* step two, we further decide, such liability is cognizable for the purposes of the ATS.

As noted, *Sosa* and *Jesner* caution federal courts to adopt a "restrained conception" of our discretion to recognize new causes of action under the ATS. *Sosa*, 542 U.S. at 725; *see Jesner*, 138 S. Ct. at 1402 (majority op.). Although "the door is still ajar" to such actions, the ATS is "subject to vigilant doorkeeping, and thus open to a narrow class of international

---

stipulated motion to vacate the district court opinion and dismiss the case, *see* 403 F.3d 708 (9th Cir. 2005).

[9] A later iteration of *Nestle I* was reversed by the Supreme Court on the ground that the plaintiffs failed to allege sufficient domestic action to overcome the presumption against extraterritoriality. *Nestle II*, 141 S. Ct. at 1937. The Supreme Court did not decide whether aiding and abetting liability was available under the ATS, *id.* at 1936, so *Nestle I*'s holding on that point arguably remains intact, *see KDM ex rel. WJM v. Reedsport Sch. Dist.*, 196 F.3d 1046, 1052 n.4 (9th Cir. 1999). In light of intervening Supreme Court precedent interpreting the ATS, however, we do not stand on *Nestle I* but instead conduct a new analysis as to the availability of aiding and abetting liability under the ATS.

[10] The Supreme Court vacated *Sarei* and remanded for further consideration in light of *Kiobel*. *See* 569 U.S. 945 (2013). "Vacated opinions remain persuasive, although not binding, authority." *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002).

DOE I V. CISCO SYSTEMS, INC.                    25

norms today." *Sosa*, 542 U.S. at 729. Again, any new cause of action must meet the two-part test elaborated by *Sosa* and reiterated in *Jesner*: First, the international norms must be "specific, universal, and obligatory." *Jesner*, 138 S. Ct. at 1399 (plurality op.) (quoting *Sosa*, 542 U.S. at 732). Second, a court must determine "whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion." *Id.* (plurality op.). The two prongs of the *Sosa* test are interrelated and "not altogether discrete." *Id.* (plurality op.).

Questions as to the scope of liability under the ATS, including accomplice liability, are determined under international law and so are subject to *Sosa*'s two-part test. *Sosa* directed courts to international law to determine "the scope of liability for a violation of a given norm." 542 U.S. at 732 n.20; *see also Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 268–69 (2d Cir. 2007) (Katzmann, J., concurring) (looking to the law of nations to determine the standard for aiding and abetting claims under the ATS). We thus analyze whether, and what form of, accomplice liability is available under the ATS by considering whether international law specifically and universally provides for aiding and abetting liability. We then look to whether any practical or foreign policy considerations caution against recognizing this form of liability, generally or in this case in particular.

### a. Sosa's First Step

To evaluate the contours of an international law norm, *Sosa* instructs courts to look to "those sources we have long, albeit cautiously, recognized," which include "the customs and usages of civilized nations; and, as evidence of these, . . . the works of [qualified] jurists and commentators." 542 U.S.

26          DOE I v. CISCO SYSTEMS, INC.

at 733–34 (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). Article 38(I) of the Statute of the International Court of Justice ("ICJ"), annexed to the Charter of the United Nations, similarly outlines the following authoritative sources of international law: "international conventions, whether general or particular, establishing rules expressly recognized by the contesting states," "international custom, as evidence of a general practice accepted as law," "the general principles of law recognized by civilized nations," and "judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law." Statute of the International Court of Justice, art. 38, ¶ 1; *see also* Restatement (Third) of Foreign Relations Law § 102 (Am. L. Inst. 1987). We accordingly proceed to survey the types of international law sources identified by *Sosa* and Article 38(I), as applicable to aiding and abetting liability. The available sources establish that customary international law recognizes aiding and abetting liability as a specific and universal form of liability, satisfying the first prong of the *Sosa* two-part test.

In *Khulumani*, the Second Circuit determined that aiding and abetting liability is cognizable under the ATS, but the judges differed as to their reasoning. 504 F.3d at 260 (per curiam). Judge Katzmann, concurring, comprehensively reviewed criminal trials in the seminal tribunals of Nuremberg and the U.S. occupation zone after World War II, a plethora of treaties and conventions, actions of the U.N. Security Council, the decisions of two modern international tribunals—the International Criminal Tribunal for Yugoslavia ("the Yugoslavia Tribunal") and the International Criminal Tribunal for Rwanda ("the Rwanda Tribunal")—and the Rome Statute of the International

DOE I v. CISCO SYSTEMS, INC.                    27

Criminal Court ("Rome Statute"), July 17, 1998, 37 I.L.M. 999 (1998), all of which recognize some form of accomplice liability for violations of international law. *Id.* at 270–77. Based on those sources, Judge Katzmann concluded that aiding and abetting liability was sufficiently well defined and universally recognized to be cognizable under the ATS. *Id.* at 277. The Second Circuit later adopted Judge Katzmann's reasoning, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009).

Since *Khulumani*, the Second, Fourth, and Eleventh Circuits have all held that aiding and abetting liability claims may proceed under the ATS. *See Talisman*, 582 F.3d at 258; *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011); *Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–58 (11th Cir. 2005)); *cf. Doe v. Exxon Mobil Corp.* ("*Doe v. Exxon*"), 654 F.3d 11, 32 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. Appx. 7 (D.C. Cir. 2013).[11] No circuit to consider the issue has held otherwise.

In light of this domestic consensus, our Court's prior holdings, and the universality of aiding and abetting liability under international law as demonstrated by Judge Katzmann's analysis in *Khulumani*, we again conclude that

---

[11] The D.C. Circuit recognized aiding and abetting liability under the ATS and adopted the substantial assistance *actus reus* and knowledge *mens rea* in *Doe v. Exxon*, 654 F.3d at 39. The judgment was later vacated and the ATS claims were remanded to the district court for additional consideration after the Supreme Court decided *Kiobel*, 569 U.S. 108, and after the International Criminal Tribunal for Yugoslavia ("the Yugoslavia Tribunal") decided *Prosecutor v. Perisic*, Case No. IT-04-81-A, Judgment (Yugoslavia Tribunal Feb. 28, 2013). *Doe v. Exxon Mobil Corp.*, 527 Fed. App'x 7 (D.C. Cir. 2013). The D.C. Circuit has not since revisited accomplice liability under the ATS.

aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS.

### b. Sosa's Second Step

Even where a norm of international law is sufficiently definite and universal to meet *Sosa*'s first requirement, "it must be determined further whether allowing [a] case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before [a new form of liability] can be imposed." *Jesner*, 138 S. Ct. at 1399 (plurality op.). *Sosa* and *Jesner* together describe the contours of the second step of this analysis, which includes two broad categories of inquiry: foreign policy consequences and deference to Congress.

*First,* federal courts must consider the foreign policy implications and general "practical consequences of making [a] cause available to litigants in federal courts." *Sosa*, 542 U.S. at 732–33. Of gravest concern in *Sosa* was the risk of U.S. courts interfering with the sovereign actions of another government:

> It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign

government or its agent has transgressed those limits.

*Id.* at 727 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 431–32 (1964)) (concerning the act of state doctrine). To address that concern, a federal court must consider whether recognizing a cause of action under the ATS serves the original purposes of the Act, to "promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." *Jesner*, 138 S. Ct. at 1397, 1406 (majority op.).

Additionally, because of the international comity and foreign policy concerns inherent in enforcing international law norms in U.S. courts, *Sosa* suggests that in certain "case-specific" instances, federal courts have good reason to defer to the views of the Executive Branch as to whether a given case should proceed, although *Sosa* itself did not present such concerns. 542 U.S. at 733 n.21. Discussing *In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379 (JPML 2002), in which the U.S. State Department submitted written objections to the suit, *Sosa* noted that an objection by the State Department to a particular claim under the ATS would present a "strong argument" to defer to "the Executive Branch's view of the case's impact on foreign policy." 542 U.S. at 733 n.21.

*Jesner* held that practical consequences precluded recognition of a cause of action in that case. Pointing to "significant diplomatic tensions" caused by the suit, the Court determined that foreign corporations cannot be liable under the ATS and that diplomatic tensions counseled

30          DOE I v. CISCO SYSTEMS, INC.

against allowing the particular case to proceed. 138 S. Ct. at 1406–07 (majority op.). The Court in *Jesner* noted, first, that the Hashemite Kingdom of Jordan had filed an amicus brief objecting that the litigation against Arab Bank was "a 'grave affront' to its sovereignty" and that the suit would "threaten[] to destabilize Jordan's economy." *Id.* at 1407 (majority op.). The Court also referenced the U.S. State Department's amicus brief describing Jordan as "a key counterterrorism partner, especially in the global campaign to defeat the Islamic State in Iraq and Syria," and discussing the "significant diplomatic tension" the lawsuit had caused in its initial thirteen years. *Id.* at 1406 (majority op.). Ultimately, the foreign relations tensions the case engendered—"the very foreign relations tensions the First Congress sought to avoid"—cautioned against holding that foreign corporations could be defendants in suits brought under the ATS. *Id.* at 1406–07 (majority op.). After *Sosa* and *Jesner*, then, courts must carefully consider whether allowing a cause of action to proceed will cause or has already caused diplomatic tension, as indicated by the statements of foreign countries and the U.S. government.

*Second,* federal courts must consider whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a . . . remedy" before recognizing a new cause of action. *Jesner*, 138 S. Ct. at 1402 (majority op.) (*quoting Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017)). *Sosa* instructed federal courts to use restraint in recognizing new causes of actions in part for this separation-of-powers reason. 542 U.S. at 728. The Court in *Sosa* recognized that the absence of a congressional mandate to allow new causes of action under the ATS and the lack of legislation "to promote such suits"—with the exception of the TVPA—provide strong reason to be "wary of impinging on the

DOE I v. CISCO SYSTEMS, INC.                           31

discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727–28. Exercising this caution, *Jesner* concluded that "absent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations." 138 S. Ct. at 1403 (majority op.).

Considering the potential impact of this case in these two arenas—identifiable foreign relations concerns and deference to Congress—we see no prudential reason to decline to recognize aiding or abetting liability or to bar this particular action from proceeding.

*First,* recognizing aiding and abetting liability does not trigger *Sosa*'s principal foreign policy concern—that ATS claims could impose liability on sovereign nations for behavior with respect to their own citizens. 542 U.S. at 727. Rather, accomplice liability, historically and as shown here, is much more likely to be used to address the transgressions of nongovernmental actors than the actions of foreign governments themselves. *See, e.g.*, *Nestle II*, 141 S. Ct. at 1935 (majority op.); *Kiobel*, 569 U.S. at 111–12; *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 163 (2d Cir. 2015). Dating back to the military tribunals after World War II, aiding and abetting liability has been alleged frequently in proceedings against private individuals and corporations. *See, e.g.*, *The Zyklon B Case*, 1 Trials of War Criminals ("T.W.C.") 93, 93–95 (1946); *The Flick Case*, 6 T.W.C. 1, 11, 13 (1947); *United States v. Krauch ("The I.G. Farben Case")*, 8 T.W.C. 14, 1081, 1084–95, 1107 (1948). Suits against nongovernmental actors do not raise the same international comity and sovereignty issues inherent in "claim[ing] a limit on the power of foreign governments over their own citizens" that animated *Sosa*'s concerns regarding the broader foreign policy effects of ATS litigation. 542 U.S. at

32          DOE I v. CISCO SYSTEMS, INC.

727. Particularly after *Jesner*, which forecloses suit under the ATS against foreign corporations, 138 S. Ct. at 1407 (majority op.), and *Kiobel*, which requires a close relationship between the alleged violation and the territory of the United States, 569 U.S. at 124, aiding and abetting liability is most likely to be alleged, as here, in suits against U.S. citizens and corporations, not foreign governments.

Further, recognizing aiding and abetting liability, particularly for U.S. defendants, well serves the original goals of the ATS: to provide a forum for violations of international law that, if lacking, could cause foreign relations strife or "embarrass[ment]" to the United States. *Id.* at 123. In this instance, of course, China is unlikely to take issue with a federal court's discretionary refusal to recognize imposing accomplice liability on Cisco. But international concern with violations of human rights or the failure to provide an adequate forum for their vindication may also be of some relevance—in this instance, potential scrutiny by the international community generally for a failure to provide a forum in which U.S. citizens and corporations can be held accountable for violating well-defined and universal international norms, including aiding and abetting liability.

Additionally, the current record does not reflect any case-specific foreign policy considerations that present a reason to bar this action. Unlike cases in which both U.S. and foreign government actors raise objections to the litigation, no foreign government or Executive Branch agency has submitted an amicus brief, declaration, or letter objecting to this lawsuit. *See, e.g.*, *Jesner*, 138 S. Ct. at 1406–07 (majority op.); *In re S. Afr. Apartheid Litig.*, 238 F. Supp. 2d 1379 (JPML 2002). There has been no lack of time to do so: Plaintiffs first filed suit in May 2011. In sharp contrast, the Chinese government and the U.S. State

DOE I v. CISCO SYSTEMS, INC.                    33

Department *have* become involved in other cases relating to the Chinese government's persecution of Falun Gong practitioners. Both China and the U.S. State Department, for example, submitted statements of interest in *Doe v. Qi*, a case involving ATS and TVPA claims brought by Falun Gong adherents against Chinese government officials directly. 349 F. Supp. 2d 1258, 1264, 1296–1301 (N.D. Cal. 2004). That neither the government of China nor the U.S. Executive Branch has taken action regarding this case indicates that the foreign affairs implications here are not comparable to cases in which the Chinese government or Chinese government officials are parties. In *Jesner*, in contrast to this case, the Court was presented with forceful and strategic warnings by the U.S. State Department as well as an amicus brief by a foreign government. 138 S. Ct. at 1406–07 (majority op.). No similar case-specific, articulated foreign policy concerns have been raised in this case. *See Sosa*, 542 U.S. at 733 n.21.

The dissent notes that district courts (and on occasion appellate courts) have sometimes requested the State Department submit analysis regarding the foreign policy implications of an ATS suit. *See* Dissent at 7-8 (citing, *e.g.*, *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 347 (D.C. Cir. 2007); *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995)). The district court here did not ask the State Department to submit its views on the case. For several reasons, we do not consider the lack of affirmative solicitation of the State Department's views to be a barrier to our analysis of case-specific foreign policy concerns on the current record.

First, neither *Sosa* nor *Jesner* states that affirmatively soliciting the government's view is required. *See Sosa*, 542 U.S. at 733 n.21; *Jesner*, 138 S. Ct. at 1406–07. And, although district courts have at times sua sponte requested

34          DOE I V. CISCO SYSTEMS, INC.

the views of the State Department, *see, e.g.*, *Exxon Mobil Corp.*, 473 F.3d at 347, others have done so only after a party's request, *see Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d. 1164, 1169 (D.C. Cal. 2005); after allowing the parties to be heard on the necessity of requesting the government's views, *see, e.g.*, *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 335 (C.D. Cal. 1997); or when a foreign government has filed an ex parte declaration urging the court to dismiss the suit, *see Khulumani*, 504 F.3d at 259. Here, Cisco did not request that the district court solicit the views of the State Department. And, as we have discussed, the Chinese Government has not submitted any declarations objecting to the suit.

Second, we disagree with the dissent that we may not infer a lack of concern from the government's silence. The dissent notes that the State Department, in an area of litigation similarly rife with foreign policy ramifications— the Foreign Sovereign Immunities Act —"intervenes only selectively" where suit is brought against a high-ranking foreign government official. Dissent at 11. The State Department's passive approach in cases such as the one before us, in which no foreign government actor or head of state is directly party to the suit, offers support for the conclusion that the State Department views such cases as less likely to harm foreign relations.

We also decline to request the State Department's analysis ourselves. The foreign policy implications of a lawsuit, where contested, would constitute a factual dispute that we would be required to remand to the district court. *See DeMarco v. United States*, 415 U.S. 449, 450 (1974); *Spokane County v. Air Base Housing, Inc.*, 304 F.2d 494, 499 (9th Cir. 1962). Our decision on the current record does

DOE I v. CISCO SYSTEMS, INC.                    35

not foreclose the district court from considering on remand whether to request the views of the State Department.

*Second,* we consider whether "there are sound reasons to think Congress might doubt the efficacy or necessity" of recognizing aiding and abetting liability under the ATS. *Jesner*, 138 S. Ct. at 1402 (majority op.). Cisco puts forward two such arguments against the recognition of aiding and abetting liability here.[12]

First, Cisco argues that *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), established a presumption that Congress has not provided for aiding and abetting liability in a civil statute unless it has done so expressly. We reject this reading of *Central Bank of Denver*, as explained in our analysis of the TVPA claim. *See infra* Discussion, Part II.A.

For present purposes, it is enough to observe that *Central Bank of Denver* does not govern whether aiding and abetting liability is available under the ATS, as the Second Circuit has recognized. *See Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring), *cited with approval in Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 130 (2d Cir. 2010); *see also Khulumani*, 504 F.3d at 288 n.5 (Hall, J., concurring); *cf. Doe v. Exxon*, 654 F.3d at 28–29. The ATS is a jurisdictional statute. Decisions as to the appropriate scope of liability, as we have discussed, depend on international law, not on statutory text delineating the scope of liability or the

---

[12] Cisco raises some of these points in arguing that this case is a nonjusticiable political question and barred by the act of state and international comity doctrines. In the context of the ATS, these arguments are more appropriately considered in the second step of the *Sosa* test, so we address them here.

36          DOE I v. CISCO SYSTEMS, INC.

elements of the permissible causes of action. *See supra* Discussion, Part I.B.1. Because ATS liability is generally determined under international law, *Central Bank of Denver*'s rejection of a presumption of aiding and abetting liability for federal civil statutes delineating new causes of action is not apposite to the question whether the ATS provides accomplice liability.

To be sure, under *Sosa*'s step two, caution from Congress *against* recognizing a particular form of international law liability under the ATS would be relevant. *Jesner*, 138 S. Ct. at 1402 (majority op.). But, again, there is no ATS-specific caution pertinent here.

Cisco next argues with respect to the congressional doubt consideration that this case would improperly interfere with the system of U.S. trade regulation of export sales to China, regulation that takes into account human rights concerns. Specifically, Cisco cites U.S. Commerce Department regulations concerning the export of crime control equipment, 15 C.F.R. § 742.7 (2010), and part of the Foreign Relations Authorization Act for Fiscal Years 1990 and 1991, Pub. L. No. 101-246, §§ 901–902, 104 Stat. 15, 80–85 (1990) ("Tiananmen Act").

The Commerce Department regulations implement a licensing regime for the export of crime control equipment, including police batons, whips, helmets, and shields, to most countries, including China. 15 C.F.R. § 742.7(a); *see* 50 U.S.C. §§ 4801–4852. The regulations do not cover the export of computer networking software or hardware. Cisco argues that this omission is intentional and represents a decision not to ban exports to China of such software or hardware.

DOE I v. CISCO SYSTEMS, INC.                    37

The Tiananmen Act was passed in response to the "unprovoked, brutal, and indiscriminate assault on thousands of peaceful and unarmed demonstrators and onlookers in and around Tiananmen Square by units of the People's Liberation Army." Pub. L. No. 101-246, § 901(a)(1). Among other sanctions, the Act suspended the granting of the requisite licenses for exports of crime control equipment to China until the President of the United States issued a report meeting enumerated statutory requirements. *Id.* § 902(a)(4). This suspension did not affect exports of computer networking software or hardware, for which no license is required, as just discussed.

The Commerce Department regulations and the Tiananmen Act, Cisco maintains, were "carefully designed to strike a balance between the Nation's policy of economic and political engagement with China and concerns about China's respect for civil and human rights." As a consequence, Cisco asserts, it was entitled to rely on the fact that U.S. trade regulations do not restrict the sale of internet infrastructure components to Chinese law enforcement officials.

This argument, premised on what is *not* in the Commerce Department regulations or the Tiananmen Act, calls to mind one made in *Jesner* and adopted by three Justices but not by the majority of the Court. *See* 138 S. Ct. at 1405 (plurality op.). Those Justices—Chief Justice Roberts and Justices Kennedy and Thomas—would have declined to recognize the liability of foreign corporate banks in light of the Anti-Terrorism Act, "part of a comprehensive statutory and

38          DOE I v. CISCO SYSTEMS, INC.

regulatory regime that prohibits terrorism and terrorism financing." *Id*. (plurality op.). Justice Kennedy explained:

> The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism. It would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability in actions filed under the ATS.

*Id.* (plurality op.).

Putting aside the absence of a majority ruling on the Anti-Terrorism Act argument in *Jesner*, the circumstances in *Jesner* are not parallel to those here. The regulations and congressional actions Cisco cites lack the comprehensive and direct regulation of the subject matter present in *Jesner*. Unlike the Anti-Terrorism Act's treatment of banks, which the Supreme Court described as "part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing," *id.*, neither the Commerce Department regulations nor the Tiananmen Act specifically address or attempt to regulate the export of computer networking software or hardware. So recognizing an aiding and abetting claim involving the sale of such software and hardware under the ATS does not displace, or even affect, an existing, comprehensive regulatory scheme.

Ultimately, Congress and the Executive's decision not to regulate or prohibit generally the export of computer

DOE I v. CISCO SYSTEMS, INC.                    39

networking software does not conflict with the recognition that U.S. corporations may be liable, in designing and selling *certain* software under *certain* circumstances, for aiding and abetting violations of international law. Put another way, the Commerce Department regulations and the Tiananmen Act do not regulate the sale of computer networking software or hardware at all, for crime control or any other purpose, and so do not insulate such sales from otherwise applicable legal regimes, domestic or international.

We conclude that no general or case-specific foreign policy considerations caution against recognizing accomplice liability under the ATS. Nor is there any indication that Congress "might doubt the efficacy or necessity" of recognizing aiding and abetting liability under the ATS generally or as to the design and sale of computer networking software and hardware to China. *Jesner*, 138 S. Ct. at 1402 (majority op.).

### 2. Aiding and Abetting Standard

The standard for accomplice liability is determined by customary international law. *See Khulumani*, 504 F.3d at 268–69 (Katzmann, J., concurring); *see also Sosa*, 542 U.S. at 732 n.20. We join the Second, Fourth, and Eleventh Circuits in holding that the global consensus is that the *actus reus* of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation. *See Talisman*, 582 F.3d at 253; *Aziz*, 658 F.3d at 401; *Cabello*, 402 F.3d at 1158; *cf. Doe v. Exxon*, 654 F.3d at 39. Like the Eleventh Circuit, we additionally hold the *mens rea* for aiding and abetting liability under customary international law is knowing assistance. *See Cabello*, 402 F.3d at 1158; *cf. Doe v. Exxon*, 654 F.3d at 39. Applying this standard, we conclude that Plaintiffs plausibly alleged that

corporate defendant Cisco provided assistance to the Party and to Chinese Public Security that had substantial effects on those entities' violations of international law. We further hold that Plaintiffs plausibly alleged that corporate defendant Cisco knowingly provided such assistance. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

### a. Actus reus

### (i) Standard

The *actus reus* of aiding and abetting liability is well established under customary international law. During and since the military tribunals following World War II, international tribunals have concluded that under international customary law, a defendant is liable for aiding and abetting a violation of international law when the accused provides assistance, encouragement, or moral support that has a substantial effect on the crimes. *See e.g.*, *Prosecutor v. Taylor*, Case No. SCSL-03-01-A, Judgment, ¶¶ 368, 371, 377 n.1193 (Special Court for Sierra Leone ("Sierra Leone Tribunal") Sept. 26, 2013) (collecting cases); *Prosecutor v. Furundzija*, Case No. IT-95-17/1-T, Judgment, ¶ 245 (Yugoslavia Tribunal Dec. 10, 1998); *Prosecutor v. Tadic*, Opinion and Judgment Case No. IT-94-1-T, ¶ 689 (Yugoslavia Tribunal May 7, 1997).[13] Every circuit and numerous trial courts recognizing aiding and abetting liability under the ATS have adopted this *actus reus* standard. *See Khulumani*, 504 F.3d at 277 (Katzmann, J.,

---

[13] International treaties and agreements, including the Rome Statute, do not specify what a defendant must be proven to have done for aiding and abetting liability to attach. *See* Rome Statute of the International Criminal Court art. 25(3)(c), July 17, 1998, 2187 U.N.T.S. 90. We therefore rely principally on the decisions of international tribunals to discern the appropriate *actus reus* standard.

DOE I v. CISCO SYSTEMS, INC.                    41

concurring); *Talisman*, 582 F.3d at 247, 253; *Aziz*, 658 F.3d at 401; *Cabello*, 402 F.3d at 1158; *cf. Doe v. Exxon*, 654 F.3d at 39. The parties do not dispute that assistance with substantial effect on the perpetration of an international law violation is the correct standard. We agree, and hold the *actus reus* of aiding and abetting liability under the ATS is established if the plaintiff demonstrates that the defendant provided assistance that had a substantial effect on the commission of a violation of the law of nations.

The parties here do disagree concerning the meaning of "assistance with substantial effect." Citing *Prosecutor v. Perisic*, Case No. IT-04-81-A, Judgment, ¶¶ 27–28, 38 (Yugoslavia Tribunal Feb. 28, 2013), Cisco argues that customary international law requires plaintiffs to allege that a defendant's conduct was "specifically directed" toward the commission of a crime.[14]

*Perisic* held that "assistance must be 'specifically'— rather than 'in some way'—directed towards the relevant crimes." *Perisic*, ¶ 27; *see also id.* ¶ 37. In *Prosecutor v. Sainovic*, however, the Yugoslavia Tribunal Appeals Chamber "unequivocally reject[ed]" *Perisic* and concluded that "'specific direction' is not an element of aiding and abetting liability under customary international law." Case No. IT-05-87-A, Judgment, ¶¶ 1649–50 (Yugoslavia Tribunal Jan. 23, 2014). The Yugoslavia Tribunal reaffirmed that decision in *Prosecutor v. Popovic*, Case No. IT-05-88-A, Judgment, ¶ 1758 (Yugoslavia Tribunal Jan. 30, 2015).

---

[14] Whether a "specifically directed" factor is included in the *actus* reus standard for aiding and abetting liability under international law is a question we noted but left unanswered in *Nestle I*. 766 F.3d at 1026–27.

*Perisic* was thus an outlier at the Yugoslavia Tribunal, repudiated in later cases. And it was an outlier among the decisions of other international tribunals when it was decided. *See Taylor*, ¶¶ 474–75 (Sierra Leone Tribunal 2013) (reviewing international tribunal judgments, which did not require specific direction, and subsequent case law at the Yugoslavia and Sierra Leone Tribunals, and rejecting the *Perisic* specific direction standard). The current consensus of international law tribunals is that aiding and abetting liability requires only that a defendant provide assistance, of any kind, with substantial effect on the perpetration of an international law violation. We therefore adopt that *actus reus* standard.

Assistance with substantial effect may be established "in an infinite variety of ways." *Taylor*, ¶ 369. The inquiry is case specific and fact intensive. *Id.* ¶ 370 (citing *Prosecutor v. Sesay*, SCSL-04-15-T, Judgment, ¶ 769 (Sierra Leone Tribunal Mar. 2, 2009) (collecting cases)). In assessing the effect of a defendant's action, courts consider the "cumulative[]" contribution a defendant makes to the alleged violation—not whether each individual act had substantial effect. *Id.* ¶ 362 n.1128.

International tribunals have held, for example, that a defendant's assistance had a substantial effect on the commission of international law violations when the defendant furnished "weapons and ammunition, vehicles and fuel or personnel," or other resources relied on in the commission of the crimes. *Id.* ¶ 369 (collecting cases). Some courts have interpreted this form of assistance as providing the "means" by which a principal commits the crime. *See, e.g.*, *In Re South African Apartheid Litigation*, 617 F. Supp. 2d 228, 259 (S.D.N.Y. 2009). The canonical Second World War–era example is *The Zyklon B Case*, in which the owner

DOE I v. CISCO SYSTEMS, INC.                    43

of a chemical company and his second-in-command were convicted of aiding and abetting war crimes after selling large quantities of poison gas, used to effectuate mass killings, to the German security forces. 1 T.W.C. at 93–95, 102.

More recently, courts have recognized that an actor may have a substantial effect on the perpetration of international law violations by supplying computer hardware, software, or technological support that enhances the capacity of the principal to coordinate and facilitate operations in which crimes are committed. For example, in *In re South African Apartheid Litigation*, victims of the South African apartheid regime brought suit under the ATS in the Southern District of New York alleging that IBM "aided and abetted the South African Government's denationalization of black South Africans [the crime of apartheid] through the provision of computers, software, training, and technical support." 617 F. Supp. 2d at 242, 265. Specifically, the plaintiffs alleged that IBM sold computers used in denationalization campaigns and developed "indispensable" computer software and support "specifically designed to produce identity documents and effectuate denationalization." *Id.* at 265. In holding these allegations sufficient to satisfy the *actus reus* requirement of aiding and abetting liability at the pleadings stage, the district court noted that "the records necessary to deliberately denationalize a large proportion of black South Africans were generated using equipment allegedly provided by IBM." *Id.*

Similarly, the Sierra Leone Tribunal recently upheld the conviction of former President of Liberia Charles Ghankay Taylor for aiding and abetting numerous crimes during the conflict in Sierra Leone and Liberia in the late 1990s and early 2000s. *Taylor*, ¶¶ 4-9. The trial court found, and the

44          Doe I v. Cisco Systems, Inc.

Sierra Leone Tribunal Appeals Chamber affirmed, that Taylor's provision of arms and ammunition, personnel, and "operational support and advice," which the armed forces used in committing atrocities, constituted assistance with a substantial effect on the crimes. *Id.* ¶ 395. The operational assistance Taylor provided to the Revolutionary United Front/Armed Forces Revolutionary Council ("RUF/AFRC") included a communications system, satellite phones, a long-range radio, and radio operators, used to report on the location of international and other opposition forces and to coordinate diamond mining and sales and the shipment of arms used in the conflict. *Id.* ¶¶ 323, 326, 332, 342. The appeals chamber held that the "communications and logistics support Taylor provided was sustained and significant" and "enhanced the capability of the RUF/AFRC leadership to plan, facilitate or order RUF/AFRC military operations during which crimes were committed." *Id.* ¶ 520.

Other cases establish that a defendant's assistance in locating or identifying victims, through technology or otherwise, can have substantial effect on the commission of international law violations. In *Trial of Otto Ohlendorf and Others* ("*Einsatzgruppen*"), a Nuremberg tribunal found Waldemar Klingelhoefer guilty as a principal and accessory to the killing of thousands of people by specialized German military ("Einsatz") units. 4 T.W.C. 1, 568–70 (1948). The tribunal concluded that Klingelhoefer's "locating, evaluating and turning over lists of Communist party functionaries to the executive of his organization" made him an accessory to the subsequent unlawful killing of the individuals whose identity he revealed. *Id.* at 569–70. Similarly, the Rwanda Tribunal Appeals Chamber held that Emmanuel Rukundo, a military chaplain in the Rwandan army, substantially assisted the Rwandan army, and so

DOE I V. CISCO SYSTEMS, INC.                    45

fulfilled the *actus reus* of aiding and abetting abductions and killings during the Rwandan genocide, when he "on at least four occasions . . . was present . . . and identified Tutsi refugees to soldiers . . . who subsequently removed and then killed them." *Prosecutor v. Rukundo*, Case No. ICTR-2001-70-A, Judgment, ¶¶ 2, 176 (Rwanda Tribunal Oct. 20, 2010).

These cases represent some of the "variety of ways" that assistance with substantial effect may be established. *Taylor*, ¶ 369. We now turn to applying the substantial effect standard, as illuminated by this case law from various international tribunals and domestic courts, to corporate defendant Cisco.[15]

### (ii) Application to Corporate Defendant Cisco

Plaintiffs allege that Cisco's contributions to the Golden Shield improved the capacity of Chinese government officials and Party security agents across China to work together, share information about, and identify specific Falun Gong practitioners, and so constituted assistance with substantial effect. Specifically, Plaintiffs point to the integration of Falun Gong "profile" databases into a national surveillance system accessible by every level of security—national, provincial, and municipal. According to the complaint, the centralization of information and integration of security systems not only helped Chinese security officials with the tracking and identification of individual practitioners, but also provided a system through which

---

[15] We do not here apply the *actus reus* or *mens rea* standards to the individual defendants, Chambers and Cheung, as we conclude below that the complaint does not allege actions taken by Chambers and Cheung that sufficiently touch and concern the United States to overcome the presumption against extraterritorial application of the ATS. *See infra* Discussion, Part I.B.3.b(ii).

46          DOE I v. CISCO SYSTEMS, INC.

officials could track the progression of a given Falun Gong practitioner from detection to forced conversion to post-detention and post-conversion surveillance.

The allegations in the complaint are specific, not conclusory. *See Twombly*, 550 U.S. at 555. Each of the thirteen plaintiffs alleges having been tracked and identified through Chinese authorities' use of Golden Shield technology, without which their detection would not have been possible. Nearly all plaintiffs allege the use of information collected via Golden Shield technology during the forced conversion, or torture, to which they were subjected. Plaintiffs also point to reports and statements by Chinese officials describing Golden Shield software as necessary to the repression of Falun Gong. According to one former Office 610 security agent, for example, Golden Shield technology was the "essential means to manage, analyze and categorize information about [three of the plaintiffs] and [then] instruct public security officers to apprehend, detain and forcibly convert them."

These allegations, accepted as true, are sufficient to state a plausible claim that Cisco provided assistance with substantial effect on cognizable violations of international law. Similarly to *In Re South African Apartheid Litigation*, in which the technology IBM provided played an "indispensable" role in the mechanism of the apartheid regime, here Golden Shield technology was described by Chinese authorities as "essential" in locating and apprehending Falun Gong members. 617 F. Supp. 2d at 265. Like the satellite phones and technical assistance that enabled improved coordination among the military groups in *Taylor*, ¶¶ 323, 326, 332, 342, here Cisco's technological products and assistance greatly enhanced the capacity of Party and Chinese security officers to coordinate their

DOE I v. CISCO SYSTEMS, INC.                    47

monitoring and forced conversion—torture—of Falun Gong practitioners, and so substantially assisted the perpetration of alleged human rights abuses. Moreover, although Cisco's alleged contributions to the efforts of Chinese authorities to identify and track Falun Gong practitioners differ somewhat from those in *Einsatzgruppen* and *Rukundo*, in which the defendants aided and abetted the principal by directly identifying targets of persecution, *Einsatzgruppen*, 4 T.W.C. at 569; *Rukundo*, ¶ 176, the difference in the type of connection to identification does not detract from the essential role Cisco's technology played, according to the complaint, in identifying and tracking Falun Gong practitioners.

Finally, as in *Taylor*, in which the tribunal found it significant that the defendant provided assistance during an international embargo that otherwise restricted the flow of resources to the armed forces, *Taylor*, ¶¶ 323, 514, 517, the timing of Cisco's assistance increased its overall impact. Plaintiffs allege that China did not at that time have the technological prowess itself to create a database with the sophistication of the Golden Shield, including the ability to track Falun Gong activities online with sufficient accuracy to collect the desired level of information about suspected Falun Gong practitioners. So, as in *Taylor*, the timing of Cisco's assistance to Chinese authorities increased its significance.

In sum, given Cisco's significant technological assistance; the use of such technology to identify, detain, and torture Falun Gong practitioners; and the timing of that assistance during a period in which Chinese authorities did not have equivalent technological tools, we conclude that Plaintiffs have plausibly alleged that Cisco provided

48          DOE I v. CISCO SYSTEMS, INC.

assistance with substantial effect on Chinese authorities' violations of international law.

Cisco further insists that the tools it provided could have been used lawfully, so Cisco's assistance cannot be considered to have a substantial effect on the commission of illegal activity. That argument is misplaced. Actions that are not themselves criminal can lead to aiding and abetting liability, depending on the circumstances. Again, the canonical example of an act satisfying the *actus reus* of aiding and abetting liability under international law is *The Zyklon B Case*, in which the defendants were convicted of selling large quantities of a chemical delousing agent, an act that in another context would violate no law. 1 T.W.C. at 93–96. More recently, the Sierra Leone Tribunal in *Taylor* explicitly affirmed that:

> perfectly innocuous items, such as satellite phones, could be used to assist the commission of crimes, while instruments of violence could be used lawfully. The distinction between criminal and non-criminal acts of assistance is not drawn on the basis of the act in the abstract, but on its effect in fact.

*Taylor*, ¶ 395.

Nor does assistance need to be used for exclusively criminal purposes to be actionable. In *Taylor*, the Sierra Leone Tribunal Appeals Chamber noted that one of Taylor's acts of substantial assistance—the provision of a guesthouse—was used both for matters related to the ongoing peace negotiations and "to facilitate the transfer of arms, ammunition, and funds directly from Taylor to the

RUF/AFRC." *Id.* ¶ 342. In *Flick*, another canonical post-World War II tribunal case in which the defendant was convicted of contributing money to a criminal organization, the tribunal noted that "[i]t seems to be immaterial whether [the money] was spent on salaries or for lethal gas." 6 T.W.C. at 1221. Here, although Golden Shield technology could be and was used for some legitimate law enforcement activities, a multipurpose use and the general legality of providing crime control software does not render the assistance Cisco provided any less substantial in its facilitation and enhancement of Chinese authorities' persecution of Falun Gong in violation of customary international law.

### b. Mens rea

#### (i) Standard

No domestic consensus exists as to the *mens rea* requirement of aiding and abetting liability under international law. The Second and Fourth Circuits have held, drawing heavily from Judge Katzmann's analysis in *Khulumani* and the language of the Rome Statute, that customary international law requires a defendant to act with the purpose of facilitating the crime. *Talisman*, 582 F.3d at 259; *Aziz*, 658 F.3d at 390. The Eleventh Circuit disagrees, concluding that aiding and abetting liability requires only knowledge that a defendant's actions will assist in the commission of an international law violation. *Cabello*, 402 F.3d at 1158; *cf. Doe v. Exxon*, 654 F.3d at 39. We left this question unresolved in *Nestle I* because we concluded that the plaintiffs' allegations in that case satisfied the "more stringent purpose standard." 766 F.3d at 1024. We noted that "[a]ll international authorities agree that '*at least* purposive action . . . constitutes aiding and abetting.'" *Id.* (quoting

*Sarei*, 671 F.3d at 765–66); *accord Khulumani*, 504 F.3d at 277.

A growing body of relevant material supports the universality and specificity of the knowledge standard for aiding and abetting liability under customary international law. The knowledge standard "dates back to the Nuremberg tribunals," *Nestle I*, 766 F.3d at 1023, and other post–World War II tribunals and has been followed by international criminal courts with few exceptions in the many decades since.

All major international tribunals to try individuals for aiding and abetting liability for war crimes after World War II used the knowledge standard.[16] In the *Zyklon B Case*, the British Tribunal at Nuremberg convicted the owner and administrative assistant of a chemical company for aiding and abetting war crimes by supplying poisonous gas to the S.S. knowing that the gas would be used to kill human beings. 1 T.W.C. at 93–96. The International Military

---

[16] We disagree with the conclusion of the Second Circuit in *Talisman* that "international law at the time of the Nuremberg trials recognized aiding and abetting liability only for purposeful conduct." *Talisman*, 582 F.3d at 259. *Talisman* cited just one case, *United States v. von Weizsaecker ("The Ministries Case")*, 14 T.W.C. 622 (1949). *Id.* As we noted in *Nestle I,* the *Ministries Case* acquitted one defendant, Karl Rasche, because his actions did not meet the *actus reus* of aiding and abetting liability, not because he failed to act purposefully. 766 F.3d at 1023. And the same Nuremberg Military Tribunal convicted another defendant, Emil Puhl, because he knowingly received and disposed of stolen property taken from people imprisoned in concentration camps, supporting the use of the knowledge standard. 14 T.W.C. at 620. Additionally, the Second Circuit's reliance on the *Ministries Case* does not acknowledge the many Second World War tribunal cases that employed the knowledge standard. *See Doe v. Exxon*, 654 F.3d at 38.

DOE I V. CISCO SYSTEMS, INC.                51

Tribunal, acting under the authority of Control Council Law 10, convicted individuals for aiding and abetting war crimes by knowingly assisting organized units to carry out mass executions. *See, e.g.*, *Einsatzgruppen Case*, 4 T.W.C. at 15, 456, 569 (convicting a defendant under both principal and accessory liability theories). Conversely, *Krauch* acquitted defendants of war crimes arising from the sale of poisonous gas to German security forces because the evidence did not show "knowledge of the criminal purposes to which this substance was being put." 8 T.W.C. at 1168; *see also Flick*, 6 T.W.C. at 1216–17, 1220–21. French military tribunals also applied the knowledge standard, requiring only that a defendant be "aware of the significance of [the defendant's] own role" in international law violations. *See, e.g.*, *The Roechling Case*, Judgment on Appeal, 14 T.W.C. 1097, 1119 (Super. Mil. Gov't Ct. of the French Occupation Zone in Germany 1949) (applying Control Council Law. No. 10).[17]

More recently, international criminal tribunals interpreting and applying customary international law have continued to use and refine the knowledge standard in aiding and abetting liability cases, confirming that knowledge is the standard required by customary international law. The Yugoslavia Tribunal, for example, adopted the knowledge standard in *Tadic*, ¶¶ 661–77, after conducting "a detailed investigation of the parameters of individual responsibility

---

[17] One case suggests that post–World War II military tribunals used the knowledge standard not only in Europe but in the Far East as well. In *The Jaluit Atoll Case*, a U.S. tribunal in the Marshall Islands convicted one defendant, Tasaki, for his participation in the killing of three American prisoners of war "knowing that they were to be killed." 1 T.W.C. 71, 73, 76 (1945).

52          DOE I v. CISCO SYSTEMS, INC.

under customary international law." *Prosecutor v. Delalic*, Case No. IT-96-21-A, Judgement, ¶ 325 (Yugoslavia Tribunal Nov. 16, 1998). The Yugoslavia Tribunal reaffirmed *Tadic*'s analysis in *Delalic. Id.* ¶¶ 325–29. Since *Tadic*, the Yugoslavia Tribunal has tried numerous defendants for their alleged knowing assistance in the commission of international crimes.[18] The Appeals Chamber of the Sierra Leone Tribunal has also adopted the "knowing participation" standard, again "after conducting an extensive review of customary international law." *Nestle I*, 766 F.3d at 1023 (quoting *Taylor*, ¶ 417, 483). These tribunals' adoption of knowledge as the *mens rea* for aiding and abetting liability is of particular importance, as the Restatement of Foreign Relations accords the decisions of international tribunals "substantial weight" in determining the contours of customary international law. Restatement (Third) of Foreign Relations Law § 103(2) (Am. L. Inst. 1987).

Despite the volume and near consensus of international criminal tribunal judgments applying the knowledge *mens rea* standard, the Second and Fourth Circuits have held the purpose standard the more appropriate *mens rea* for aiding and abetting liability claims brought under the ATS. *Talisman*, 582 F.3d at 259; *Aziz*, 658 F.3d at 390. The principal disagreement between those Circuits and the D.C. Circuit in *Doe v. Exxon*, now vacated, which concluded that knowledge is the correct standard, is the weight each accords

---

[18] *See, e.g.*, *Prosecutor v. Stanisic and Simatovic*, Case No. IT-03-69-A, Judgment, ¶ 104 (Yugoslavia Tribunal Dec. 9, 2015); *Popovic*, ¶¶ 1732, 1758; *Sainovic*, ¶ 1772; *Prosecutor v. Blagojevic and Jokic*, Case No. IT-02-60-A, Judgment, ¶ 127 (Yugoslavia Tribunal May 9, 2007); *Prosecutor v. Kvocka*, Case No. IT-98-30/I-T, Judgment, ¶ 251 (Yugoslavia Tribunal Nov. 2, 2001); *Prosecutor v. Aleksovki*, Case No. IT-95-14/1-T, Judgment ¶ 61 (Yugoslavia Tribunal Jun. 25, 1999).

DOE I v. CISCO SYSTEMS, INC.                          53

the Rome Statute. *Compare Talisman*, 582 F.3d at 259, and *Aziz*, 658 F.3d at 396–98, *with Doe v. Exxon*, 654 F.3d at 17–19.

The Rome Statute is the international treaty, adopted in 1998 and signed by 123 countries,[19] that created the first permanent international criminal tribunal, the International Criminal Court. *Aziz*, 658 F.3d at 396. Article 25(3)(c) of the Rome Statute provides for individual criminal responsibility when an individual, "*[f]or the purpose of facilitating* the commission of such a crime, aids, abets, or otherwise assists in its commission or its attempted commission." Rome Statute, art. 25(3)(c) (emphasis added). We agree with the Fourth Circuit that the Rome Statute, as a treaty, could be an authoritative source of international law. *Aziz*, 658 F.3d at 399–400; *see also* Statute of the International Court of Justice, art. 38. Several considerations nonetheless caution against applying the Rome Statute's purpose standard for the aiding and abetting *mens rea* under international law to the ATS.

First, the Rome Statute was not intended to codify customary international law nor to inhibit or otherwise affect its development. The text of the Statute expressly warns against conflating its provisions with customary international law. Article 10 provides that "[n]othing in this Part shall be interpreted as limiting or prejudicing in any way existing or developing rule of international law for purposes other than this Statute." Rome Statute, art. 10; *see also Doe v. Exxon*, 654 F.3d at 35–37. Article 22(3) similarly warns that the standard that article adopts is limited to cases before

---

[19] S*ee* International Criminal Court, *The States Parties to the Rome Statute*, https://asp.icc-cpi.int/states-parties (last visited Nov. 29, 2022).

54      DOE I v. CISCO SYSTEMS, INC.

the International Criminal Court. *Id.*, art. 22(3) ("This article shall not affect the characterization of any conduct as criminal under international law independently of this Statute."). Further accentuating the distinction between the provisions adopted in the Rome Statute and customary international law at the time of its drafting and in general, Article 21 permits the Court to apply customary international law "where appropriate." *Id.*, art. 21(1)(b).

The negotiation history of the Rome Statute underscores the importance of these provisions and the particularity of the Statute's elaboration of the elements of the international crimes within its limited jurisdiction. One scholar present during the negotiations of the Rome Statute has explained that although the statute was originally viewed as an opportunity to codify international law developed from the war tribunals of the 1940s and 50s, during negotiations "it began to seem that there might be a fundamental incompatibility between the political agendas of States and the process of codifying, in a progressive manner, the customary international law of war and crimes against humanity." Leila Nadya Sadat, *Custom, Codification and Some Thoughts about the Relationship Between the Two: Article 10 of the ICC Statute*, 49 DePaul L. Rev. 909, 910–11 (2000). In light of those conflicts and compromises, the goal of codification gave way to a more cautious approach. *Id.* at 910.

The treaty-making process culminating in the Rome Statute ultimately produced "definitions of crimes that," instead of codifying existing customary international law, represented "'lowest common denominator' definitions far more restrictive than those generally believed to be part of customary international law." *Id.* at 916. Professor Sadat explains that Professor M. Cherif Bassiouni proposed

DOE I V. CISCO SYSTEMS, INC.                                    55

language that would become Article 10, cautioning against expansive application of the Rome Statute's standards, to limit the potential negative impact on international law generally of adopting restrictive definitions. *Id.* at 910–11, 916–17.[20] Former Ambassador David Scheffer, who served as the lead negotiator of the Rome Statute for the United States, and his co-author Caroline Kaeb corroborate this understanding of the reason for including Article 10. *See* David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 Berkeley J. Int'l Law 334, 348–57 (2011). They note that the aiding and abetting "purpose" *mens rea* standard articulated in Article 25(3)(c), in particular, reflects a compromise position, striking a balance between the specific intent standard some countries advocated and the knowledge standard theretofore established under customary international law. *Id.* The concern that the Rome Statute not chill the development or interpretation of customary international law, as evidenced in the Rome Statute's text and drafting history, caution against according the Statute's definition of criminal elements countervailing weight when compared to other authoritative sources of law.

---

[20] Other scholars support this account. *See, e.g.*, Beth Van Schaak, *Crimen Sine Lege: Judicial Lawmaking at the Intersection of Law and Morals*, 97 Geo. L.J. 119, 177 n.298 (2008); Keitner, *Conceptualizing Complicity*, at 88; Otto Triffterer, *Article 10*, *in* Commentary on the Rome Statute of the International Criminal Court 317 (Otto Triffterer ed., 1999).

Second, the Rome Statute, because it is the product of a political negotiation that arrived at an aiding and abetting *mens rea* standard different from that used in customary international law before or after the treaty was negotiated, lacks the universality and specificity that *Sosa* requires. *See* 542 U.S. at 725. In *Khulumani*, Judge Katzmann essentially advocated adopting the Rome Statute's least common denominator approach. He reasoned that he had found "no source of international law that recognizes liability for aiding and abetting a violation of international law but would not authorize the imposition of such liability on a party who acts with the purpose of facilitating that violation." 504 F.3d at 277 (Katzmann, J., concurring). The Fourth Circuit agreed, holding that such a least-common-denominator approach "hew[ed] as closely as possible to the *Sosa* limits of 'requir[ing] any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of 18th-century paradigms.'" *Aziz*, 658 F.3d at 400–01 (quoting *Sosa*, 542 U.S. at 725).

We are inclined to disagree. Adopting the Rome Statute's outlier *mens rea* standard appears to contradict *Sosa*'s command to look to customary international law for the articulation of new causes of action and to recognize only norms established with the highest levels of universality and definition. Again, the Rome Statute, as other circuits have acknowledged, *see, e.g.*, *Aziz*, 658 F.3d at 399; *cf. Doe v. Exxon*, 654 F.3d at 39, and as its own text makes clear, *see* Rome Statute, art. 10, is *not* customary international law. Treaties comprise only one source for norms of customary international law. Int'l Court of Justice Statute, art. 38; *Sosa*, 542 U.S. at 733–34. Discerning international law through a broad range of sources may prove challenging, as several

DOE I v. CISCO SYSTEMS, INC.                    57

circuits have highlighted. *See, e.g.*, *Aziz*, 658 F.3d at 400 (quoting *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1015 (7th Cir. 2011)). Nonetheless, a comprehensive, "fulsome and nuanced inquiry" of customary international law, and all its diverse sources, is what *Sosa* requires. *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176 (2d Cir. 2009). A treaty may appear to be a helpful shortcut, but adopting a single provision at odds with nearly every other authority subverts the international law inquiry required by *Sosa*. 542 U.S. at 725, 733–34. The fallacy of relying on a single treaty to discern customary international law is evident with respect to determining the *mens rea* of aiding and abetting liability. That approach has caused some Circuits to adopt an idiosyncratic standard rarely applied before the Rome Statute's ratification and not followed by international tribunals since. *See, e.g.*, *Taylor*, ¶¶ 435–36.

In sum, the Article 25(3)(c) purpose standard in all probability fails the universality requirement of the ATS.

The purpose standard also lacks the very specificity for which the Fourth Circuit turned to the Rome Statute. *Aziz*, 658 F.3d at 400 (describing the "elusive character" of customary international law). Article 25(3)(c) does not define "purpose." Thus, it "remains unclear whether 'purpose' [in the Rome Statute] means sole purpose, primary purpose, . . . simply purpose as inferred from knowledge of likely consequences," or something else. Keitner, *Conceptualizing Complicity*, 60 Hastings L.J. at 88. Compared with the knowledge standard applied by tribunals in cases dating to Nuremberg and numbering at least in the dozens, the Rome Statute's purpose standard is inchoate and indefinite. *See id.* at 88–89 (contrasting the ambiguity of the Rome Statute *mens rea* standard with "the greater weight of

58          DOE I v. CISCO SYSTEMS, INC.

existing international criminal jurisprudence on this question").

Reflecting this lack of definition, courts and commentators have interpreted the Rome Statute's purpose standard in a variety of ways. The Second and Fourth Circuits, for example, have interpreted the "purpose" *mens rea* to require specific intent—that is, to demand that the defendant acted with the purpose of advancing the alleged international law violations. *Talisman*, 582 F.3d at 262–63; *Aziz*, 658 F.3d at 400–01. In contrast, former Ambassador Scheffer and some scholars have interpreted "purpose" in keeping with the Rome Statute's own definition of "intent," which is considerably less stringent. *See* Brief for Former U.S. Ambassador-at-Large for War Crimes Issues David J. Scheffer as Amicus Curiae Supporting Appellants at 11-13, *Doe v. Cisco Systems, Inc.*, No. 15-16909 (9th Cir. June 29, 2023)**;** *e.g.*, James G. Stewart, *An Important New Orthodoxy on Complicity in the ICC Statute?* (Jan. 21, 2015), http://jamesgstewart.com/the-important-new-orthodoxy-on-complicity-in-the-icc-statute/ (last visited Feb. 6, 2023).

The Rome Statute provides that "intent" for a crime is satisfied when a person "means to engage in the conduct" and "[i]n relation to a consequence, that person means to cause that consequence *or is aware that it will occur* in the ordinary course of events." Rome Statute, art. 30(b) (emphasis added). There is little or no light between this version of the "purpose" test and the knowledge standard generally applied under customary international law. And the diversity of interpretations of "purpose" in the Rome Statute illustrates that the treaty's purpose standard lacks the specificity that *Sosa* and *Jesner* require. *Jesner*, 138 S. Ct. at 1399 (plurality op.).

DOE I V. CISCO SYSTEMS, INC.                    59

In sum, we agree with the D.C. Circuit's conclusion in *Doe v. Exxon*, 654 F.3d at 35-38, that the arguments against adopting the Rome Statute's "purpose" test as the definitive *mens rea* standard for aiding and abetting liability under the ATS are persuasive. We accordingly conclude that customary international law imposes aiding and abetting liability for knowing assistance.

### (ii) Application to Corporate Defendant Cisco

The knowledge *mens rea* standard is satisfied when a defendant acts with knowledge that the defendant's actions will assist in the commission of a crime or with awareness of a "substantial likelihood that [the defendant's] acts would assist the commission of a crime." *Sesay*, ¶ 546. "It is not necessary that the aider or abettor know the precise crime that was intended and was in fact committed—if [the accused] is aware that one of a number of crimes will probably be committed, and one of those crimes is committed," the standard is satisfied. *Popovic*, ¶¶ 1732; *see also id.*, ¶ 1751. An accused's statements regarding the purposes and goals of the project for which they are providing assistance can establish awareness that crimes are likely to be committed. *See, e.g.*, *Zyklon B*, 1 T.W.C. at 95. And when ongoing abuses are common knowledge, knowing action may be imputed to the defendant. *See Flick*, 6 T.W.C. at 1217.[21]

Plaintiffs allege Cisco acted with actual and constructive knowledge of the intended uses of the Golden Shield project, particularly its use in the *douzheng* of Falun Gong, which

---

[21] In *Nestle I*, for example, we held that knowledge of the likelihood of international law violations may be imputed from widespread reporting by domestic and international organizations. 766 F.3d at 1017.

60          DOE I v. CISCO SYSTEMS, INC.

involved a substantial likelihood of human rights abuses. The complaint alleges that during the bidding process, Chinese authorities communicated to Cisco and other corporations that they "were primarily concerned with whether the technology could eliminate Falun Gong adherents and activity." Cisco's marketing materials and internal reports reflect this goal, repeatedly mentioning the connection between Cisco's technological assistance and the crackdown on, or *douzheng*" of, Falun Gong adherents. Plaintiffs refer to *douzheng* "the term of art used to describe persecutory campaigns comprising persecution and torture." They allege that Cisco understood the meaning of *douzheng* and used it intentionally: "[i]nvoking the Party's use of douzheng and similar rhetoric has been central to Cisco's intent to curry favor with Communist Party leaders by displaying the ideological orthodoxy needed to maintain insider status in Party dealings." One Cisco PowerPoint presentation noted that the key purpose of the Golden Shield project included *douzheng*, and other Cisco reports referred to "Strike Hard" campaigns against "evil cults." A Cisco software engineer allegedly described *douzheng* as a "major purpose" of the software. And Cisco's website discusses the ability of Cisco's network design features to enhance "social stability," a term Plaintiffs allege Cisco knew was a code word for the elimination of dissident groups, including the "*douzheng* of Falun Gong." A Cisco training session available online in 2012 described Falun Gong practitioners as "viruses" and "pestilence," mirroring Party propaganda.

Plaintiffs also allege that Cisco internal files contain references to the Chinese authorities' *douzheng* goals in building and improving the Golden Shield, including mention of Office 610 (an entity focused specifically on the targeting of Falun Gong practitioners) and of detention

DOE I v. CISCO SYSTEMS, INC. 61

centers, hospitals, psychiatric facilities, and re-education through labor camps. Other Cisco internal reports allegedly "confirm that local security officers stationed outside of big cities used the Golden Shield as the means to identify, capture and forcibly convert Falun Gong adherents between 2001 and 2012."

Additionally, both shareholders and contracted consulting groups allegedly brought to Cisco's attention that human rights abuses were rampant in Chinese authorities' targeting of Falun Gong. Shareholder resolutions offered in 2002, 2003, 2005, 2006, 2007, 2008, and 2010 documented concerns regarding abuses arising from the provision of technology abroad, "including and especially [in] China," and called for internal investigation. One shareholder publicly divested from Cisco in 2011 because of those human rights concerns. Plaintiffs also allege that Cisco "hired consulting agencies to provide regular updates and compilations of news articles, among other sources of information that describe the persecutory goals of the [Golden Shield] apparatus," and that the information the consultants provided "made clear that those goals included torture and other human rights abuses."

In the United States and Europe, both independent news media and government entities reported on the widespread abuses taking place in China against the Falun Gong movement. The U.S. State Department issued reports on the situation, documenting the use of detention and torture as early as 1999 and every year since. For example, the "State Department Country Report on Human Rights Practices for 2011 describes widespread accounts of Falun Gong adherents being committed to mental health facilities and involuntarily subjected to psychiatric treatment (including forcible medication and electric-shock treatment) for

62          DOE I v. CISCO SYSTEMS, INC.

political reasons." Other groups also published concerns with the violations of international law committed during China's crackdown on Falun Gong, including the U.S. Commission on International Religious Freedom (2012 Report), the United Nations Human Rights Council's Special Rapporteur, and the European Parliament. Finally, the *New York Times*, Associated Press, *Wall Street Journal*, and other news outlets widely reported on the torture, including torture resulting in death, and detention of Falun Gong adherents in China.

In sum, the complaint alleges facts demonstrating that Cisco was aware of the Party and Chinese authorities' goal to use Golden Shield technology to target Falun Gong adherents and that it was widely known that the authorities' efforts involved significant and ongoing violations of international law, especially torture and arbitrary detention. We conclude that Plaintiffs' allegations, accepted as true, are sufficient to state a plausible claim that Cisco provided essential technical assistance to the *douzheng* of Falun Gong with awareness that the international law violations of torture, arbitrary detention, disappearance, and extrajudicial killing were substantially likely to take place. *See Sesay*, ¶ 546.[22]

---

[22] We note that we would likely reach the same conclusion were we to apply the purpose *mens rea*; these same allegations, accepted as true, are likely sufficient to state a plausible claim that Cisco acted with the purpose of facilitating the violations of international law. The purpose *mens rea* standard under international law is, as we have discussed, ill defined. We have held that where a defendant "supported" and "benefitted" from the commission of a violation, the purpose *mens rea* standard is satisfied. *Nestle I*, 766 F.3d at 1024–25.

DOE I v. CISCO SYSTEMS, INC.                    63

### 3.  Extraterritoriality

Cisco maintains that Plaintiffs have failed to plead facts sufficient to overcome the presumption against extraterritoriality articulated in *Kiobel*, 569 U.S. at 124–25, and *Nestle II*, 141 S. Ct. at 1936. Specifically, Cisco contends that the complaint fails to connect the illegal acts of Chinese security on Chinese soil to Cisco's corporate conduct in San Jose, California. According to Cisco, Plaintiffs have pleaded only domestic conduct amounting to general corporate activity, which is not actionable under the ATS.

We disagree as to corporate defendant Cisco. Plaintiffs' allegations, taken as true, state a plausible claim that the

---

In *Nestle I*, the "defendants allegedly supported the use of child slavery" to "reduce costs." *Id.* at 1024. Here, Plaintiffs allege that Cisco "acknowledged" in "internal files . . . that the purpose of the Golden Shield was to *douzheng* Falun Gong and described this goal as a lucrative business opportunity for the company." If true, then Cisco supported the *douzheng* and benefitted from specifically tailoring its assistance, including software, training, and messaging, to the illegal goals of the Party and Public Security. Had Cisco not tailored its assistance in this way, it would not have obtained the lucrative contracts.

Alternatively, adopting the intent standard from Article 30 of the Rome Statute, an accused must "mean to engage in the conduct" and do so with "aware[ness] that [a consequence] will occur in the ordinary course of events." Rome Statute, art. 30(2). Cisco indisputably meant to market and develop technology and provide years of technological assistance, maintenance, and training to the Party and Chinese authorities. And, as above, Plaintiffs' allegations, accepted as true, are sufficient to state a plausible claim that Cisco provided that assistance with awareness that violations of international law would occur in the ordinary course of events taking place in China relating to the persecution of Falun Gong.

64 DOE I v. CISCO SYSTEMS, INC.

corporation took substantial actions domestically that aided and abetted violations of international law.

### a. Background

*Kiobel* held that the ATS does not apply extraterritorially. 569 U.S. at 124. When plaintiffs seek to apply a statute that "does not apply extraterritorially, [they] must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Nestle II*, 141 S. Ct. at 1936 (majority op.) (quoting *RJR Nabisco*, 579 U.S. at 337); *see Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010). If so, "the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337).

*Kiobel* and *Nestle II* held that "mere corporate presence," *Kiobel*, 569 U.S. at 125, and "allegations of general corporate activity," including corporate decision-making, are insufficient to show domestic conduct warranting application of the ATS, *Nestle II*, 141 S. Ct. at 1937 (majority op.). In both cases, the plaintiffs also alleged that the defendants took specific actions that aided and abetted violations of international law, but those alleged actions by defendants took place entirely (or nearly entirely) abroad. *Kiobel*, 569 U.S. at 124; *Nestle II*, 141 S. Ct. at 1936–37 (majority op.).

In *Kiobel*, petitioners sued several foreign oil companies under the ATS for aiding and abetting the Nigerian government in committing violations of international law. 569 U.S. at 111–12. The petitioners alleged the companies provided Nigerian forces with food, transportation, and money and allowed the forces to make use of company land in Nigeria. *Id.* at 113. "[A]ll the relevant conduct took place outside the United States," and the only alleged conduct

DOE I v. CISCO SYSTEMS, INC.                65

within the United States was "mere corporate presence." *Id.* at 124–25. The Court concluded that the defendants' actions did not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.*

Likewise, in *Nestle II*, the Court held that "the conduct relevant to the statute's focus" did not occur in the United States. 141 S. Ct. at 1936 (majority op.) (quoting *RJR Nabisco*, 579 U.S. at 337). The parties disputed what conduct was relevant to the focus of the ATS. *Id.* The plaintiffs contended that "the 'focus' of the ATS is conduct that violates international law, that aiding and abetting forced labor is a violation of international law, and that domestic conduct can aid and abet an injury that occurs overseas." *Id.* Assuming but not deciding that the plaintiffs were correct in these respects, the Court held that the complaint impermissibly sought extraterritorial application of the ATS. *Id.* at 1936–37. "Nearly all the conduct" alleged to constitute aiding and abetting child slavery, including "providing training, fertilizer, tools, and cash to overseas farms," "occurred in Ivory Coast," the Court noted. *Id.* at 1937. And the Court reiterated that "allegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of the ATS." *Id.*

The analysis in *Nestle II* treated the specific actions the defendants were alleged to have taken to assist the principal—that is, the *actus reus* of the alleged aiding and abetting—as the "conduct relevant to the statute's focus." 141 S. Ct. at 1936–37 (majority op.). The Second Circuit has applied a similar approach, explaining that the "relevant conduct" in assessing whether plaintiffs seek to apply the ATS extraterritorially is "the conduct constituting the alleged offenses under the law of nations"—in cases such as

this one, "conduct that constitutes aiding and abetting another's violation of the law of nations." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 184–85 (2d Cir. 2014).

For purposes of assessing the "focus" of the ATS to apply the extraterritoriality limitation, conduct that occurs within the United States and violates customary international law is most relevant to the ATS's aim of providing a forum to address violations of international norms that take place in U.S. territory. *See Jesner*, 138 S. Ct. at 1396–97 (majority op.). As discussed, *supra* Discussion, Part I.B.1, aiding and abetting a violation of international law establishes individual or corporate liability for a violation of the law of nations. Under the assumption the Supreme Court applied in *Nestle II*, in accord with the Second Circuit's approach in *Mastafa*, conduct within the United States that constitutes aiding and abetting a violation of international law, "even if other conduct [i.e., the principal's acts] occurred abroad," is a violation of the law of nations that falls within the "focus" of the ATS. *See Nestle II*, 141 S. Ct. at 1936 (majority op.) (quotation omitted).

As we have established, Plaintiffs have plausibly alleged that Cisco took actions that satisfied the *actus reus* and *mens rea* of aiding and abetting liability. *See supra* Discussion, Part I.B.2. We now consider whether those alleged actions took place in the United States.

#### b. Application

##### (i) Corporate Defendant Cisco

As discussed, *supra* Discussion, Part I.B.2.a(ii), Cisco is alleged to have supplied significant software, hardware, and ongoing support to the Party and Chinese authorities, thereby providing assistance with substantial effect on the

DOE I v. CISCO SYSTEMS, INC.                      67

commission of international law violations. Specifically, the complaint alleges that the Golden Shield apparatus was "designed and developed by Defendants in San Jose," and that "[a]ll of the high level designs provided by Cisco to its Chinese customers were developed by engineers with corporate management in San Jose, the sole location where Cisco cutting edge integrated systems and components were researched and developed."

The complaint also alleges corporate decision-making and oversight in San Jose of actions taken in China to build and integrate Golden Shield technology provided by Cisco. But the complaint further notes that "*[i]n addition* [to general decision-making], the Defendants, *from their San Jose headquarters*, handled all aspects of the high-level design phases including those enabling the *douzheng* of Falun Gong." During the request for proposal and design phases, for example, "the Defendants *in San Jose* described sophisticated technical specification linked to the . . . functions of the Golden Shield, including . . . who can access information, how the information is transmitted, transmission speeds, [and] data storage location and capacity."

The complaint additionally alleges "[f]or technologically advanced important overseas projects like the Golden Shield, [Cisco] operating out of San Jose routinely assigns its own engineering resources to design and implement the project in its entirety and in particular through its Advanced Services Team[,] . . . a specialized service offered by San Jose Defendants that employs experts and engineers in network technology for large-scale overseas projects or important clients." For the Golden Shield technology, specifically, the "operation and optimization phases" were "orchestrated" from San Jose, and system practices were

68        DOE I v. CISCO SYSTEMS, INC.

"carefully analyzed and made more efficient as well as increased in scope by Cisco engineers in San Jose." Additionally, the "post-product maintenance, testing and verification, [and] training and support" that "Cisco provided to Public Security" "required intensive and ongoing involvement by Cisco employees in San Jose." Finally, "San Jose manufactured key components of the Golden Shield in the United States, such as Integrated circuit chips that function in the same manner as the Central Processing Unit of a computer."

Additionally, Plaintiffs have plausibly alleged that Cisco's domestic activities satisfied the *mens rea* for aiding and abetting liability. For example, the "anti-Falun Gong objectives communicated to Cisco were . . . outlined in Cisco internal reports and files . . . kept in San Jose." Cisco materials using the term *douzheng* to describe the purpose of the Golden Shield, and referring to "Strike Hard" campaigns against "evil cults," "were identified as emanating from Cisco San Jose." And, as discussed above, U.S. government entities and news media widely reported on the torture and detention of Falun Gong adherents in China.

In sum, Plaintiffs allege that Cisco designed, developed, and optimized important aspects of the Golden Shield surveillance system in California; that Cisco manufactured hardware for the Golden Shield in California; that Cisco employees in California provided ongoing maintenance and support; and that Cisco in California acted with knowledge of the likelihood of the alleged violations of international law and with the purpose of facilitating them.

Contrary to Cisco's arguments, the corporation's domestic actions, as plausibly alleged in the complaint, well exceeded "mere corporate presence" or simple corporate

DOE I V. CISCO SYSTEMS, INC.                    69

oversight and direction. *Kiobel*, 569 U.S. at 125. Rather, the design and optimization of integrated databases and other software, the manufacture of specialized hardware, and ongoing technological support all took place in California. Unlike in *Kiobel* and *Nestle*, in which all or nearly all the actions that constituted assistance to the principal occurred abroad, the domestic activities alleged here constituted essential, direct, and substantial assistance for which aiding and abetting liability can attach. So, with regard to corporate defendant Cisco, Plaintiffs' allegations support application of the ATS.[23]

The Second Circuit's holding in *Balintulo v. Ford* supports our conclusion. The plaintiffs in *Balintulo* alleged that IBM aided and abetted violations of international law through the design and provision of technology to the apartheid regime of South Africa. 796 F.3d at 165. Specifically, the *Balintulo* plaintiffs alleged that IBM in the United States "developed both the hardware and the software—both a machine and a program—to create" a particular identity document in an apartheid regime in which identity documents "were an essential component." *Id.* at 169. The Second Circuit concluded that "designing particular technologies in the United States that would facilitate South African racial separation" would be sufficient to overcome the presumption against

---

[23] We do not address as to extraterritoriality the corporate relationship between Cisco China and Cisco. The Second Circuit has held that the actions of subsidiaries do not overcome the presumption against extraterritoriality in suits against the U.S. parent corporation. *Balintulo v. Ford*, 796 F.3d at 168–69. Here, we conclude Plaintiffs have plausibly alleged that Cisco in San Jose, California, provided substantial assistance to the Party and Chinese authorities. Whether Cisco China's actions may be appropriately imputed to Cisco does not matter to this conclusion.

extraterritoriality if that activity, considered separately, satisfied the *actus reus* and *mens rea* of aiding and abetting liability. *Id.* at 169–70.**[24]** The design and provision of hardware and software in *Balintulo* closely resembles what Plaintiffs here allege to have occurred in San Jose.

We conclude that Plaintiffs' case against Cisco "involves a permissible domestic application [of the ATS] even if other conduct occurred abroad." *Nestle II*, 141 S. Ct. at 1936 (majority op.) (quotation omitted).

### (ii) Defendants Chambers and Cheung

By contrast, Plaintiffs do not sufficiently connect the alleged actions taken by Chambers or Cheung to the United States.

Chambers is alleged to have directly participated in the Cisco Golden Shield project by ratifying key decisions while in San Jose and by meeting with Chinese authorities in China. Chambers's ratification of key decisions is equivalent to general corporate presence and oversight and so does not ground the claim against him in any domestic *actus reus*. *See Nestle II*, 141 S. Ct. at 1937 (majority op.). Chambers's meetings with Chinese authorities took place in China and so cannot support the domestic application of the ATS. As to Cheung, Plaintiffs allege no conduct linking Cheung, who was the Vice President of Cisco China during the pertinent time period, to the territory of the United States.

In short, the complaint does not allege actions taken by Chambers and Cheung that sufficiently touch and concern

---

[24] The Second Circuit ultimately concluded that the allegations of the complaint failed to meet the *mens rea* requirement for aiding and abetting liability. *Balintulo v. Ford*, 796 F.3d at 170.

DOE I V. CISCO SYSTEMS, INC.                    71

the United States to overcome the presumption against extraterritorial application of the ATS.

### 4. State Action

Cisco argues that Plaintiffs' ATS claims require a showing of state action, and that the pleadings do not sufficiently allege conduct demonstrating that Cisco acted under color of state law. Specifically, Cisco contends that Plaintiffs have not adequately pleaded that Cisco's "acts can fairly be characterized as being taken jointly with the" Chinese government.

Cisco is correct that "'certain forms of conduct' violate the law of nations only when undertaken by state actors or those acting under color of law." *Khulumani*, 504 F.3d at 281 (Katzmann, J., concurring) (quoting *Kadic*, 70 F.3d at 239). We note that not all violations of international law require state action. Courts have recognized several that do not, including the prohibitions against piracy, the slave trade, and certain war crimes. *See, e.g.*, *Kadic*, 70 F.3d at 239; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449, 453 n.2 (2012). But we assume for purposes of this analysis that at least some of the substantive international law violations that Plaintiffs have alleged require a showing of state action.

Cisco misunderstands how this state action requirement operates in the context of an aiding and abetting claim. Plaintiffs do not allege that Cisco committed any of the alleged international law violations *directly*. To the contrary, Plaintiffs' allegations of aiding and abetting require "'a predicate offence committed by someone other than [Cisco],' in this case, a state actor or someone acting under color of law." *Khulumani*, 504 F.3d at 281 (Katzmann, J.,

72   DOE I v. CISCO SYSTEMS, INC.

concurring) (quoting *Prosecutor v. Akayesu*, Case No. ICTR–96–4–T, Trial Chamber Judgment, ¶ 529 (Rwanda Tribunal Sept. 2, 1998)).

"International law," like domestic law, "recognizes that criminality is assessed by reference to the actions of the principal, not the aider and abettor." *Id.* at 282 (Katzmann, J., concurring) (citing *Akayesu*, ¶ 528). Plaintiffs need not show that Cisco satisfied the elements of the substantive crime, only that Cisco satisfied the *actus reus* and *mens rea* of aiding and abetting liability. Thus, we agree that Cisco "could be held liable as an aider and abettor of the violation of a norm requiring state action" when Cisco, as a private actor, "could not be held liable as a principal." *Id.* at 281 (Katzmann, J., concurring). We recognize the same rule, that an aider and abettor need not share a requisite status or capacity with the principal, in our domestic law. For example, a defendant who is not "an officer, agent, or employee of" a federally insured financial institution, and therefore could not be charged personally with a substantive offense "which could only be committed by" such "an officer, agent, or employee," may still be found guilty of aiding and abetting such a violation. *United States v. Smith*, 891 F.2d 703, 710 (9th Cir. 1989), *amended*, 906 F.2d 385 (9th Cir. 1990).

Although Plaintiffs need not establish that Cisco itself acted under color of state law, they must show, for at least some of the alleged international law violations, that Cisco aided and abetted the offenses of a state actor. Many of the allegations in the complaint involve the Chinese Communist Party, which is alleged to be "organizationally and operationally distinct from the Chinese State." But Plaintiffs have also plausibly alleged that Cisco provided assistance to Chinese state law enforcement, known as "Public Security,"

DOE I v. CISCO SYSTEMS, INC.                    73

*see supra* n.2, that had substantial effects on that entity's violations of international law.

According to the complaint, Public Security participated extensively in the development and use of the Golden Shield surveillance system to persecute Falun Gong practitioners. Plaintiffs allege that both the Party and "Chinese security" proposed the creation of the Golden Shield network and "in concert" sought the assistance of Western technology companies.[25] "Public Security" issued the request for proposals that led to Cisco's selection as the entity that would submit the "high-level design" as early as August 2001. That system's design was specifically keyed to "interface with the larger Public Security confidential security systems." Regional Chinese authorities announced the need for such a system, and described the system as an "essential" tool for the identification, detention, and forced conversion (torture) of Falun Gong adherents. Plaintiffs further allege that Cisco cultivated relationships both with Party members *and* Public Security officials to determine the aims and needs of the Golden Shield technology and improve design and implementation. Finally, Plaintiffs allege that Cisco trained and provided ongoing technological assistance and "customer services" to "Chinese security officers" generally and to "Public Security officers . . . to enable them to use the customized technologies to suppress Falun Gong."

These allegations plausibly show that the Chinese state participated in the commissioning, design, long-term development, and use of the Golden Shield technology to

---

[25] The complaint defines "Chinese security" to include "[Office] 610 officers, other Party agents *and Public Security* officers."

identify, detain, and torture Falun Gong adherents. The allegations also show that corporate defendant Cisco provided assistance with substantial effect on the Chinese state's alleged violations of international law, with knowledge of the likelihood of the violations and with the purpose of facilitating them. *See supra* Discussion, Part I.B.2. The state action requirement is therefore satisfied.

## II. The Torture Victim Protection Act of 1991

Plaintiff Charles Lee—not the other plaintiffs—alleges that Chambers and Cheung violated the TVPA by aiding and abetting torture. The district court dismissed the claim on the ground that *Bowoto v. Chevron Corporation*, 621 F.3d 1116, 1128 (9th Cir. 2010), forecloses aiding and abetting claims under the TVPA. We disagree that *Bowoto* decided this question. After analyzing the TVPA's statutory language, structure, and background independently of *Bowoto*, we hold that aiding and abetting torture is actionable under the TVPA. We then review the complaint to determine whether the allegations are sufficient to state a claim against Chambers and Cheung for aiding and abetting torture under the TVPA, and we hold that they are.

### A. Aiding and Abetting Liability

Congress enacted the TVPA in 1992 to "establish[] a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). The statute provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual." 28 U.S.C. § 1350 note § 2(a).

DOE I v. CISCO SYSTEMS, INC.                    75

*Bowoto* did not decide whether aiding and abetting liability is available under the TVPA, the district court's understanding to the contrary notwithstanding. The primary question decided in *Bowoto* was whether, because the prohibitions in the TVPA apply to "individual[s]," corporations cannot be liable under the statute. 621 F.3d at 1126–28; *see* 28 U.S.C. § 1350 note § 2(a). *Bowoto* decided that corporations are not "individual[s]" for purposes of the TVPA's liability provision. 621 F.3d at 1126–28.

The *Bowoto* plaintiffs had argued, alternatively, that even if corporations are not generally covered by the TVPA, they can nonetheless be liable when they direct individuals to commit torture. *Bowoto* rejected this possibility, holding that the "TVPA . . . does not contemplate such liability." *Id.* at 1128. Rather, *Bowoto* explained, as the statute "limits liability to '[a]n individual' who subjects another to torture," "[e]ven assuming the TVPA permits some form of vicarious liability, the text limits such liability to individuals, meaning in this statute, natural persons." *Id.* In other words, *Bowoto* foreclosed all corporate liability under the TVPA, including corporate accomplice liability, but did not decide whether individuals can be liable under the statute vicariously or as accomplices. Here, Lee sues only two individuals, Chambers and Cheung, under the TVPA, so *Bowoto*'s preclusion of corporate accomplice liability is not pertinent.

Addressing the question of aiding and abetting liability under the TVPA as a matter of first impression in our Court, we begin with the language of the statute. *See, e.g.*, *United States v. Nishiie*, 996 F.3d 1013, 1020 (9th Cir. 2021). The statute provides liability for an individual who "*subjects* an individual to torture." 28 U.S.C. § 1350 note § 2(a). It does not specify that an individual must directly "torture" another. The statute defines "torture" as the "intentional[]

inflict[ion]" of any act causing "severe pain or suffering." 28 U.S.C. § 1350 note § 3(b). If Congress had intended to restrict TVPA liability to those who themselves intentionally commit acts causing severe pain or suffering, it could have used the term "tortures" or "inflicts torture" in section 2(a), the liability provision.

Instead, the term used was "subjects an individual to torture." The dictionary definition of the verb "subject" includes "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying)." *Subject*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject (last visited Feb. 24, 2023); *see also Subject*, American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=subject (last visited Feb. 24, 2023) (defining the verb "subject" as "[t]o cause to experience, undergo, or be acted upon"). "Subjects . . . to torture" thus encompasses not only individuals who directly torture another but also those who in some respect *cause* another to undergo torture.

"Congress's explicit decision to use one [term] over another in drafting a statute," where the two have different meanings, "is material." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). Here, the more comprehensive term, "subjects . . . to torture," indicates that the statute contemplates liability for actions that helped bring about the torture but did not directly inflict it. The use of the term "subjects . . . to torture," instead of simply "tortures," is thus "imbued with legal significance and should not be presumed to be random or devoid of meaning." *Id.*

Consistent with this understanding of the "subjects to" locution as imposing liability on individuals who help bring about torture but do not themselves inflict it, both the

DOE I v. CISCO SYSTEMS, INC.                    77

Supreme Court and several circuits, including ours, have held that TVPA liability is not limited to those who directly torture others. The Supreme Court has recognized that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." *Mohamad v. Palestinian Authority*, 566 U.S. 449, 458 (2012) (*citing Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009)). Similarly, our circuit and others have determined that the TVPA provides for "command responsibility" liability—that is, the vicarious liability of superior officers for the actions of subordinates if the superior knew of the unlawful actions a subordinate planned to take and did not act to stop them. *See, e.g.*, *Hilao v. Est. of Marcos*, 103 F.3d 767, 777, 779 (9th Cir. 1996); *Chavez*, 559 F.3d at 499; *Cabello*, 402 F.3d at 1157. The Second Circuit has additionally recognized agency theories of liability under the TVPA. *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 746 F.3d 42, 53 (2d Cir. 2014).

"In addition to exploring the text of the statute itself, we examine the relevant statutory context" and "history." *Nishiie*, 996 F.3d at 1024 (quoting *County of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017)). Besides command responsibility and other vicarious theories of liability, the history of the TVPA strongly "indicates that the [statute] was intended to reach . . . those . . . abetting[] or assisting in the violation." *Cabello*, 402 F.3d at 1157–58. We review this background as a supplement to our primary focus on the statutory text because it "can help to elucidate . . . the meaning of statutory terms and phrases," *County of Amador*, 872 F.3d at 1022, here, the broad statutory term "subjects to."

The TVPA secured a cause of action for victims of torture as torture is defined by international law. The Senate

78          Doe I v. Cisco Systems, Inc.

Report on the TVPA explained that after *Filartiga*, "[a]t least one Federal judge . . . questioned whether [the ATS] can be used by victims of torture committed in foreign nations absent an explicit grant of a cause of action by Congress." S. Rep. No. 102-249, at 4–5 (1991). The TVPA "provide[d] such a grant," and "enhance[d] the remedy already available" under the ATS by providing a remedy for U.S. citizens tortured abroad. *Id.* at 5.

Toward that end, the TVPA adopted its definition of torture directly from the Convention Against Torture, confirming that the TVPA "carr[ied] out the intent of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," as the Senate Report stated. *Id.* at 3, 6; *see* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") art. 1(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.[26] As we have discussed, *supra* Discussion, Part I.B.1, aiding and abetting liability is universally recognized under international customary law, including for torture. Moreover, the Convention Against Torture, from which the TVPA adopted its "torture" definition, contemplates accomplice liability. Article 4 of the Convention Against Torture requires that each state party to the convention enact domestic criminal laws prohibiting torture, and that such prohibitions extend "to an act by any person which constitutes complicity or participation in torture." Convention Against Torture, art. 4. The genesis of the TVPA's torture concept in the Convention Against Torture

---

[26] The Senate Report repeatedly invokes cases applying international law, evidencing that international law determines the scope of liability for torture under the TVPA. *Id.* at 9 & nn.17–18.

DOE I v. CISCO SYSTEMS, INC.                    79

thus supports interpreting the term "subjects . . . to" in section 2(a) of the TVPA to cover accomplice liability. Reflecting the statute's background in the Convention Against Torture, the Senate Report on the TVPA explicitly notes that the statute provides a cause of action "against persons who ordered, *abetted*, or assisted in the torture." S. Rep. No. 102-249, at 8 (emphasis added).

In sum, based on the text and Convention Against Torture background of the TVPA, we conclude that the TVPA encompasses claims against those who aid and abet torture or extrajudicial killing.

Chambers and Cheung's principal contention to the contrary—that *Central Bank of Denver* prohibits interpreting the TVPA to allow for aiding and abetting liability—is unpersuasive. *Central Bank of Denver* held that the text of section 10(b) of the Securities Exchange Act of 1934 does not prohibit aiding and abetting fraud. 511 U.S. at 175–77. Noting that "aiding and abetting liability reaches persons who do not engage in the proscribed activities at all," *Central Bank of Denver* concluded the statute's prohibition of "directly or indirectly" engaging in specified activity does not apply to people who aid and abet the activity. *Id.* at 176. The Court in *Central Bank of Denver* also found no indication in the legislative history to suggest Congress meant the section to extend to aiders and abettors. *Id.* at 183. Finally, *Central Bank of Denver* rejected an argument that the Court should adopt a "broad-based notion of congressional intent" presuming the inclusion of aiding and abetting liability in civil statutes. *Id.* at 180–81. The Court "decline[d] to recognize such a comprehensive rule with no expression of congressional direction to do so." *Id.* at 183.

Chambers and Cheung read this last ruling expansively, maintaining that *Central Bank of Denver* established a presumption that Congress has *not* provided for aiding and abetting liability in a civil statute where it has not done so expressly. That is not what *Central Bank of Denver* said. The opinion declined to create a presumption favoring the inclusion of aiding and abetting liability in a civil statute, but it did not adopt the opposite presumption.

Moreover, Chambers and Cheung's reliance on *Central Bank of Denver*'s other rationales for rejecting aiding and abetting liability does not account for key distinctions between the text and background of the Securities Exchange Act of 1934 and the TVPA. Unlike the "directly or indirectly" language of the Securities Exchange Act, the TVPA employs the term "subjects to," and, as we have explained, has been interpreted to permit liability for those who did "not engage in the proscribed activities"—here, torture—"at all." *Cent. Bank of Denver*, 511 U.S. at 175; *see Mohamad*, 566 U.S. at 458. Also, unlike the history of the Exchange Act, which the Court concluded evidenced no intent to proscribe aiding and abetting of fraud, *Central Bank of Denver*, 511 U.S. at 183, the TVPA's background, as we have discussed, confirms that liability under the TVPA extends to those who abetted, participated in, or were complicit in torturing others, even if those individuals did not themselves engage in the torturous acts.

## B. Application

As discussed in the preceding section, international law determines the scope of liability for torture under the TVPA. We therefore apply the same standards for aiding and abetting liability that we applied under the ATS. *See supra* Discussion, Part I.B.2.

DOE I v. CISCO SYSTEMS, INC. 81

### 1. *Actus Reus*

Plaintiffs allege Chambers and Cheung directly participated in the marketing, design, and implementation of Cisco's work on the Golden Shield, and that both were sufficiently high-ranking within Cisco to have the ability to influence Cisco's work in China. To support these allegations, Plaintiffs cite general workflow charts of Cisco that describe Chambers as overseeing and directing all projects. Plaintiffs also recount Chambers's frequent visits to China to oversee Cisco's work on the Golden Shield project, during which Chambers cultivated a personal relationship with Chairman Jiang Zemin and other Party officials.[27] Chambers is alleged to have personally initiated or ratified the Golden Shield project, while Cheung is alleged to have directly overseen all security projects in China. Finally, Chambers and Cheung served on Cisco's China Strategy Board, which, Plaintiffs allege, controls Cisco's China operations.

Accepting the alleged facts in the complaint as true, we conclude that Plaintiffs have plausibly pleaded that Chambers and Cheung's direct participation in the marketing and oversight of Cisco's projects with the Party and Chinese security, and their respective high rank and influence within the corporation, constituted assistance to Chinese authorities with substantial effect on the commission of violations of international law, including torture. *Cf. The Zyklon B Case*, 1 T.W.C. at 102 (discussing the liability of a corporate officer for aiding and abetting war

---

[27] Chambers and Cheung do not dispute that the TVPA applies extraterritorially. *See Doe v. Drummond Co.*, 782 F.3d 576, 601 (11th Cir. 2015); *Chowdhury*, 746 F.3d at 51.

crimes in light of his inability "either to influence . . . or to prevent" the acts constituting the crimes).

### 2. *Mens Rea*

Plaintiffs allege that shareholders presented their concerns about human rights abuses facilitated by Cisco technology directly to Chambers and other members of the Board of Directors. Chambers allegedly attended meetings with Chinese authorities in which *douzheng* was discussed, and Chambers expressed his "support of the Golden Shield's *douzheng* objectives and goals." Plaintiffs further allege that Cheung used the term "social stability" when describing the selling points of Cisco technology. Both Chambers and Cheung allegedly received reports and PowerPoint presentations from sales engineers containing references to *douzheng*, making clear that repression of Falun Gong was the purpose of Golden Shield technology.

Given the internal communications from shareholders and widespread external reporting about the human rights abuses ongoing in Chinese authorities' targeting of Falun Gong adherents, *see supra* Discussion, Part I.B.2.b(ii), as well as the direct statements by Chambers and Cheung alleged in the complaint, Plaintiffs have adequately pleaded that Chambers and Cheung provided their assistance with awareness that international law violations, including torture, were substantially likely. These allegations, taken as true, also state a plausible claim that Chambers and Cheung "supported" and "benefitted" from the use of the Golden Shield to suppress Falun Gong, and so acted with the purpose of facilitating the violations. *Nestle I*, 766 F.3d at 1024–25.

We conclude that the District Court erred in dismissing the TVPA claim on the ground that the statute does not

DOE I v. CISCO SYSTEMS, INC.                    83

contemplate accomplice liability for individuals, and that Plaintiff Lee has plausibly alleged that Chambers and Cheung aided and abetted torture under the TVPA. We reverse the dismissal and remand Plaintiff Lee's claim for further proceedings.

**CONCLUSION**

To summarize:

With respect to the ATS, we first reaffirm that aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS. Because recognizing aiding and abetting liability does not raise separation-of-powers or foreign policy concerns under *Sosa* step two, such liability is cognizable under the ATS.

Second, Plaintiffs have plausibly alleged that corporate defendant Cisco took actions constituting the *actus reus* and satisfied the *mens rea* for aiding and abetting liability.

Third, Plaintiffs' allegations state a plausible claim that corporate defendant Cisco took actions domestically that aided and abetted violations of international law. Plaintiffs' allegations against Chambers and Cheung, however, impermissibly seek extraterritorial application of the ATS, and so we affirm the dismissal of the ATS claims against those two individuals.

Fourth, Plaintiffs have plausibly alleged that corporate defendant Cisco aided and abetted the international law violations of the Chinese state, satisfying the state action requirement.

We remand the ATS claims for further proceedings consistent with this opinion, including consideration of

whether the underlying alleged violations of international law meet *Sosa*'s two-step test.

We reverse the district court's dismissal of Plaintiff Lee's TVPA claim against Chambers and Cheung. We hold that the TVPA encompasses claims against those who aid and abet torture, and that the complaint adequately alleges that Chambers and Cheung did so. We remand the TVPA claim for further proceedings.

For these reasons, we affirm the dismissal of Plaintiffs' ATS claims against Chambers and Cheung; reverse the district court's dismissal of the Plaintiffs' ATS claims against corporate defendant Cisco and of Plaintiff Lee's TVPA claims against Chambers and Cheung; and remand for further proceedings. Costs on appeal are awarded to Plaintiffs. Fed. R. App. P. 39(a)(4).

**AFFIRMED in part; REVERSED in part; and REMANDED.**

CHRISTEN, Circuit Judge, concurring in part and dissenting in part.

I join Part II of the majority's opinion because I agree with my colleagues that Plaintiffs' complaint states a claim under the Torture Victim Protection Act. *See* Slip Op. at 74–83. The majority's careful and cogent analysis of aiding and abetting liability under the Alien Tort Statute in Part I is consistent with the views of our sister circuits, and in an appropriate case, I would likely join it. I do not do so here because I conclude that recognizing liability for aiding and abetting alleged human rights violations, committed in China and against Chinese nationals by the Chinese Communist Party and the Chinese government's Ministry of

DOE I v. CISCO SYSTEMS, INC.                    85

Public Security, is inconsistent with the purpose of the Alien Tort Statute.**1**  I would affirm the dismissal of Plaintiffs' Alien Tort Statute claims on this basis, and go no further.

The First Congress enacted the Alien Tort Statute (ATS) in 1789 "to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713, 720 (2004).  "[T]here is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 123 (2013).  The ATS's primary objective was "to promote harmony in international relations" and "avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397, 1406 (2018).  Three torts were actionable under the ATS in 1789: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 1397 (quoting *Sosa*, 542 U.S. at 715).

When Congress enacted the Torture Victim Protection Act (TVPA) in 1991, it explicitly created a new cause of action against individuals who commit torture or extrajudicial killing in violation of international law under actual or apparent authority, or color of law, of any foreign nation.  *See* 28 U.S.C. § 1350 note (Torture Victim Protection); *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937–38 (2021) (opinion of Thomas, J.) (explaining that the TVPA

---

1 Like my colleagues, I understand the term "Public Security" in the complaint to refer to the Chinese government's Ministry of Public Security.  *See* Slip Op. at 10 n.2.

86      Doe I v. Cisco Systems, Inc.

represents the first and only independent cause of action for violations of international law that Congress has established since the ATS was enacted). It is unclear why the complaint in this case alleges a TVPA claim only on behalf of Plaintiff Charles Lee, a United States citizen, and "class members similarly situated," but not on behalf of the Chinese national plaintiffs.[2]

The ATS's goals are an awkward fit for Plaintiffs' claims. Plaintiffs allege that Cisco, operating primarily from California, violated the ATS by designing, implementing, and helping to maintain a surveillance and internal security network in collaboration with the Chinese Communist Party and Ministry of Public Security. Plaintiffs allege this network enabled the Party and the Ministry to identify members of Falun Gong, a disfavored religious group in China, and to systematically subject Falun Gong adherents and their families to torture and other crimes against humanity. Defendants contend that Chinese law designates Falun Gong as an "illegal organization" and criminalizes Plaintiffs' activities. But at this stage, we accept the Plaintiffs' allegations as true and draw all reasonable

---

[2] We have implicitly held that the TVPA applies to suits by foreign nationals as well as those brought by United States citizens. *See Hilao v. Est. of Marcos*, 103 F.3d 767, 771 (9th Cir. 1996) (allowing a TVPA claim by Philippine citizens); *see also Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 51 n.8 (2d Cir. 2014) ("[W]e note that our affirmance of plaintiff's TVPA claim here necessarily recognizes that aliens—not just American citizens—may bring suit under the TVPA . . . ."); *Arce v. Garcia*, 434 F.3d 1254, 1256–58 (11th Cir. 2006) (allowing a TVPA claim by Salvadoran citizens); H.R. Rep. No. 102–367(I), at 4 (1991) ("While the [ATS] provides a remedy to aliens only, the TVPA would extend a civil remedy *also* to U.S. citizens who may have been tortured abroad." (emphasis added)); S. Rep. No. 102–249, at 5 (1991) (same).

DOE I V. CISCO SYSTEMS, INC.                              87

inferences in their favor. *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019).

Plaintiffs allege that the Party and the Ministry are "organizationally and operationally distinct," but Plaintiffs' allegations also suggest that the Communist Party's ideological control permeates the Chinese government's Public Security apparatus such that the two are effectively inseparable, at least where Plaintiffs' allegations of torture and extrajudicial killing are concerned. Most saliently for purposes of the question presented to our court, to prove that Cisco aided and abetted the human rights violations alleged in Plaintiffs' complaint, Plaintiffs will have to prove that the Chinese Communist Party and the Ministry of Public Security committed human rights violations against Chinese nationals.

In my view, Plaintiffs have not met the second step of the Supreme Court's test for recognizing a claim under the ATS. *Sosa*'s second step requires Plaintiffs to show that we should exercise our judicial discretion before recognizing aiding and abetting as a viable cause of action for purposes of this jurisdictional statute. *Sosa*, 542 U.S. at 726, 736 n.27. Because Plaintiffs fail to clear the high bar at *Sosa*'s second step, I would affirm the district court's dismissal of Plaintiffs' ATS claims on that basis and not reach the other issues the majority discusses in Part I.

In *Sosa*, the Court specified that the prudential concerns we should consider in exercising our discretion include "the practical consequences of making th[e] cause available to litigants in the federal courts" as well as foreign policy considerations. *Id.* at 732–33, 733 n.21. The Supreme Court reiterated *Sosa*'s two-step framework in *Jesner*, where it held that foreign corporations cannot be held liable under the

ATS. 138 S. Ct. at 1405. *Jesner* explained that "judicial caution under *Sosa* 'guards against our courts triggering . . . serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches.'" *Id.* at 1407 (quoting *Kiobel*, 569 U.S. at 124). The Supreme Court's most recent decision on point was divided, but a majority of the Court agreed that the second step of the *Sosa* inquiry—whether prudential concerns militate against recognizing aiding and abetting liability under the ATS— demands that we exercise judicial discretion to avoid creating foreign policy controversies. *Nestlé*, 141 S. Ct. at 1938 (opinion of Thomas, J.); *id.* at 1945 (Sotomayor, J., concurring in part and concurring in the judgment)).

I see several sound reasons to decline to recognize a cause of action for aiding and abetting the acts alleged in Plaintiffs' complaint, and I am deeply concerned about the practical consequences of allowing Plaintiffs' claims to go forward without input from the political branches. The Supreme Court has explained that "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner*, 138 S. Ct. at 1403. Under the Constitution, "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803) (including the Secretary of State's discretionary foreign affairs functions as beyond the power of the Judiciary to review). We are ill-equipped to serve as instruments of foreign policy, an arena in which it is particularly important for the United States to

DOE I v. CISCO SYSTEMS, INC.                    89

speak "with one voice." *United States v. Pink*, 315 U.S. 203, 242 (1942) (Frankfurter, J., concurring).

Federal courts were not designed to play a leading role in our nation's international affairs. Holding Cisco liable in this case would not *directly* impose liability on the Chinese government for its conduct with respect to its own nationals, but a finding of liability in this case would necessarily require a showing that the Chinese Communist Party and Ministry of Public Security violated international law with respect to the Chinese-national Plaintiffs. Such a finding could have serious ramifications for Sino-American relations, fraught as they already are. *See* Robert Knowles, *A Realist Defense of the Alien Tort Statute*, 88 Wash. U.L. Rev. 1117, 1151–52 (2011) ("China has the most important and perhaps the most volatile bilateral relationship with the United States. . . . [and] ATS litigation is arguably more likely to impose substantial foreign policy costs in this context than in any other."); Daniel Abebe, *Not Just Doctrine: The True Motivation for Federal Incorporation and International Human Rights Litigation*, 29 Mich. J. Int'l L. 1, 38 (2007) ("The need for confidence in national self[-]image and China's international status creates a particular sensitivity to intentional or perceived insults by the United States."). The concerns the Court expressed in *Jesner* about holding a foreign corporation liable apply tenfold to a case that hinges on whether a foreign government's treatment of its own nationals violated international law. I see no way to reconcile the majority's decision to allow Plaintiffs' claims to proceed with the ATS's aim "to promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." *Jesner*, 138

S. Ct. at 1406.  Plaintiffs' claims and the ATS are at cross-purposes: the availability of the remedy Plaintiffs seek is far more likely to provoke a foreign nation than the absence of such a remedy.

To be sure, *Sosa* contemplated that courts could appropriately recognize a new cause of action under the ATS on rare occasions.  *See Sosa*, 542 U.S. at 729 ("[T]he judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today.").  This is not one of those rare occasions.

Even considering a hypothetical ATS case in which the sovereign's interest is less squarely in the crosshairs than the one Plaintiffs present, we would surely be better prepared if the views of the political branches were before us.  For instance, when it considered the South African Apartheid litigation, the Second Circuit noted that the district court had *sua sponte* solicited the State Department's views. *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 259 (2d Cir. 2007), *aff'd for lack of quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (mem.). Similarly, the D.C. Circuit in *Doe v. Exxon Mobil Corp.* observed that the district court had requested the State Department's input about "whether adjudication of the plaintiffs' claims would interfere with U.S. foreign policy interests."  473 F.3d 345, 347 (D.C. Cir. 2007).  In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, after the district court initially declined Talisman's suggestion to solicit the State Department's views, the U.S. Attorney submitted a three-page statement that included as attachments a letter from the Department of State and a diplomatic note from the Embassy of Canada.  No. 01-CV-9882-DLC-HBP, 2005 WL 2082846, at *1 (S.D.N.Y. Aug.

DOE I v. CISCO SYSTEMS, INC.                    91

30, 2005), *aff'd*, 582 F.3d 244 (2d Cir. 2009). In *Sarei v. Rio Tinto PLC.*, Judge Paez cited a cavalcade of cases in which federal courts "solicited the opinion of the Department of State as to whether adjudication of an action would negatively impact the nation's foreign policy." 221 F. Supp. 2d 1116, 1179–80 (C.D. Cal. 2002), *aff'd in part, rev'd in part on other grounds*, 671 F.3d 736 (9th Cir. 2011) (en banc). Citing many of these cases, my colleagues correctly note that "every circuit to have considered the issue" has recognized aiding and abetting liability under the ATS. Slip Op. at 24, 27. But as a closer look at those cases demonstrates, many of those courts had the benefit of State Department statements of interest that courts solicited or the parties requested.

Plaintiffs allege that Cisco aided and abetted human rights violations by creating a vast program that swept in thousands of China's own nationals and subjected them to arbitrary arrest, prolonged detention, forced labor, torture, extrajudicial killing, and other crimes against humanity. Considering the views of our coordinate branches is particularly important in a case like this one because our relationship with China is both delicate and complex, and the Constitution delegates foreign relations primarily "to the political departments of the government, Executive and Legislative," not to the judiciary. *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Here, the district court did not ask for the Executive's position because it dismissed Plaintiffs' ATS suit on other grounds.

Our court had an opportunity to solicit the State Department's position. My view is that we should have done so, especially before ruling that policy considerations do not bar this action because "no foreign government or Executive Branch agency has submitted an amicus brief, declaration,

92          DOE I v. CISCO SYSTEMS, INC.

or letter objecting to this lawsuit." Slip Op. at 32. The majority analogizes this case to *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), arguing that *Qi* demonstrates that both China and the State Department have opted to express their views on a case involving similar allegations. Slip Op. at 33. My colleagues seem to infer that, because neither government has weighed in here, neither will object to this action. For two reasons, *Qi* does not support that inference. First, though *Qi* involved claims against the former mayor of Beijing and the then-serving Deputy Provincial Governor of Liaoning Province—both high-level Chinese government officials—the State Department submitted a statement of interest in *Qi* only after the district court solicited the Department's views. 349 F. Supp. 2d at 1264, 1267–68, 1270. Second, *Qi* was decided almost two decades ago. I see no basis for concluding that because the State Department indicated no objection to allowing the *Qi* action to proceed in 2004, the Department would not object to this action today. It is no secret that the current status of our nation's relationship with China is both volatile and tense.

The majority also notes that the State Department and the Jordanian government proactively offered their views in *Jesner*. Slip Op. at 33 (citing 138 S. Ct. at 1406–07). Fair enough. But *Jesner* was a Supreme Court case. Considering the salience of the Court's decision to grant certiorari and the limited number of cases on its docket, one might expect that any interested entity would weigh in. It is less realistic to expect the Department and foreign governments to monitor all 94 federal district courts for any ATS litigation raising foreign policy concerns. Even in cases implicating the Foreign Sovereign Immunities Act (FSIA), where sensitive foreign affairs issues are comparatively easier to identify because the cases usually involve defendants who are

officers or employees of a foreign sovereign, the State Department proactively intervenes only selectively. The Department's well-documented practice is to affirmatively file suggestions of foreign sovereign immunity only when it becomes aware of lawsuits against sitting heads of state and foreign ministers; otherwise, it generally has not filed suggestions of immunity for other foreign government officials unless a court solicits the Department's views. *See* John B. Bellinger III, *The Dog That Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 823 (2011); *Republic of Austria v. Altmann*, 541 U.S. 677, 701 & n.21 (2004); *see also Sosa*, 542 U.S. at 733 n.21 (drawing an analogy between the ATS and the FSIA). There is no evidence that the Department maintains a practice of affirmatively filing statements of interest in ATS cases. Thus, I am not persuaded that we should draw conclusions from the absence of comments by the State Department or others.

The foreign policy consequences that will result from this suit could be very significant. I do not downplay the seriousness of the Plaintiffs' allegations or the gravity of the harms their complaint describes, but proving that Cisco aided and abetted the terrible human rights violations alleged in the complaint requires proving that the Chinese Communist Party and the Chinese Ministry of Public Security committed those violations in the first place. As such, allowing this case to move forward is inconsistent with our obligation to exercise "great caution in adapting the law of nations to private rights." *Sosa*, 542 U.S. at 728. Because I would not reach the merits, I respectfully dissent from the majority's decision to allow plaintiffs' ATS claims to proceed.